# EXHIBIT B

May 3, 2017 Deposition of Anna Simmons as Experian's 30(b)(6) witness

Redacted

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

JOHN E. ASHCRAFT      ) Case No. 2:16-cv-02978-JAD-NJK
                     )
                     )
VS.                )
                     )
WELK RESORT GROUP,    )
CORP., and EXPERIAN   )
INFORMATION SOLUTIONS,)
INC.              )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF

ANNA SIMMONS

MAY 3, 2017

Volume No. 1

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


ORAL DEPOSITION of ANNA SIMMONS, produced
as a witness at the instance of the Plaintiff, and
duly sworn, was taken in the above-styled and numbered
cause on the 3rd of May, 2017, from 10:14 a.m. to
5:18 p.m., before Sherry Folchert, CSR, in and for the
State of Texas, reported by machine shorthand, at the
offices of Jones Day, 2727 North Harwood, Dallas, Texas
75201.

Anna Simmons
May 3, 2017

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3    Miles N. Clark (telephonically)
      KNEPPER & CLARK
 4    10040 West Cheyenne Avenue, Suite 170-109
      Las Vegas, Nevada  89129
 5
      FOR THE DEFENDANT:
 6
      Jennifer L. Braster
 7    MAUPIN NAYLOR BRASTER
      1050 Indigo Drive, Suite 200
 8    Las Vegas, Nevada  89145

 9
      ALSO PRESENT:
10
      Lucille Chiusano (telephonically)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Anna Simmons
May 3, 2017

1                          INDEX

2                                                 Page

3   Appearances . . . . . . . . . . . . . . . . .      2

4   Stipulations. . . . . . . . . . . . . . . . .      5

5   ANNA SIMMONS
        Examination by Mr. Clark . . . . . . . . .      6
6
    Signature and Changes . . . . . . . . . . . .    256
7
    Reporter's Certificate. . . . . . . . . . . .    258
8

9   Exhibit Name    Description                      Page

10  Exhibit 1   First Amended Deposition Notice       17
                And Amended Objections and Amended
11              Objections to First
                Amended Notice of Deposition
12
    Exhibit 2   Mail Correspondence                   42
13
    Exhibit 3   Transaction Log                       72
14
15  Exhibit 4   Policies and Procedures for           92
                ACDV
16
    Exhibit 5   Policies and Procedures for           94
17              Handling Trade Disputes
18
    Exhibit 6   Policies and Procedures for           95
19              Handling Additional Information
20  Exhibit 7   Policies and Procedures for           97
                Identification and Statements
21
    Exhibit 8   Policies and Procedures for           98
22              Handling Public Records
23  Exhibit 9   e-OSCAR                               98
24  Exhibit 10  e-OSCAR codes                        114
25  Exhibit 11  Glossary                             115

Anna Simmons
May 3, 2017

1    Exhibit 12   Document to Assist in Reading a        117
                  Credit Profile Report

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anna Simmons
May 3, 2017

AGREEMENTS

1

2      It is hereby agreed by and between the parties

3   hereto, through their attorneys appearing herein, that

4   any and all objections to any question or answer herein,

5   except as to the form of the question and responsiveness

6   of the answer, may be made upon the offering of this

7   deposition in evidence upon the trial of this cause with

8   the same force and effect as though the witness were

9   present in person and testifying from the witness stand.

10     It is further agreed by and between the parties

11  hereto, through their attorneys appearing herein, that

12  this deposition may be signed before any notary public

13  in and for the State of Texas, but if the original

14  deposition has not been signed by the witness and

15  returned by the time of the trial or any hearing in the

16  case, the unsigned original or a copy thereof may be

17  returned into Court and used with the same force and

18  effect as though all requirements of the rules and

19  statutes with reference to signature and return had been

20  fully complied with.

21

22

23

24

25

Anna Simmons
May 3, 2017

```
 1              P R O C E E D I N G S
 2                  ANNA SIMMONS,
 3   having been first duly sworn, testified as follows:
 4                    EXAMINATION
 5   BY MR. CLARK:
 6        Q.   Good morning.   Could you please identify
 7   yourself for the record, ma'am?
 8        A.   Anna Simmons.
 9        Q.   Okay.   Could you spell your name, please?
10        A.   A-N-N-A, S-I-M-M-O-N-S.
11        Q.   And, Ms. Simmons, do you mind if -- you and
12   I -- you and I have talked in -- in the past; have we
13   not?
14        A.   Yes.
15        Q.   Okay.   And in those -- those prior depositions,
16   Ms. Simmons, I referred to you as Anna.   Is that still
17   okay?
18        A.   Yes.
19        Q.   All right.   And you can -- as before, you can
20   call me Miles.   So just more specifically, my name is,
21   again, Miles Clark.   I represent the Plaintiff John
22   Ashcraft in this case.   And so we're here to take your
23   deposition today.
24                    Mrs. -- sorry.   Anna, have you been deposed
25   before?
```

Anna Simmons
May 3, 2017

1      A.   Yes.

2      Q.   And approximately how many times?

3      A.   I think nine times.

4      Q.   Okay.  And is -- are all of those depositions

5  ones in which you testified on behalf of Experian?

6      A.   Yes.

7      Q.   Okay.  And --

8           MS. BRASTER:  Miles --

9      Q.  (BY MR. CLARK) -- are all of those --

10          MS. BRASTER:  -- this is Jen.  If I can

11  interject real quick.  I'm going to see if I can just

12  turn up the conference call phone real quick.  Can you

13  just give me one second?

14          MR. CLARK:  Sure.

15          MS. BRASTER:  Thanks.

16          (Pause in proceedings)

17          MR. CLARK:  All right.  And just -- just --

18  just for the record.  So I'm the only one appearing

19  telephonically, everybody else is in Dallas; is that

20  correct?

21          MS. BRASTER:  Yes.  And for the record,

22  this is Jennifer Braster the attorney for Experian.

23          MR. CLARK:  Good.

24      Q.  (BY MR. CLARK) Okay.  So, Anna, and of

25  those -- of those nine depositions, what -- what was the

Anna Simmons
May 3, 2017

```
 1   first time you were deposed?
 2         A.   I don't remember.  It was several years ago.
 3         Q.   Okay.  It was several -- so it was several
 4   years ago was the first time you were deposed on behalf
 5   of Experian?
 6         A.   That's correct.
 7         Q.   Okay.  Do you -- do you recall being deposed on
 8   February 24th in a case called Lynn Travers?  Twelfth --
 9   February 24th of this year?
10         A.   Yes, I -- I don't remember the date, but I
11   remember being deposed for Lynn Travers.
12         Q.   And -- and, Anna, during the course of the --
13   this deposition, I'll make several representations to
14   you.  And when I make a representation to you that you
15   can -- you can rely on that.  You can rely on the fact
16   as true.  And if I'm wrong, that's going to be on me.
17   Is that okay?
18         A.   Yes.
19         Q.   Okay.  So do you recall -- so I'll represent to
20   you that -- that your deposition was taken -- or
21   Experian's deposition was take on -- in a case called
22   Lynn Travers and that was 16-CV-18 --
23                   THE REPORTER:  Sir, I need you --
24                   MR. CLARK:   -- District Court --
25                   THE REPORTER:  It is it a bad -- sir --
```

Anna Simmons
May 3, 2017

```
 1                    MR. CLARK:  -- 27 --
 2                    THE REPORTER:  I can't understand you.  I
 3      need you to either -- slow down a little bit.  The
 4      connection is not great.
 5                    MR. CLARK:  All right.  Well, this is --
 6      I've -- I've appeared telephonically on a number of
 7      cases and we've done so through Jones Day's conference
 8      line --
 9                    THE REPORTER:  Okay.
10                    MR. CLARK:  -- the connection has never
11      been a problem before.  I don't know why it would be a
12      problem today.  But if -- just let me know --
13                    THE REPORTER:  Okay.
14                    MR. CLARK:  All right.  Should I repeat my
15      last question?
16                    THE REPORTER:  Please.
17          Q.  (BY MR. CLARK)  All right.  And I'll just
18      rephrase it.
19                    Anna, I'll represent to you that I deposed
20      you appearing on behalf of Experian on February 24,
21      2017, in a case called Lynn Travers, which is Case No.
22      16-CD-1848; is that okay?
23          A.  Yes.
24          Q.  Okay.  And do you recall being deposed in a
25      case called Serena Goodman on March 3, 2017, sitting on
```

Anna Simmons
May 3, 2017

1    behalf of Experian?

2         A.  Yes.

3         Q.  Okay.  And do you recall sitting in as

4    Experian's 30(b)(6) witness on March 9th, 2017, in a

5    case called Michael Hannan, 16-CD-1814?

6         A.  Yes.

7         Q.  Okay.  Okay.  And in -- in those three cases --

8    and I'll refer to them as Travers, Goodman and Hannan,

9    you gave testimony as Experian's 30(b)(6) witness; is

10   that correct?

11        A.  Yes.

12        Q.  And -- okay.  And so the -- so those are three

13   of the nine times that you say you've been deposed.

14   Were you deposed -- and so you said the first time you'd

15   been deposed was several years ago, correct?

16        A.  Yes.

17        Q.  Okay.  Any other of the remaining six

18   depositions -- did any of the other depositions take

19   place a few -- a few months ago or a few years ago or --

20   or over what time period did those other five

21   depositions take place?

22             MS. BRASTER:  Objection; compound.

23             THE WITNESS:  Within the last ten months,

24   maybe, the other five depositions took place.  Other

25   than one that was several years back.

Anna Simmons
May 3, 2017

1      Q.  (BY MR. CLARK)  And so -- so it's fair to say
2  you were deposed once and then there was a gap of
3  several years and then you've been deposed eight times
4  in the last ten months?
5      A.  Roughly, yes.
6      Q.  Okay.  And -- and the reason I ask, Anna, is
7  just to -- to gauge your familiarity with taking a
8  deposition.  The -- so before the Lynn Travers
9  deposition on February 24th, 2017, how many of your --
10  how many times had you been deposed back at that time
11  that you sat for that deposition?
12      A.  I don't remember.
13      Q.  Okay.  Would it -- have you been deposed --
14  other than the three depositions that I've pointed out a
15  moment ago, have you ever been deposed at any point in
16  time after February 14, 2017?
17            MS. BRASTER:  Objection to vague.
18            THE WITNESS:  Yes.
19      Q.  (BY MR. CLARK)  Okay.  And how many times have
20  you been deposed since February 24th of 2017?
21      A.  Maybe two.  But I don't remember.  I didn't
22  look at my deposition dates before today's depo.
23      Q.  Okay.  So maybe -- maybe -- maybe two, maybe --
24  maybe one or two more; is that fair to say?
25            MS. BRASTER:  Objection to the extent it

Anna Simmons
May 3, 2017

```
 1   misstates her testimony.
 2              THE WITNESS:  I think so.
 3        Q.  (BY MR. CLARK)  Okay.  All right.  So you --
 4   you have some familiarity with your deposition.  Would
 5   you like me to go over the general admonitions for
 6   taking a deposition?
 7        A.  No thank you.
 8        Q.  Okay.  I will have to ask you a few things,
 9   Anna, which you're are probably -- probably aware of.
10   Number one, because this is a -- I'm appearing
11   telephonically, I'll just ask you to wait -- and I'm
12   sure that we -- both of us will -- will get this wrong
13   at certain points during the course of the deposition.
14   But since we're doing this deposition telephonically, if
15   you could please wait to answer my question until the
16   full question is presented, I'll try to -- I'll try not
17   talk over you and I'd appreciate if you didn't talk over
18   me.  It may be difficult for us to anticipate where the
19   other is pausing, given that we can't see each other,
20   but I'll -- I'll do my best if -- if you do too; is that
21   all right?
22        A.  Yes.
23        Q.  Okay.  And because this is a deposition
24   we're -- we -- we're interested in answers that are like
25   yes or no and not like uh-huh and huh-uh.  That means
```

Anna Simmons
May 3, 2017

1   that the -- that also means that if an answer calls for,

2   you know, a -- a -- a nod of the head or a shake of the

3   head, we would like you to respond with an affirmative

4   yes or no.  Is that okay?

5       A.  Yes.

6       Q.  Okay.  And if -- if I ask a question that you

7   don't know what is -- what I'm asking, I ask plenty of

8   bad questions.  Don't -- you can always ask me if you --

9   you need clarification on what I'm -- the question I've

10  asked.  Is that all right?

11      A.  Yes.

12      Q.  And again, if you need a break at any time,

13  just ask and I'll just ask that you answer the question

14  that I have pending before we take a break.  Is that all

15  right?

16      A.  Yes.

17      Q.  And you're aware that you have to tell the

18  truth today, correct?

19      A.  Yes.

20      Q.  And you must answer my questions without any

21  coaching from your counsel?

22      A.  Correct.

23      Q.  And you're here to testify as Experian's

24  30(b)(6) witness today, correct?

25      A.  Yes.

Anna Simmons
May 3, 2017

1      Q.   And you understand that your answers today bind
2   the company?
3      A.   Yes.
4      Q.   And have you had any drugs or alcohol in the
5   last 24 hours that would impair your ability to answer
6   my questions truthfully and accurately?
7      A.   No.
8      Q.   Is there any other reason you can't testify
9   truthfully and accurately today?
10      A.   No.
11      Q.   Do you have any questions for me at all before
12   we begin?
13      A.   No.
14      Q.   So, Anna, I -- I mentioned before that I would
15   make certain representations to you and -- during the
16   course of the deposition and I'll make several
17   representations to you here just for purposes of getting
18   us both on the right -- on the right track.  And so --
19   so just listen carefully and then -- and then we'll --
20   we'll get started.
21              So the first thing I'll represent to you is
22   that Mr. Ashcraft, John Ashcraft, who is the plaintiff
23   in this case, filed a Chapter 7 Bankruptcy Petition in
24   the US Bankruptcy Court for the District in Nevada on
25   April 29, 2011.

Anna Simmons
May 3, 2017

1              Is that okay?

2        A.   Yes.

3        Q.   The second thing I'll represent to you is that

4   Mr. Ashcraft's bankruptcy was discharged in August 2011.

5   Is that all right?

6        A.   Yes.

7        Q.   And I'll finally, for now, I'll represent to

8   you that the -- that Mr. Ashcraft filed his complaint

9   with the U.S. District Court for the District of Nevada

10  on December 22, 2016.  Is that all right?

11       A.   Yes.

12       Q.   And I may -- may make some other

13  representations while we go along.

14            So now let me -- let me ask you basically,

15  do you know why you're here today?

16       A.   Yes.

17       Q.   And why are you here?

18       A.   To sit as a 30(b)(6) for Experian.

19       Q.   And what did you do to prepare for your

20  deposition?

21       A.   I sat with my attorney.

22       Q.   Okay.  And -- and when did you talk to your

23  attorney?

24       A.   Yesterday.

25       Q.   And about for how long?

Anna Simmons
May 3, 2017

```
 1        A.   About four hours.

 2        Q.   And was anyone else besides you and your

 3   attorney present for the conversation?

 4        A.   It was me and two of my attorneys.

 5        Q.   Okay.  And who were the attorneys that were

 6   present?

 7        A.   Jennifer Braster and Andrew Cummings a.

 8        Q.   And who is Andrew Cummings?

 9        A.   He is an attorney for Experian.

10        Q.   Okay.  And so it's fair to say he helped you

11   prepare for today's deposition, along with Jennifer

12   Braster?

13        A.   Yes.

14        Q.   But he's not on the call with us today,

15   correct?

16        A.   Correct.

17        Q.   Okay.  Let's see.  Okay.

18             MR. CLARK:  So let's see.  At this point,

19   Madam Court Reporter, you have a list of -- a binder

20   with exhibit tabs in it; is that correct?

21             THE REPORTER:  Yes, we do.

22             MR. CLARK:  Okay.  And, Jen, let's see.  I

23   had -- I had one copy printed, but I'm going to be able

24   to refer you to Bates numbers for -- for each of the

25   exhibits that I -- that I intend to enter.  The only
```

Anna Simmons
May 3, 2017

```
 1   exception is going to be the one that I enter now, which
 2   is going to be the First Amended Deposition Notice and
 3   Amended Objections.  Okay?
 4                   MS. BRASTER:  Okay.
 5                   MR. CLARK:  All right.  So, Madam Court
 6   Reporter, if you could please enter Tab 1A and Tab 1B
 7   as -- together as Exhibit 1, please.
 8                   (Exhibit 1 was marked)
 9                   MR. CLARK:  Thank you.
10       Q.  (BY MR. CLARK)  Okay.  So, Anna, please take a
11   moment to look over what I've had the court reporter
12   mark as Exhibit 1 and let me know when you're ready to
13   proceed.
14       A.  Okay.  I'm ready.
15       Q.  All right.  So do you recognize the documents
16   that I've had marked as Exhibit 1?
17       A.  Yes.
18       Q.  Okay.  Have you seen them before?
19       A.  Yes.
20       Q.  And what are they?
21       A.  Amended Notice of Deposition.
22       Q.  Okay.  Is there another document attached as
23   Exhibit 1, aside from the Amended Notice of Deposition?
24       A.  (Looked at document.)  Yes.
25       Q.  Okay.  And what is the title of that document?
```

Anna Simmons
May 3, 2017

```
 1        A.   Amended Objections to the First Amended Notice
 2   of Deposition.
 3        Q.   Okay.  I just wanted to make sure -- and -- and
 4   you've seen the amended objections as well, right?
 5        A.   Yes.
 6        Q.   Okay.  So did you -- did you review this notice
 7   and these amended objections in preparation for your
 8   deposition today?
 9        A.   Yes.
10        Q.   Okay.  So what I would like you to do is
11   looking at the Amended Notice of Deposition, there is a
12   list of deposition topics listed on -- from page six
13   through -- through ten of the amended notice.  And I
14   would like -- I would like you to look through those --
15   those pages and then just -- as you're -- as you're
16   reading through topics, let me know if there are any
17   topics for which you're not able to testify to today.
18   Is that all right?
19        A.   Yes.
20             MS. BRASTER:  I'm just going to object to
21   the extent that we had a meet and confer on this and we
22   stand by our amended objections.  But the witness can
23   still answer.
24             MR. CLARK:  Understood.  That's why I
25   introduced amended objections as well.
```

Anna Simmons
May 3, 2017

```
 1              MS. BRASTER:  Yeah.  No.  Understood.
 2              THE WITNESS:  Topic O and S.
 3       Q.  (BY MR. CLARK)  And topic O and S, are those
 4    subtopics of a particularly numbered topic?
 5       A.   Number four.
 6       Q.   Okay.  Topic number four, O and S.  Anything
 7    else?
 8       A.   (Looked at document.)  Topic 12 about adverse
 9    action, risk factor and denial codes.  Topic 14 --
10       Q.   Okay.
11       A.   -- for quotas and productivity targets.
12    Topic 16.
13       Q.   Okay.  Other than -- sorry -- topic 16, sorry.
14       A.   Yes, topic 16.
15       Q.   Okay.
16       A.   (Looked at document.)  The rest I can talk
17    about some with just a high overview.
18       Q.   When you say the rest I can talk about some
19    with just a high overview, when you say "the rest," what
20    do you mean?
21       A.   The rest of the topics that you've had me
22    review.
23       Q.   So you are not able to testify as to specifics
24    on any of those topics?  When you say high -- I want to
25    understand what high overview means in your mind.
```

Anna Simmons
May 3, 2017

1      A.  It is a general term I use.  Maybe some topics

2   I would just have a high overview instead -- and other

3   topics I would be able to give you more specific --

4   specifics and details once you ask me about them.

5      Q.  Okay.  So we don't know right now the extent to

6   which you're able to provide testimony until I ask the

7   question.  Is that fair to say?

8              MS. BRASTER:  Objection to the extent it

9   misstates her testimony.

10             THE WITNESS:  It's fair to say I would be

11   able to answer a question -- a specific question from

12   you best, instead of just trying to answer generally

13   right now without getting a specific topic to talk

14   about.

15      Q.  (BY MR. CLARK)  I understand.  Let me -- let me

16   just make sure that there are no -- there are no

17   surprises later in the deposition.

18             What topics of -- other than the ones you

19   just listed that you will not be able to testify to,

20   which of the remaining topics are ones for which you

21   believe you can give only, as you -- as you say, a high

22   overview of any questions posed within that topic?

23      A.  I'm not able to answer it.  It's a very general

24   question.  I would need you to ask me about a specific

25   topic for me to know -- you know, it has to be a more

Anna Simmons
May 3, 2017

```
 1   specific question about a topic.
 2        Q.  Okay.  Well then, I -- I'm afraid -- we did
 3   hold a meet and confer, I'll represent to you, on -- on
 4   your deposition and I will tell you that we -- this
 5   is -- this is not a -- an answer that has been given, I
 6   think in response to other times you've been deposed.
 7   What I'm going to have to do is I'm going to have to go
 8   topic by topic and ask you specifically for each topic
 9   whether this is one for which you would -- you believe
10   you can a high overview, as you have characterized it.
11   Or one in which you -- you have -- you have more
12   specific knowledge.
13             So I'm sorry I have to do this.  But based
14   on your answer, I don't think I have a choice.
15             So let's start with topic one.  Is topic
16   one -- and -- and so if I refer to a -- a high overview,
17   I don't know what you mean by that.  So I have to use
18   your term.  Let me know if you don't understand the use
19   of your term.  And I will try to ask another question.
20             But my first question is with the topic
21   one.  Is topic one a -- a -- topic for which you can
22   only provide, as you have stated, a high overview?
23        A.  No.
24        Q.  What about topic two?
25        A.  No.
```

Anna Simmons
May 3, 2017

```
 1        Q.   What about topic three?
 2        A.   No.
 3        Q.   What about topic 4A to 4N and 4P through 4R?
 4        A.   No.
 5        Q.   What about topic five?
 6        A.   No.
 7        Q.   What about topic six?
 8        A.   No.
 9        Q.   What about topic seven?
10        A.   No.
11        Q.   What about topic eight?
12        A.   No.
13        Q.   What about topic nine?
14        A.   No.
15        Q.   What about topic ten?
16        A.   No.
17        Q.   What about topic 11?
18        A.   No.
19        Q.   What about topic 13?
20        A.   No.
21        Q.   What about topic 15?
22        A.   No.
23        Q.   What about topic 17?
24        A.   No.
25        Q.   What about topic 18?
```

Anna Simmons
May 3, 2017

```
 1        A.   Yes.

 2        Q.   What about topic 19?

 3        A.   No.

 4        Q.   All right.  So of the topics for which you have

 5   indicated that you can only give a high overview only

 6   topic 18 is one for which you believe you can only

 7   provide a high overview?

 8        A.   Yes.

 9        Q.   All right.  Did you understand what -- what I

10   meant when -- when I used the term "high overview"?

11        A.   Yes.

12        Q.   Do you have any questions about the language

13   or -- I'm sorry.

14             Do you have any --

15             Strike that.

16             Do you have any questions about -- about

17   any of the deposition topics, either as -- as they have

18   been phrased or how -- what they're asking for or do you

19   have any other questions about the topics themselves

20   that I can clarify in advance of asking you questions

21   today?

22             MS. BRASTER:   Objection; compound and

23   vague.

24             THE WITNESS:   I don't have any questions at

25   the moment.
```

Anna Simmons
May 3, 2017

1      Q.  (BY MR. CLARK)  Okay.  Is there any reason why

2  you feel you don't understand what any of the particular

3  topics for which you can provide testimony today is --

4  is asking?

5                MS. BRASTER:  Objection to vague and

6  standing by our amended objections.

7                THE WITNESS:  No.

8      Q.  (BY MR. CLARK)  Turning to topic 16.  You said

9  you are not able to provide testimony today is that --

10  did I hear you correctly?

11     A.  Yes.

12     Q.  Why?

13     A.  I do not know what online data exchange is.

14     Q.  You've never heard the term "online data

15  exchange"?

16                MS. BRASTER:  Objection; outside the scope.

17                THE WITNESS:  I've heard of it in other

18  depositions.

19     Q.  (BY MR. CLARK)  Other than in online -- other

20  depositions, you've never heard of the term "online data

21  exchange"?

22                MS. BRASTER:  Same objection.  Asked and

23  answered.

24                THE WITNESS:  That is correct.

25     Q.  (BY MR. CLARK)  Okay.  So the -- the term

Anna Simmons
May 3, 2017

```
 1    "online data exchange" has never come up in your -- the
 2    course of your work at Experian?
 3                    MS. BRASTER:  Objection; outside scope.
 4                    THE WITNESS:  That is correct.
 5                    MR. CLARK:  Okay.  I'm going to leave the
 6    deposition open on topic 12, 14, 16 and topic one -- O
 7    and S -- sorry.  Topic four, subtopics O and S.  As well
 8    as for topic 18, which is the -- which is a -- for which
 9    any question I ask call for something other than a high
10    overview.
11                    Anna, that's not a -- that doesn't --
12    that's not meant accusatory in any way.  We don't want
13    you to testify in any way that -- that forces you to
14    guess or forces you to -- to, you know, speculate as to
15    the answer.  But it is my right to hold the deposition
16    open on a series of topics if you were not able to
17    testify.  I am doing so now.  And we'll -- we'll see how
18    that goes.
19                    MS. BRASTER:  And we're just -- I will
20    object to leaving it open on those topics.  But that's
21    certainly a conversation for another day.  I'm not going
22    to go through the objection with everybody on the phone.
23    So we can move forward.
24                    MR. CLARK:  Of course.  Okay.
25         Q.  (BY MR. CLARK)  Anna, thank you very much for
```

Anna Simmons
May 3, 2017

```
 1    that.  You can -- you can place Exhibit 1 aside.  And
 2    we'll just do some background questions.
 3              I apologize.  You've probably heard these
 4    before, but I -- this is another deposition and we have
 5    not reached an agreement which would permit me to not
 6    ask them.
 7              So I'll have to ask some of them again.
 8    I'm sure these -- the answers will be familiar to you.
 9              So, Anna, if you could please tell me a
10    little bit about your educational background?
11         A.  I have a bachelor's degree.
12         Q.  Okay.  And when did you start working for
13    Experian?
14         A.  May of 2004.
15         Q.  What was your first job at Experian?
16         A.  I was a customer service agent.  I believe
17    that's what the title was, but I'm not exactly sure.
18         Q.  Okay.  And about how long did you have that
19    job?
20         A.  For about seven months.
21         Q.  What time period did you have that job?
22         A.  May of 2004 until July -- I'm sorry.  Until
23    December of 2004.
24         Q.  And did -- what -- is customer service agent a
25    job that still exists as Experian?
```

Anna Simmons
May 3, 2017

1      A.  Yes.

2      Q.  Could you just tell me in general what your job

3  duties were as a customer service agent?

4      A.  Yes.  In general, they were to assist consumers

5  with disputes they might have regarding information on

6  their credit report.

7      Q.  Okay.  And after December of 2004 -- let me ask

8  you this.  Have -- since May of 2004 have you worked for

9  Experian continuously?

10     A.  Yes.

11     Q.  Okay.  And so after December 2004 did you take

12  another job with Experian?

13     A.  Yes.

14     Q.  What was the name of that job?

15     A.  Senior regulatory affairs associate.

16     Q.  And about how long did you have that job?

17     A.  Until June of 2016.

18     Q.  Okay.  And so could you tell me just in general

19  is -- what that job entailed?

20     A.  I still assisted consumers with disputes they

21  might have regarding information on their credit files.

22  But we received the disputes through other venues, such

23  as an attorney that would be representing a consumer.

24  Could be a regulatory agency.  Media venue, attorney

25  general's office, a BBB office, a Congressional office.

Anna Simmons
May 3, 2017

1      Q.   Okay.  So -- and -- and -- and when did you --
2   sorry.  When did you leave that job again?
3      A.   June of 2016.
4      Q.   And you testified before that you had been
5   deposed nine times, correct?
6      A.   I -- I stated roughly nine times.  I -- I
7   didn't memorize --
8      Q.   Okay.
9      A.   -- before I came today.
10     Q.   I understand.  And -- and I'm not -- the -- I'm
11  not -- I'm not asking that figure.  I thought I heard
12  you say definitively, but if you said roughly that's --
13  that's fine.  I don't want to put words into your mouth.
14              And -- but the first deposition, if I
15  recall correctly, was -- was about three years ago?
16              MS. BRASTER:  Objection to the extent it
17  misstates her testimony.
18              THE WITNESS:  I didn't state three years.
19  It was several years ago and I don't remember when it
20  was.
21     Q.   (BY MR. CLARK)  Okay.  But if it was several
22  years ago, I -- the question I'm trying to get to is --
23  were you deposed for the first time while you were in
24  the job you just described for Experian, the senior
25  regulatory affairs associate?

Anna Simmons
May 3, 2017

```
1        A.  I was a senior regulatory affairs associate
2   when I was first deposed.
3        Q.  Okay.  And were you deposed as Experian's
4   30(b)(6) witness at that time?
5        A.  No.
6        Q.  Okay.  Were you deposed as a representative of
7   Experian at that time?
8                MS. BRASTER:  Objection to vague.
9                THE WITNESS:  I'm sorry, I don't know
10  the -- the legal explanation for representative of
11  Experian.  So I don't want to answer wrong.
12       Q.  (BY MR. CLARK)  Okay.  I understand.  Did you
13  testify as Experian's 30(b)(6) witness in that -- in the
14  deposition several years ago?
15               MS. BRASTER:  Objection; asked and
16  answered.
17               THE WITNESS:  No.
18       Q.  (BY MR. CLARK)  Okay.  And that was the
19  only -- did you -- at that deposition did you testify as
20  to your position as a senior regulatory affairs
21  associate?
22       A.  I was a senior regulatory affairs associate
23  when I had that depo.
24       Q.  Okay.  And -- and do you recall the name of the
25  case for which you testified?
```

Anna Simmons
May 3, 2017

```
 1        A.   I do not.
 2        Q.   Okay.  Other than the three depositions that I
 3   mentioned at the beginning of this -- of our
 4   conversation -- and those were, for the record, the
 5   Travers, Hannan and Goodman deposition, do you recall
 6   the names of any of the cases for which you have been
 7   deposed in the past?
 8        A.   One name of the plaintiff was Patty Jo Sharp.
 9        Q.   Patty Jo Sharp.  And -- and here -- here's a
10   real memory test.  Do you recall how to spell Sharp?
11        A.   Yes.  S --
12        Q.   Okay.  And how do you spell that?
13        A.   S-H-A-R-P.
14        Q.   And do you -- and how long ago did you testify
15   as a Experian 30(b)(6) witness for the -- I'll just
16   refer to it as the Sharp case.  Is that okay?
17        A.   That is okay.  And I -- I don't remember.
18        Q.   Okay.  Was it -- was it -- it was sometime in
19   the last ten months.  Is that fair to say?
20        A.   Yes.
21        Q.   Okay.  And do you recall what district that --
22   what judicial district, if any, that case was -- was --
23   was in at the time you testified?
24        A.   No.
25        Q.   Okay.  Let's see.  Do you recall -- do you
```

Anna Simmons
May 3, 2017

```
 1   recall any other names of -- of plaintiffs for
 2   depositions where you have sat as Experian's 30(b)(6)
 3   witness?
 4        A.  I recall my last one being -- the last name was
 5   King and it was two plaintiffs.  One was Taiwana and
 6   other one I think was Shakina.  But I do not remember
 7   how to spell either of their first names.
 8        Q.  That's -- that's -- that's -- that's totally
 9   fine.  And -- but you said it was King, K-I-N-G?
10        A.  Yes.
11        Q.  Okay.  And -- and -- and if you were to
12   estimate, about when did you take that deposition?
13        A.  I believe it was last month.
14        Q.  Okay.  And let me ask you this -- and I'll just
15   refer to that as -- as the King case, if you don't mind?
16   Is that all right?
17        A.  Yes.
18        Q.  For the -- for the Sharp case, do you remember
19   the -- the name of the attorney who -- who deposed you?
20        A.  No.
21        Q.  Okay.  You don't remember their first name or
22   their last name?
23        A.  No.
24        Q.  Okay.  What about for the Sharp case -- or did
25   I just ask -- I think I just asked you about the Sharp
```

Anna Simmons
May 3, 2017

1  case.  So what about for the King case?

2      A.  I do not remember.

3      Q.  Okay.  Fair enough.  All right.  So let's see.

4  In -- so in -- in the summer of 2006 (sic) you took

5  another position at Experian; did you not?

6          MS. BRASTER:  I'm sorry, Miles.  Can you

7  repeat that?  Did you say the summer of 2006?

8          MR. CLARK:  2016.

9          MS. BRASTER:  Thank you.

10          THE WITNESS:  Yes.

11      Q.  (BY MR. CLARK)  And what was the name of that

12  job you took?

13      A.  Senior legal and compliance specialist.

14      Q.  Okay.  And what does a -- a senior legal and

15  compliance specialist do at Experian in general?

16      A.  In general, I assist with federal litigation

17  that has been filed against Experian.

18      Q.  And when you say assist with federal litigation

19  filed against Experian, what do you mean?

20      A.  I work with Experian's attorneys regarding

21  federal cases filed against Experian.

22      Q.  Okay.  And when you say work with attorneys,

23  what do you mean?

24      A.  I research and answer their questions.

25      Q.  And when you say research and answer their

Anna Simmons
May 3, 2017

```
 1    questions, what do you research?

 2                 MS. BRASTER:  I object to the extent it

 3    calls for work product or attorney/client

 4    communications.  And to the extent your answer would

 5    call for that type of information, I would instruct you

 6    not to answer.

 7                 MR. CLARK:  That's fine.  And, Anna, I --

 8    I -- I agree.  I don't want you to provide me with the

 9    substance of any information which is privileged.  I'm

10    asking as -- as -- as you might say a high overview.

11    I'm not asking for any specific information related to

12    any particular case.  I'm just trying to get an idea

13    of -- in general of what you do in your -- in your

14    current job.

15                 THE WITNESS:  And what was the last

16    question?

17                 MR. CLARK:  Madam Court Reporter, could you

18    read back my last question, please?

19                 THE REPORTER:  (Read back.)

20                 MS. BRASTER:  Same objections.

21                 THE WITNESS:  Whatever they ask me to

22    research regarding a consumer that might have filed

23    federal litigation against Experian.

24        Q.  (BY MR. CLARK)  Okay.  And when you say -- when

25    you say whatever, are there things that are commonly --
```

Anna Simmons
May 3, 2017

1     that you are commonly asked to research on a regular
2     basis?
3                 MS. BRASTER:   At this point if it's asking
4     questions regarding exactly what she researches for
5     attorneys, I will instruct Ms. Simmons not to answer on
6     the grounds of work product.
7                 MR. CLARK:   And -- and -- and to be clear,
8     I am asking in general what she does in her job.   I'm
9     not asking for information in any particular case.   I
10    think that if she's unable to answer those questions,
11    it's hard to get an understanding about what
12    Ms. Simmons' job actually entails.
13                MS. BRASTER:   If it's a higher --
14                MR. CLARK:   But we can --
15                MS. BRASTER:   I'm sorry.   Go ahead.   I
16    thought you were finished.
17                MR. CLARK:   Sorry.   No, no.   You go.
18                MS. BRASTER:   I was going to say then if
19    the high overview, then I'm just going to object as to
20    asked and answered.
21       Q.   (BY MR. CLARK)   So Ms. Simmons, are you
22    refusing to answer my question about what you do in your
23    current job?
24                MS. BRASTER:   Same objection.   Asked and
25    answered.

Anna Simmons
May 3, 2017

```
 1                THE WITNESS:  No, I did not refuse to
 2    answer your question.
 3        Q.  (BY MR. CLARK)  Okay.  So will you answer my
 4    question then?
 5        A.  I'm sorry, can you repeat the last question?
 6                MR. CLARK:  Certainly.
 7                Madam Court Reporter, could you read back
 8    the last question, please, before the objection?
 9                THE REPORTER:  (Read back.)
10                MS. BRASTER:  Object to the extent it calls
11    for privileged communications and asked and answered.
12                THE WITNESS:  Yes.
13        Q.  (BY MR. CLARK)  Okay.  And what are those
14    things?
15                MS. BRASTER:  I'm going to object again to
16    the extent it calls for privileged information.  If it's
17    a general answer, you may answer.  But any specifics, I
18    would instruct you not to answer.
19                (Phone beeped)
20                MS. BRASTER:  Did somebody else just call
21    in?  There was a blip on the phone?
22                MR. CLARK:  Yeah.  I heard that too.
23                Did -- did somebody else call in?  If you
24    could, please identify yourself.
25                MS. CHIUSANO:  Miles, it's me Lucille.
```

Anna Simmons
May 3, 2017

1              MR. CLARK:  Okay.  So for the record
2    everyone, the -- the person on the call is Lucille
3    Chiusano, who is my assistant at my law firm.  She'll be
4    observing the deposition today.
5              And, Lu, when you get on and off the
6    conference, if I could just have you identify yourself.
7    They're not giving us the -- the prompt to say who we
8    are.  So we want to make sure that -- because it's
9    telephonic, we want to make sure that everybody knows
10   who is on the call at any given time.
11             Is that all right?
12             MS. CHIUSANO:  That will be fine.
13             MR. CLARK:  Okay.  Thank you very much.
14   All right.  Sorry about that, Folks.
15             But, Anna, would like -- would you like to
16   hear the last question again?
17             THE WITNESS:  Yes, please.
18             MR. CLARK:  Okay.  You're welcome.
19             Madam Court Reporter, could you read back
20   my last question, please?
21             THE REPORTER:  (Read back.)
22             MS. BRASTER:  Same objections.
23             THE WITNESS:  Can you please ask me the
24   question again?  I heard your question, Madam Court
25   Reporter, but I think I might need a more detailed

Anna Simmons
May 3, 2017

1    question again, please.
2         Q.  (BY MR. CLARK)  Well, let me -- let me ask you
3    this, Anna.  Do you recall giving background information
4    or testifying as to the background information of your
5    current job in the Lynn Travers deposition?
6         A.  I don't recall what I stated about my job in
7    that deposition, I'm sorry.
8         Q.  That's okay.  And that -- that -- that
9    testimony isn't before you.  I'm just recalling.  Do you
10   recall in general giving answers to questions about your
11   background information at that deposition?
12        A.  I do recall answering background questions at
13   that deposition.
14        Q.  Okay.  And do you recall answering background
15   questions at the Goodman deposition?
16        A.  Yes.
17        Q.  And do you recall answering background
18   questions at the Hannan deposition?
19        A.  Yes.
20        Q.  And so those -- those answers you gave, those
21   answers were -- to those depositions were true and
22   correct to the best of your knowledge?
23             MS. BRASTER:  Objection.  Outside the
24   scope.  Improper.
25             THE WITNESS:  Yes.

Anna Simmons
May 3, 2017

1    Q.  (BY MR. CLARK)  Okay.  All right.  We can move

2 on.

3              Okay.  So other than answering questions

4 from your attorney, are there any other -- sorry.  From

5 the Experian attorneys to be -- to be sure, to the

6 degree that I said something slightly different than how

7 you describe your role, I apologize.  But other than

8 answering questions from -- from attorneys, is there any

9 other task that you generally engage in at your current

10 job?

11   A.  That is my main function is to work with the

12 attorneys in regard to federal litigation filed against

13 Experian.

14   Q.  Okay.  Do you -- as part of your job, do you

15 also -- do you also sit for depositions like this one?

16   A.  Yes.

17   Q.  Okay.  And after June of 2016, is that -- was

18 it only after that time that you began sitting for

19 depositions like this one at Experian's 30(b)(6)

20 representative?

21   A.  Yes.

22   Q.  Okay.  And you said the first time you sat

23 through a deposition was about ten months ago?  You

24 can't remember the date, I understand, but it was about

25 ten months ago?

Anna Simmons
May 3, 2017

```
 1              MS. BRASTER:  Objection to the extent it
 2   misstates her testimony.
 3              THE WITNESS:  Are you asking me as a
 4   30(b)(6)?
 5              MR. CLARK:  Correct.
 6              THE WITNESS:  I -- I -- roughly ten months
 7   ago, I would imagine so, yes.
 8       Q.  (BY MR. CLARK)  Okay.  All right.  So let's
 9   see -- and let me ask you this before I transition into
10   the -- in the main entrée of the deposition.  No. 1,
11   Anna, if you want to take a break right now, we're about
12   to transition into a different area.  So I'm happy to
13   give you one.
14              So I'll ask you that question first.
15   Would you like a break before we start on another line
16   of conversation?
17       A.   No.  I'm okay to keep going if everybody else
18   is.
19       Q.  Fantastic.
20              MS. BRASTER:  Why don't we take a break in
21   a half hour or so and then I can check on lunch and find
22   timing for that and all that good stuff.
23              MR. CLARK:  That sounds like a good idea.
24   So great.  So, yeah, Anna, again, if you need a break at
25   any point in time, this is not an endurance test, just
```

Anna Simmons
May 3, 2017

1   let me know.
2        Q.  (BY MR. CLARK)  So with that, let me ask you:
3   Did you review any documents in preparation for your
4   deposition today, in addition to speaking with your
5   attorneys?
6        A.  Yes.
7        Q.  And do you recall -- I know we talked about the
8   Deposition Notice and the First Amended Deposition
9   Notice and the Amended Objections.  But were there any
10  other besides those two documents?  Were there any other
11  documents that you reviewed?
12       A.  Yes.
13       Q.  Okay.  And although you may not recall all of
14  them, do you recall maybe some of the documents that you
15  looked at?
16       A.  Yes.
17       Q.  And what are those -- what are the documents
18  that you recall looking at in preparation for your
19  deposition today?
20       A.  Disclosure log, D/R Log, transaction log, mail
21  correspondence.  Disclosure.  CDF.  Admin report.  ACDV.
22  Interrogatories.
23       Q.  Anything else that you can recall?
24       A.  I cannot recall anything else right now.
25       Q.  Okay.  Just before we get -- Anna, do you have

Anna Simmons
May 3, 2017

```
 1  any notes or anything else in front of you within --
 2  within eyeshot that you're -- that you're looking at
 3  while you answer these questions?
 4       A.   In front of me I have a piece of paper where I
 5  wrote down the bankruptcy dates you gave me and
 6  complaint filing date you gave me.
 7       Q.   Okay.  So you didn't bring any notes or
 8  anything into the deposition with you today?
 9       A.   I did not.
10       Q.   And you're not able to look at your
11  attorney's -- any notes that your attorney may -- may
12  have in front of them.  And I don't want to know what
13  those are.  I was just wondering if you can see them,
14  if they exist, because I'm not there.
15       A.   I'm not looking at anybody's notes, no.
16       Q.   Okay.  And -- and so I would ask that you not
17  do that during the deposition unless -- unless
18  instructed to do so by -- if the question calls for
19  it or because we have something logistical that comes up
20  that requires you to look at your attorney's laptop
21  screen, if she's got one there.  Is that all right?
22       A.   Yes.
23            MS. BRASTER:  Miles, I'll represent to that
24  I have my laptop turned so she can't see it and I also
25  have my notes on the other side so she can't see them.
```

Anna Simmons
May 3, 2017

1    Nor would I have her look at my notes or my laptop

2    screen.

3              MS. BRASTER:  I understand that.  And --

4    and -- and I would not expect that.  But just because

5    I'm not there, I just want to, out of an abundance of

6    caution, make sure that that's the -- that's the -- the

7    circumstances on the ground.  If I had been present, I

8    probably would not have asked that question at all.

9         Q.  (BY MR. CLARK)  Okay.  So --

10             MR. CLARK:  Madam Court Reporter, if you

11   could please introduce --

12             And, of course, Anna, the exception to the

13   paperwork in front of you will be any exhibits that I --

14   that I have -- that I have introduced for you to look

15   at.  Obviously, I -- I want you to look at those, so...

16             Just so we're clear.

17             Madam Court Reporter, if you could

18   introduce Tab 2 as Exhibit 2, please?

19             THE REPORTER:  Okay.

20             (Exhibit No. 2 was marked)

21             MR. CLARK:  And, Jen, for reference, this

22   is Experian 1 through 93.

23             MS. BRASTER:  Experian 1 to 93.  Got it.

24   Thank you.

25             MR. CLARK:  Correct.  Sure.

Anna Simmons
May 3, 2017

```
 1        Q.  (BY MR. CLARK)  And, Anna, do you have
 2    Exhibit 2 in front of you?
 3        A.  Yes.
 4        Q.  Could you please take a moment and look through
 5    exhibit -- Exhibit 2 and just let me know when you've
 6    had a chance to review that?
 7        A.  Yes, I will do that now.  (Looked at document.)
 8        Q.  Thank you.
 9        A.  I'm finished.
10        Q.  So let me first ask a general, did you review
11    all of the material contained in Exhibit 2 in
12    preparation for your deposition today?
13        A.  Yes.
14        Q.  Okay.  So let's see -- I'll now direct you to
15    specific pages of Exhibit 2 and we'll just go through
16    them in general.  But if you could direct your attention
17    first to pages 1 to 46, please?  When I say 1 to 46, I'm
18    going to be referring to -- there's a number on the
19    lower left -- right-hand corner of the page that says
20    EXP-ASHCRAFT and then has a number -- a row of numbers.
21    If it's okay with you, just to make things easier as we
22    go back and forth between pages, I'll just refer to
23    the -- the number.  So, for example, number one, number
24    35, number 28, when I'm referring to pages in -- in
25    exhibits.  Is that -- is that okay with you or would you
```

Anna Simmons
May 3, 2017

1    like me to say the entire number?

2         A.   It is okay with me.

3         Q.   Okay.  And if you have any questions about --

4    if -- if what I say is not clear about where I'm

5    directing your attention, please let me know and I'll be

6    happy to clarify.  So I will direct you first to pages 1

7    through 46.  And I'll ask you -- well, what -- what

8    in -- in your mind these pages are?

9         A.   This is the mail correspondence Experian

10   received for Mr. John Ashcraft.

11        Q.   And when you say mail correspondence, what do

12   you mean?

13        A.   I mean mail that Experian received regarding

14   Mr. Ashcraft.  And when looking through it, there is a

15   dispute regarding information on his credit file.

16        Q.   Okay.  And when you say there is a dispute

17   regarding information on his credit file, are you

18   looking at particular pages within one to 46 to make

19   that conclusion?

20        A.   (Looked at document.)  Yes.

21        Q.   And what pages are you looking at?

22        A.   It appears the dispute starts on page one.

23        Q.   Okay.  And how many pages does the dispute

24   comprise of?

25                  MS. BRASTER:   Objection to the extent it

Anna Simmons
May 3, 2017

```
 1   calls for a legal conclusion.
 2             THE WITNESS:  The verbiage ends on page
 3   three.  However, there's, you know, additional
 4   attachments.
 5       Q.  (BY MR. CLARK)  So it's a three-page letter
 6   with -- with a few attachments; is that -- is that your
 7   reading of this?
 8             MS. BRASTER:  Objection to vague.
 9             THE WITNESS:  It's a three page -- well, I
10   mean it -- it's a lot more pages.  So I'm sorry, can you
11   please ask me the question again?
12       Q.  (BY MR. CLARK)  Sure.  I'm -- I directed your
13   attention to pages one to 46, did I not?
14       A.  Yes.  That is what I'm looking at.
15       Q.  And you had -- you had characterized those
16   pages as mail correspondence from John Ashcraft to
17   Experian; did you not?
18             MS. BRASTER:  Objection to the extent it
19   misstates her testimony.
20             THE WITNESS:  Yes.
21       Q.  (BY MR. CLARK)  And we had -- we had talked
22   about pages one to three as being a -- a dispute from
23   Mr. Ashcraft to Experian?
24             MS. BRASTER:  Same objection, legal
25   conclusion.
```

Anna Simmons
May 3, 2017

1              THE WITNESS:  Yes.

2      Q.  (BY MR. CLARK)  So what do pages four to 46

3  represent?

4      A.  I would have to -- they're all different -- or

5  several of them represent different things.  Are you

6  asking me to -- about a specific page?

7      Q.  Yes, if the pages -- particular pages within

8  four to 46 mean different things, I would like you to

9  tell me what those things are and specify page numbers

10  for which you believe those differences exist.  Can you

11  do that?

12              MS. BRASTER:  Objection to vague.

13              THE WITNESS:  Sure.  I can go through his

14  correspondence and let you know what I think it is.

15              MR. CLARK:  Thank you.

16              THE WITNESS:  Page -- page five appears to

17  be a disclosure.  I believe the disclosure ends on page

18  35.

19              MR. CLARK:  Okay.

20              THE WITNESS:  I believe page 37 through

21  page 42 -- it appears to be the voluntary petition for

22  bankruptcy for filing Chapter 7 for John Ashcraft.

23              MR. CLARK:  Okay.

24              THE WITNESS:  Page 47 through page 64 is a

25  disclosure for John Ashcraft.

Anna Simmons
May 3, 2017

```
 1        Q.  (BY MR. CLARK)  Okay.  Just -- I'll stop you
 2    right there.  I was just -- I directed your attention to
 3    one through 46.  We'll go through the rest of those
 4    pages in a moment.  I just wanted to -- but if you would
 5    like to -- actually, let me ask a few housekeeping
 6    questions about one to 46.  And then we'll go through
 7    the rest of Exhibit 2.  Is that all right?
 8        A.  Yes.
 9        Q.  Thank you.  I didn't mean to cut you off there.
10    You're -- you're -- you're anticipating my next question
11    and I -- I do appreciate that.  So on -- just to close
12    the loop.  On Ashcraft 36, that looks like a blank page
13    with a line through it, right?
14                MS. BRASTER:  You said 46, right, Miles?
15                MR. CLARK:  Thirty-six.
16                MS. BRASTER:  Oh, I'm sorry.
17                THE WITNESS:  Yes.
18        Q.  (BY MR. CLARK)  Okay.  And there are a few
19    other pages with -- that are blank with lines through
20    them, right?  I'm looking at, for example, 38 and 40.
21    And 42.  And 44.  Do you see those?
22        A.  Yes.
23        Q.  And is that just -- are those blanks just how
24    they would have scanned Mr. Ashcraft's mail
25    correspondence into records?
```

Anna Simmons
May 3, 2017

1      A.  I believe so.

2      Q.  Okay.  I'm just trying to make sure we're not

3   missing any pages here.

4              Okay.  And I believe that the -- let's see.

5   Did we talk about the documents contained on Ashcraft 43

6   and 45, 46?

7      A.  I did not talk about it.

8      Q.  Okay.  So if I could just direct your attention

9   to those pages before we move on and if you could just

10  tell me what those pages are.

11     A.  Page 43 appears to be a copy of a driver's

12  license and a copy of a health insurance, maybe Medicare

13  card.

14     Q.  Okay.  Looking at 43, can you tell who that

15  driver's license and Medicare card -- what the name is

16  listed on those?

17     A.  Yes.

18     Q.  What is the name?

19     A.  John Ashcraft.

20     Q.  What about 45, 46?  What are those pages?

21     A.  Did you say 45?

22     Q.  I -- I did, thank you.

23     A.  Forty-five appears to be a copy of the front of

24  an envelope that states "certified mail."

25     Q.  Okay.  Is there -- is there a date on the

Anna Simmons
May 3, 2017

```
 1    certified -- on 45 that you can ascertain?
 2         A.   April 25th.  And more than likely that's 2016.
 3         Q.   Okay.  And is there a -- is there a name on the
 4    return -- the return address that you can see?
 5         A.   Yes.
 6         Q.   And what is that name?
 7         A.   John Ashcraft.
 8         Q.   Who is this certified mailing addressed to?
 9         A.   Experian.
10         Q.   Okay.  And -- and if these pages were included
11    in Mr. Ashcraft's mail correspondence, is it fair to
12    conclude that Mr. Ashcraft sent this correspondence to
13    Experian via certified mail on or about April 25, 2016?
14              MS. BRASTER:  Objection; assumes facts.
15    Foundation.
16              THE WITNESS:  That's what it looks like.
17         Q.   (BY MR. CLARK)  Okay.  When -- after Experian
18    receives mail correspondence like the kind that we've
19    talked about on pages one through 46, what did Experian
20    do with that mail correspondence after they received it?
21    What is the first thing they do?
22              MS. BRASTER:  Objection to the extent it's
23    outside the scope.  Vague.
24              THE WITNESS:  Well, I believe -- I don't
25    know if there's something before this because I don't
```

Anna Simmons
May 3, 2017

```
 1   know, you know, all the exact steps.  But I believe the
 2   first step is opening the mail, reviewing the content of
 3   the mail correspondence.  And I'm sorry I guess I went
 4   to the second step.  So I will wait for your next
 5   question.
 6        Q.  (BY MR. CLARK)  That -- that's okay.  That's --
 7   that saves me having to ask the question.  So I
 8   appreciate it.
 9            Who at Experian opens the mail?
10            MS. BRASTER:  Same objection.
11        Q.  (BY MR. CLARK)  Is there a name for that type
12   of person?  A -- a job title?
13            MS. BRASTER:  Same objections.
14            THE WITNESS:  I do not know that job title.
15        Q.  (BY MR. CLARK)  Is it -- is the job title
16   ACDV agent?
17            MS. BRASTER:  Same objections.  And assumes
18   facts.  Foundation.
19            THE WITNESS:  No.
20        Q.  (BY MR. CLARK)  Okay.  Are you familiar with
21   the -- with the ACDV agent?
22        A.  Yes.
23        Q.  Are you familiar with the job title "dispute
24   agent"?
25        A.  Yes.
```

Anna Simmons
May 3, 2017

```
 1      Q.  Are you familiar with the job title "cast
 2   agent"?
 3      A.  Yes.
 4      Q.  Do any of those individuals with those job
 5   titles open the mail at Experian?
 6      A.  No.
 7      Q.  Does the person who -- does the type of
 8   employee at Experian who opens the mail have any other
 9   role in Experian's dispute process after the mail is
10   opened?
11           MS. BRASTER:  Objection; outside the scope.
12   Foundation.
13           THE WITNESS:  I don't think so.
14      Q.  (BY MR. CLARK)  Okay.  All right.  You
15   testified that after the mail is received it's opened
16   and -- and then what happens after that in the dispute
17   process?
18           MS. BRASTER:  Objection; outside the scope.
19           THE WITNESS:  It is reviewed.
20           MR. CLARK:  Hold on.  Jen, are -- are you
21   saying that Experian's disputes process is outside the
22   scope?
23           MS. BRASTER:  What I'm saying with respect
24   to the mail sorting procedure pursuant to our meet and
25   confer was that she could testify as to this plaintiff
```

Anna Simmons
May 3, 2017

1    only.  So if it's generic, I'm not going to instruct her

2    not to answer, but I'm lodging that objection.

3              MR. CLARK:  Okay.  And I'm not talking

4    about mail sorting procedures.  I'm asking -- I'm asking

5    what Experian does with the mail after it receives in

6    the course of answering a dispute.  That's something

7    else, sorting.  That's -- that's answering the dispute

8    as far as I see it.  So if you're saying that -- you

9    know, we can -- can have disagreement on what my

10   question actually means.  But if what you're telling me

11   is that -- is that you're objecting on the grounds that

12   me asking about Experian's consumer dispute resolution

13   process from the beginning is outside the scope, then I

14   think we're going to have a real problem here.

15             MS. BRASTER:  Miles, can you give me one

16   second to go back through the topics and just take a

17   quick look.

18             MR. CLARK:  Sure.

19             MS. BRASTER:  Okay.  I looked through the

20   objections.  I am going to stand by my objection --

21   excuse me.  I looked through our amended objections

22   which identified topics.  I am going to stand by my

23   objection, but I'm not going to instruct the witness not

24   to answer if it's general questions with respect to a

25   dispute.

Anna Simmons
May 3, 2017

1            MR. CLARK:  Okay.  So let me understand,
2    you know, why you believe that this is outside the
3    scope.  Are you saying that -- that the process of -- of
4    sending mail correspondence to a -- a particular dispute
5    agent would be not something that is involved in
6    Experian's consumer dispute process?
7            MS. BRASTER:  I'm not sure I fully
8    understand your question.  What I'm saying is that I
9    don't believe this line of inquiry is contained in the
10   topics that have been propounded, nor in which we
11   identified Anna to testify as to.
12           MR. CLARK:  Yeah.  I -- I'm going to
13   disagree with you --
14           MS. BRASTER:  Okay.
15           MR. CLARK:  -- on whether or not this is
16   within the scope of the topics which have been
17   propounded because clearly I think that you and I would
18   both agree that -- that Experian's disputes resolution
19   process is properly contained within the topics for
20   which the witness has been designated.  Is that fair to
21   say?
22           MS. BRASTER:  Well, it's fair to say we
23   have a dispute.  You can certainly ask her the
24   questions.  I went back and I looked through the
25   topics --

Anna Simmons
May 3, 2017

```
 1              MR. CLARK:  I --
 2              MS. BRASTER:  -- and I -- I made that
 3    objection in good faith.  I -- I -- that's why I spent a
 4    minute here to go back and look through the topics to
 5    make sure I was not missing something.
 6              MR. CLARK:  Okay.  I just want to make sure
 7    because I know that we've -- we've had disputes which
 8    have gone to court where you mentioned, among other
 9    things, your -- the fact that I had answered (sic)
10    questions which are outside the scope.  So I want to
11    make sure that I understand why you believe that certain
12    questions that I ask are outside the scope.  If -- it
13    doesn't -- I think that we -- I think we have a
14    disagreement as to whether or not this is -- this line
15    of inquiry is properly contained within a -- within a
16    topic for which the witness had been designated to
17    testify.  But with that being said, we'll -- we'll
18    just -- we'll continue.
19              MS. BRASTER:  Fair enough.  And I agree.  I
20    think we have a dispute.  I looked through the topics
21    and I don't believe this is contained in one of the
22    topics that we identified Ms. Simmons to testify as to.
23              MR. CLARK:  All right.  And I -- I -- I
24    disagree with that -- with that contention.
25              MS. BRASTER:  Okay.
```

Anna Simmons
May 3, 2017

```
 1              MR. CLARK:  But we'll -- we'll continue.
 2       Q.  (BY MR. CLARK)  Okay, Anna.  Sorry about all
 3  that.
 4              Would you like -- would you like me to ask
 5  you last question again?
 6       A.  Yes, please.
 7              MR. CLARK:  Madam Court Reporter, if you
 8  can find it, could you -- could you please read back the
 9  last question I had asked the witness, please?
10              THE REPORTER:  (Read back.)
11              THE WITNESS:  The mail correspondence is
12  reviewed in its entirety.
13       Q.  (BY MR. CLARK)  Okay.  And who reviews it?
14              MS. BRASTER:  Same objection.
15              THE WITNESS:  Again, I'm sorry, I don't
16  know their title.
17       Q.  (BY MR. CLARK)  Okay.  After that review is
18  done, what is the next step in the dispute process?
19              MS. BRASTER:  Same objection.
20              THE WITNESS:  I believe that then mail
21  correspondence would be routed into a specific queue.
22       Q.  (BY MR. CLARK)  Okay.  And what kind of queues
23  could it be routed in to?
24              MS. BRASTER:  Same objection.
25              THE WITNESS:  Some of the queues it could
```

Anna Simmons
May 3, 2017

```
 1   be routed to would be for a CDI request or for a regular
 2   dispute queue or for a fraud dispute.
 3        Q.  (BY MR. CLARK)  Okay.  Are there any other
 4   queues you can think of?
 5                 MS. BRASTER:  Same objection.
 6                 THE WITNESS:  Other than those three, I
 7   believe there's a queue where consumers are requesting
 8   to be opted out of maybe an Experian mailing list.  I'm
 9   not exactly sure of the exact terminology.
10        Q.  (BY MR. CLARK)  I think I know what you mean.
11   Would that be a opt-out for promotional inquires?
12                 MS. BRASTER:  Objection; foundation.
13   Assumes facts.
14                 THE WITNESS:  Yes.  Yes, it could be that.
15        Q.  (BY MR. CLARK)  And -- and that would be
16   different than a fraud dispute, right?  There would be
17   different queues?
18                 MS. BRASTER:  Objection; outside the scope.
19                 THE WITNESS:  Yes.
20        Q.  (BY MR. CLARK)  Okay.  And so -- so somebody --
21   so somebody at Experian -- we're not sure what the title
22   is -- but somebody at Experian decides when the mail
23   comes in, whether a piece of mail correspondence is a
24   dispute or an opt-out notice or a request for CDI or any
25   of those things.  Is that -- is that fair to say?
```

Anna Simmons
May 3, 2017

1          MS. BRASTER:  Same objection.  Compound.
2          THE WITNESS:  Yes.
3     Q.  (BY MR. CLARK)  So after assuming that -- that
4     a -- that mail correspondence is determined to be a
5     consumer dispute and is -- is placed in the appropriate
6     queue after that decision had been made, what happens to
7     the dispute after that?
8          MS. BRASTER:  Same objection.
9          THE WITNESS:  Then an agent would process
10    the consumer disputes.
11    Q.  (BY MR. CLARK)  Okay.  And when you say agent,
12    are there particular titles of Experian agents that
13    you're thinking of?
14    A.  I don't know the exact titles.  But earlier you
15    stated dispute agent.  So I would think that's okay
16    to -- to speak about the agent as a dispute agent.
17    Q.  Is that your understanding about who the -- who
18    at Experian handles these -- these particular disputes?
19          MS. BRASTER:  Objection to vague.
20          THE WITNESS:  Yes.
21    Q.  (BY MR. CLARK)  Okay.  I just wanted to make
22    sure that we're both talking about the same thing here.
23    I don't want to get to a situation where I think I'm
24    saying one thing and you're saying another thing and
25    then we find out at the end of the deposition that you

Anna Simmons
May 3, 2017

```
 1   were -- we were saying different things.  Because if
 2   that happens, you're coming back.
 3               The -- if -- if -- if there's a reason to
 4   do so.
 5               Okay.  So -- so after a dispute is
 6   received, then it's a dispute agent that basically picks
 7   up the dispute.  Is it -- is there any other type of
 8   agent who is -- would -- who would handle consumers
 9   disputes at this step that we've been talking about,
10   other than what we have both agreed to characterize as a
11   dispute agent?
12               MS. BRASTER:  Objection to vague, assumes
13   facts and outside the scope.
14               THE WITNESS:  I don't think so.
15        Q.  (BY MR. CLARK)  Okay.  So what does the dispute
16   agent do with the dispute once the dispute agent
17   receives it?
18               MS. BRASTER:  Objection; outside the scope.
19               THE WITNESS:  They would review the mail
20   correspondence in its entirety and analyze the request.
21        Q.  (BY MR. CLARK)  Okay.  And what are the types
22   of action that a dispute agent could take after review
23   of the mail correspondence?
24               MS. BRASTER:  Objection; speculation,
25   vague.
```

Anna Simmons
May 3, 2017

1              THE WITNESS:  There are probably more than
2    I can remember to state.  But one example could be to
3    send an ACDV to the data furnisher to convey the
4    dispute.
5         Q.  (BY MR. CLARK)  Okay.  Are there other things
6    that the agent -- dispute agent could do with the
7    dispute?
8              MS. BRASTER:  Same objections.
9              THE WITNESS:  Yes.  They would send ACDV to
10   the consumer stating the item appears exactly as they
11   would like it to appear.
12        Q.  (BY MR. CLARK)  Okay.  What else?  Is there
13   anything else, first of all?
14             MS. BRASTER:  Same objections.  And outside
15   the scope.
16             THE WITNESS:  They could add an employer to
17   the credit file as the consumer has requested.
18        Q.  (BY MR. CLARK)  Okay.  Anything else?
19        A.  They could delete an employer from the credit
20   file as the consumer has requested.
21        Q.  Okay.  Let me -- let me ask you this question
22   because I can see why you're -- you think that there are
23   a lot of things that Experian -- that a dispute agent
24   could do.
25             MS. BRASTER:  And -- and, Miles, before you

Anna Simmons
May 3, 2017

```
 1   go on, I do want to interject the same objections to the
 2   last line of questioning, but it went very quickly.
 3              MR. CLARK:  Okay.  Jen, do those objection
 4   include being outside the scope?
 5              MS. BRASTER:  That is correct.
 6              MR. CLARK:  All right.  If you think so.
 7   Interesting.
 8        Q.  (BY MR. CLARK)  Okay.  Anna, let me see if I
 9   can ask a different type of question that may -- that
10   may -- may make this a bit simpler.
11              Who can the dispute agent -- after
12   reviewing the mail correspondence that -- that -- which
13   the dispute is comprised, who -- what other persons or
14   entities can the dispute agent send a -- a communication
15   to about that -- about that -- about the dispute?  You
16   had mentioned sending an ACDV, which that would be to
17   the -- an ACDV would be sent to a -- a furnisher of
18   information; is that right?
19              MS. BRASTER:  Objection to vague, and
20   compound.
21              THE WITNESS:  An ACDV is sent to a data
22   furnisher.
23        Q.  (BY MR. CLARK)  Okay.  Other than a data
24   furnisher, are there other people or agencies for whom a
25   dispute agent could communicate regarding the
```

Anna Simmons
May 3, 2017

```
 1    information contained in a consumer's dispute?
 2                MS. BRASTER:  Objection; speculation.
 3                THE WITNESS:  I'm sorry, I don't know
 4    because I'm not understanding the question about who
 5    else they would send information to about a consumer's
 6    dispute.
 7         Q.  (BY MR. CLARK)  Well, you had mentioned that
 8    they could send ACDV back to the consumer; did you not?
 9         A.  Yes.
10         Q.  And you mentioned that they could send an ACDV
11    to the data furnisher.  We got that through a series of
12    questions.  But I think that was the -- that -- that was
13    the gist of what -- of what we talked about.  Is that
14    fair to say?
15         A.  Yes.
16         Q.  So -- so they can -- so a dispute agent can
17    send to -- can send a communication regarding the
18    correspondence received in the dispute to both the data
19    furnisher and the disputing consumer.  Is that fair to
20    say?
21                MS. BRASTER:  Objection to speculation,
22    legal conclusion.
23                THE WITNESS:  Yes.
24         Q.  (BY MR. CLARK)  And so other than the data
25    furnisher and -- and the disputing consumer, is there
```

Anna Simmons
May 3, 2017

```
 1    any other individual or entity for whom a -- an agent
 2    can send a communication regarding information in -- in
 3    a consumer dispute?
 4                  MS. BRASTER:  Same objections.
 5                  THE WITNESS:  I can't think of who the
 6    agent, the dispute agent, would send or convey the
 7    dispute to right now, if that's what you're asking.
 8        Q.  (BY MR. CLARK)  Okay.  That -- t.
 9                  Hat's fine.  It's kind of a -- it's kind of
10    a tough question to articulate maybe.  So I appreciate
11    you working through that with me.  And that's fine.
12                  If you think of something later, please
13    don't hesitate to amend your answer if -- if to you need
14    to.
15                  So is -- let me ask you this:  Can a
16    dispute agent send the -- are you familiar with the --
17    with the term "frivolous" as it's commonly used in the
18    consumer dispute process?
19                  MS. BRASTER:  Objection; legal conclusion.
20                  THE WITNESS:  Yes, I have heard of that
21    term.
22        Q.  (BY MR. CLARK)  Okay.  And -- and have you
23    heard of that term in the context of your work at
24    Experian?
25        A.  Yes, I have heard of it.
```

Anna Simmons
May 3, 2017

1      Q.  And in the context of your work at Experian,

2   what does the term "frivolous" mean as far as you

3   understand it?

4               MS. BRASTER:  Same objection.  Outside the

5   scope.

6               THE WITNESS:  As far as I understand it,

7   I've never had to describe this term, so I don't know

8   everything I should say about it.  But as far as I

9   understand it, it might mean that a dispute does not

10  have enough information in it for Experian to understand

11  what it is.

12              MR. CLARK:  Okay.  Yeah.  And -- and

13  that's -- that's sort of my general understanding of

14  that -- of that term, too.

15     Q.  (BY MR. CLARK)  And if -- if -- can a dispute

16  agent make a decision after receiving a -- after

17  receiving a consumer dispute that the dispute is

18  frivolous?

19              MS. BRASTER:  Same objections.

20              THE WITNESS:  I've never heard of a dispute

21  agent making a decision about -- with a frivolous

22  terminology, no.

23     Q.  (BY MR. CLARK)  Okay.  Can a -- can a dispute

24  agent determine that -- that you testified earlier that

25  the -- you had testified earlier that the -- that a

Anna Simmons
May 3, 2017

```
 1   dispute agent can send ACDV to a consumer indicating
 2   that the disputed information was actually reporting as
 3   the consumer wished it to.  That may not be exactly
 4   true, but do you recall saying something to that effect
 5   earlier?
 6                   MS. BRASTER:  Objection to the extent it
 7   misstates her testimony.
 8                   THE WITNESS:  Yes.
 9       Q.  (BY MR. CLARK)  Okay.  Is there -- does
10   Experian have a name for -- for that decision that a
11   dispute agent makes, i.e., a decision in which the
12   dispute agent determines whether a -- an item of
13   information disputed by a consumer is actually reported
14   as the consumer would wish it to and then sends the --
15   ACDV to that effect to the consumer in response to the
16   dispute?
17                   MS. BRASTER:  Objection to vague,
18   speculation.  Compound.
19                   THE WITNESS:  I do not --
20                   MR. CLARK:  My question.  I'm sorry.  Anna,
21   my -- my angiologies.
22                   THE WITNESS:  I do not remember the
23   beginning of your question.
24       Q.  (BY MR. CLARK)  I'm asking if Experian has a
25   name for the process that I described.  If you wish to
```

Anna Simmons
May 3, 2017

1   hear the question again in its entirety, I will have the
2   court reporter read it back to you.  What would you like
3   me to do?
4              MS. BRASTER:  Same objections.
5              THE WITNESS:  No, you answered.  That's
6   what I needed.  And I do not know of a name for that
7   process you described.
8       Q.  (BY MR. CLARK)  Okay.  Does -- do you think
9   Experian has a name for that process?
10             MS. BRASTER:  Same objections.  As well
11  foundation.
12             THE WITNESS:  I do not think there is a
13  name for that process.  I've never heard of a name for
14  it.
15      Q.  (BY MR. CLARK)  Okay.  Is -- is if a consumer
16  doesn't provide enough information for Experian to fully
17  research their dispute, is that a decision that a
18  dispute agent would make after reviewing the mail
19  correspondence or does some other type of Experian
20  employee make that determination?
21             MS. BRASTER:  Objection; speculation.
22  Assumes facts.
23             THE WITNESS:  If I understand your question
24  correctly, the answer is yes, the dispute agent can make
25  the decision.

Anna Simmons
May 3, 2017

1      Q.  (BY MR. CLARK)  Okay.  You said the dispute

2  agent can.  Does anyone else at Experian make that

3  decision other than the dispute agent?

4                  MS. BRASTER:  Same objections.

5                  THE WITNESS:  I don't think so.  It would

6  be the person that is reading the mail correspondence.

7  So if it -- if we were still speaking about a dispute

8  agent reviewing it, it would be that dispute agent that

9  would make that decision.

10      Q.  (BY MR. CLARK)  Okay.  And if a dispute agent's

11  determine that they did not have enough information to

12  answer the consumer's dispute, what steps does the

13  dispute agent take after that point?

14                  MS. BRASTER:  Objection; speculation.

15  Foundation and assumes facts.

16                  THE WITNESS:  They would convey that

17  information to the consumer.

18      Q.  (BY MR. CLARK)  Would they convey that

19  information to anyone else?

20                  MS. BRASTER:  Same objection.

21                  THE WITNESS:  More than likely, no.

22      Q.  (BY MR. CLARK)  Would they convey that

23  information to -- or -- or the -- sorry.  Strike that.

24                  Would they convey the -- the contents of

25  the dispute to anyone else, such as a data furnisher?

Anna Simmons
May 3, 2017

1                    MS. BRASTER:  Objection.  Speculation,

2      vague.

3                    THE WITNESS:  If the dispute agent does not

4      know what the dispute is, they would not be able to

5      send -- they would have to have a dispute.  So if they

6      do not understand the dispute, there would be nothing to

7      convey.

8          Q.  (BY MR. CLARK)  Okay.  What if -- what if the

9      dispute included enough information for Experian to

10     identify the data furnisher in question, would it --

11     would that change your answer to my last question?

12                    MS. BRASTER:  Objection; speculation.

13                    THE WITNESS:  If there is not a dispute to

14     convey, they would not have a dispute to send.

15         Q.  (BY MR. CLARK) Okay.  Let me -- let me ask

16     you -- maybe I should have asked this -- this at the

17     beginning.

18                    What is a dispute?

19                    MS. BRASTER:  Objection to the extent it

20     calls for a legal conclusion.

21                    THE WITNESS:  In general terms it is a

22     consumer's disagreement with something that's appearing

23     on their credit file.

24         Q.  (BY MR. CLARK)  Okay.  And are there ever

25     circumstances in which Experian receives a -- a piece of

Anna Simmons
May 3, 2017

```
 1   mail correspondence which it can identify as a dispute
 2   but does not have enough information to be able to
 3   answer all questions needed to be answered in connection
 4   with that dispute?
 5              MS. BRASTER:  Objection; speculation.
 6   Foundation.
 7              THE WITNESS:  I don't know.  I would have
 8   to have a more specific question.  I'm not able to
 9   answer that.
10              MR. CLARK:  Okay.
11              MS. BRASTER:  And, Miles, whenever you're
12   at a good stopping point, if we could just take a quick
13   break and I'll also find out timing for lunch.
14              MR. CLARK:  Yeah.  You know, I -- I --
15   because we're a little bit past 30 minutes.  Jen, let me
16   do this, I got about five minutes.  I just want to run
17   through the rest of Exhibit 1.  I think it's going to go
18   a lot quicker.  I'm not going to ask any -- I'm just
19   going to ask some foundational questions.
20              MS. BRASTER:  Sure.
21              MR. CLARK:  Can we get through that and
22   then take a break?
23              MS. BRASTER:  Yeah.  No, no, that's fine.
24              MR. CLARK:  Okay.  Fantastic.  And thank
25   you.
```

Anna Simmons
May 3, 2017

1     Q.  (BY MR. CLARK)  All right.  And so -- thank
2  you, Anna.
3           Like I said, I just want to go through a
4  few more of these documents on Exhibit 2 just so we know
5  what we're talking about.
6           And so if you can turn now to pages 47
7  through 64 and let me know what those pages are.
8     A.  (Looked at document.)  Pages 47 through 64
9  appears to be a disclosure for John Ashcraft.
10    Q.  Okay.  What's the date of the disclosure?
11    A.  March 15, 2016.
12    Q.  Is that same date for the disclosure contained
13 in the -- in Mr. Ashcraft's mail correspondence that we
14 just talked about?
15    A.  (Looked at document.)  Yes.
16    Q.  Okay.  And -- okay.  Great.  So if we can turn
17 to page 65.
18    A.  Okay.
19    Q.  And what is this?
20    A.  (Looked at document.)  ACDV response.
21    Q.  Okay.  And just -- and what is an ACDV?
22    A.  Automatic consumer dispute verification.
23    Q.  Okay.  Is this a -- a document that -- that a
24 data furnisher sends to a consumer reporting agency
25 after receiving notice of a dispute from the consumer?

Anna Simmons
May 3, 2017

1     A.   Yes.
2     Q.   Okay.  And -- and who is this -- who is this
3   ACDV sent by?
4              MS. BRASTER:  Objection to vague.
5              THE WITNESS:  This ACDV was sent to
6   Experian from Welk Resort Group.
7     Q.   (BY MR. CLARK)  Okay.  Thank you.  Looking
8   at -- looking at Experian's 66 -- actually, no, strike
9   that.
10             Looking at Experian 68 through 71.
11    A.   (Looked at document.)  I'm there, yes.
12    Q.   Okay.  And so -- and, again, Anna, I'm -- I'm
13  not asking if you've seen these pages before because I
14  believe you testified that you had reviewed all of them
15  in preparation for your deposition today.  But if you
16  haven't seen any of these pages, just let me know.
17             So I -- I'm assuming that you have seen
18  them because you testified to that previously.  But
19  again, if I was incorrect in that, then -- then please
20  let me know.
21             But pages 68 to 71, what are they?
22    A.   This is a CDF.
23    Q.   Okay.  What's the date?
24    A.   May 16, 2016.
25    Q.   And who was the CDF sent to?

Anna Simmons
May 3, 2017

```
1        A.   John Ashcraft.
2        Q.   Is this a CDF that Experian sent to
3   Mr. Ashcraft in response to a consumer dispute that he
4   had previously submitted to Experian?
5        A.   Yes.
6        Q.   And do you know whether or not his -- whether
7   or not it would have been in response to Mr. Ashcraft's
8   April 25, 2016, dispute that we talked about a few
9   moments ago?
10       A.   Yes.
11       Q.   All right.  So -- and so let's see.  If we
12  could turn to pages 72 to 87, please.
13       A.   (Witness complies.)  Did you say to page 87?
14       Q.   87, correct.
15       A.   Okay.
16       Q.   And what are these pages?
17       A.   This is a disclosure.
18       Q.   Okay.  What's the date of the disclosure?
19       A.   January 25, 2017.
20       Q.   Is there an individual for whom this disclosure
21  was prepared?
22       A.   The name on this disclosure is John Ashcraft.
23       Q.   Okay.  All right.  Now, let's see pages 88 to
24  93, please.
25       A.   Okay.
```

Anna Simmons
May 3, 2017

```
 1        Q.   And what are these pages?
 2        A.   ACDV.
 3        Q.   Okay.  And is there a name for whom this CDF
 4   was prepared for?
 5        A.   The name on the CDF is John Ashcraft.
 6        Q.   And what's the date of this CDF?
 7        A.   February 8, 2017.
 8        Q.   Okay.  Thanks very much, Anna.
 9             MR. CLARK:  We can take a break now.  Do
10   you want to take five or ten?
11             MS. BRASTER:  Let's go off the record.
12             (Break taken)
13        Q.  (BY MR. CLARK)  Anna, are you ready to
14   continue?
15        A.   Yes.
16             MR. CLARK:  So, Madam Court Reporter, if we
17   could please mark Tab 3 as Exhibit 3, please.
18             (Exhibit No. 3 was marked)
19        Q.  (BY MR. CLARK)  All right.  Can you please
20   review what has been marked as Exhibit 3 and let me know
21   when you -- when you're done?
22             MS. BRASTER:  And I'm just looking over
23   real quick, for my benefit, that's the 94 to 106; is
24   that correct?
25             MR. CLARK:  Oh, yes.  My apologies, Jen.
```

Anna Simmons
May 3, 2017

1    That's Experian 94 to 106.

2              THE WITNESS:  I have reviewed the document.

3         Q.  (BY MR. CLARK)  All right.  Are pages 94 to

4    106 pages you reviewed in preparation for your

5    deposition today?

6         A.  Yes.



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017

1        ████████████    ███████████████

   ████████████       ███████████    ██████████████

   ████████████

        Q.   (BY MR. CLARK)  Okay.  Does -- does Experian

6   send the results of a reinvestigation to the data

7   furnishers?

8                MS. BRASTER:  Objection; speculation.

9   Vague.

10               THE WITNESS:  Does -- was your question:

11  Does Experian send the results received from a data

12  furnisher back to the data furnisher?

13               MR. CLARK:  Correct.

14               THE WITNESS:  I can answer that by stating

15  if there are any kinds of updates to the account, the

16  data furnisher gets notified by Experian.

17       Q.  (BY MR. CLARK)  Okay.  When you say updates to

18  the account, what do you mean?

19       A.  And I don't know how to explain "update."

20  Maybe we could say change.  But I use the term "update,"

21  yes.

22       Q.  Okay.  Well, I guess I'm wondering -- you --

23  you used the term "update" and now you've indicated

24  you're not quite sure what it means.  So I'm just trying

25  to understand, based on how you characterized your

Anna Simmons
May 3, 2017

```
 1   answer, what an update is.  So I think we'll just work
 2   through that a little bit.
 3                 So let me ask my last question again so we
 4   can get on the same line.  I apologize for having to do
 5   that.
 6                 But when -- when you -- when you say
 7   "updates," what do you mean?
 8       A.  A change to the account information.
 9       Q.  Okay.  And -- and when you say "change to the
10   account information," what do you mean?
11       A.  It could be several factors.  One could be the
12   balance was updated or changed by the data furnisher.
13       Q.  Okay.  Could the balance be updated or changed
14   by Experian?
15                 MS. BRASTER:  Objection to speculation and
16   foundation.
17                 THE WITNESS:  As a result of a
18   reinvestigation, that would be correct.
19       Q.  (BY MR. CLARK)  Okay.  And when -- so let me
20   ask you this.  If Experian received a reinvestigation --
21   or strike that.
22                 If Experian received an ACDV from the data
23   furnisher and updated the consumer's account, you know,
24   in -- in a manner identical to the information provided
25   by the data furnisher in the ACDV without making any
```

Anna Simmons
May 3, 2017

1    other changes to the consumer's account, would Experian

2    send a notification to the data furnisher that it had

3    made the changes to the account as the data furnisher

4    requested?

5              MS. BRASTER:  Objection; speculation.

6    Asked and answered.

7              THE WITNESS:  Yes.

8        Q.  (BY MR. CLARK)  Okay.  And how would -- would

9    Experian keep an internal record of -- of that -- of the

10   fact that it sent that notification to the data

11   furnisher?

12             MS. BRASTER:  Same objections.

13             THE WITNESS:  I do not know.

14       Q.  (BY MR. CLARK)  Are there any documents that

15   would reflect the fact that Experian sent that

16   notification to the data furnisher?

17             MS. BRASTER:  Same objections.

18             THE WITNESS:  I do not know how Experian

19   keeps records, if there are any of that notification.

20   ████  ██████████  ██████  ███████████████

     ██  ███████████████████████████████████████

     ██  █████████████████████████████████

     ██  ████████████████████████

     ██        ████████████  ███████████████

     ██  ████████████

Anna Simmons
May 3, 2017

1           THE WITNESS:  No.

2      Q.  (BY MR. CLARK)  And so sitting here today,

3  you're -- you're not sure whether Experian keeps a

4  record of any -- of any -- any of those updates?

5           MS. BRASTER:  Objection to foundation.

6  Vague.  And to the extent that it misstates her

7  testimony.

8           THE WITNESS:  Correct.

9      Q.  (BY MR. CLARK)  Okay.  Do you think Experian

10  does keep a record of those updates somewhere, in some

11  document, even though it's not one of those that we have

12  before us today?

13           MS. BRASTER:  Objection; asked and

14  answered, speculation.  Assumes facts.

15           THE WITNESS:  I did not hear the last part

16  of your question.

17           MR. CLARK:  Sure.

18           Madam Court Reporter, could you please read

19  back my last question?

20           THE REPORTER:  (Read document.)

21           MS. BRASTER:  Same objections.

22           THE WITNESS:  I do not know.

23      Q.  (BY MR. CLARK)  Okay.  All right.  But not

24  withstanding the fact that you're not sure if Experian

25  keeps a record of those updates, it's your belief that

Anna Simmons
May 3, 2017

1    Experian does update the data furnisher of those

2    updates; is that -- is that correct?

3              MS. BRASTER:  Objection to speculation and

4    to the extent it misstates her testimony.

5              THE WITNESS:  Experian notifies the data

6    furnisher.



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017

1       Q.  Okay.  All right.  So let's see.  And then --
2   thank you, Anna.  You can set Exhibit 2 and 3 aside for
3   the moment.  What I'm going to do now is largely just
4   introduce some other documents or -- or try to introduce
5   them.  And so we'll get through these and perhaps be at
6   a good stopping point for lunch after that.
7               So let me -- before I -- before I begin.
8   Let me ask in addition to the items we discussed on
9   Exhibits 1, 2, and 3, did you look at any other
10  documents in preparation for your deposition today?
11      A.  I don't remember every document.  You'd have to
12  tell me which ones I stated to you earlier and I guess I
13  can compare in what's in Exhibit 1, 2 and 3 to make sure
14  I answer correctly.
15      Q.  Sure.  I understand.  It's not a trick
16  question.  And so -- and certainly we've looked at a
17  number of documents so I'm not trying -- not trying
18  to -- not trying to trip you up here.
19              But let me just ask you in -- let me ask
20  you.  Did -- did you review a long form admin report?
21      A.  No.
22      Q.  Okay.  Did you review any Experian participants
23  guide?
24      A.  No.
25  ███  ████████████████████████████████████████████████

Anna Simmons
May 3, 2017



        Q.   Okay.  And so what I'll -- what I'll do now is
I'll introduce some documents, many of which are
called -- and for these business guides I'll just ask
you to indicate to me whether or not they include
guidelines for generating a consumer disclosure.  Okay?
        A.   Okay.
        Q.   Okay.  And just one last background question
before I -- before I begin.

Anna Simmons
May 3, 2017

```
 1              Do the participants guides contain
 2   Experian's policies and procedures for handling various
 3   aspects of the consumer dispute process?
 4              MS. BRASTER:  Object to vague.
 5              THE WITNESS:  Yes, they can.
 6        Q.  (BY MR. CLARK)  Okay.  In addition to
 7   participants guides, are there any other documents that
 8   Experian would consult to resolve a consumer's dispute?
 9              MS. BRASTER:  Objection to vague,
10   speculation.
11              THE WITNESS:  Documents, I'm not sure if
12   there would be additional documents.  I can't think of
13   any right now.
14        Q.  (BY MR. CLARK)  Okay.  And if any time you --
15   feel free to -- to add them if -- if it comes to you
16   later.
17              MR. CLARK:  Okay.  Madam Court Reporter,
18   could we introduce Tab 4 as Exhibit 4, please.
19              (Exhibit No. 4 was marked)
20              MR. CLARK:  And, Jen, for your benefit this
21   is Experian 245 to 405.
22              MS. BRASTER:  Thank you.
23              MR. CLARK:  You're welcome.
24              THE WITNESS:  (Looked at document.)
25              MS. BRASTER:  Miles, if it assists in the
```

Anna Simmons
May 3, 2017

```
 1   process, I can stipulate to the authenticity of this
 2   document.
 3                MR. CLARK:  Okay.  I've got -- I've got a
 4   few -- I appreciate that, Jen.  I will just have a few
 5   additional questions of this one.
 6                MS. BRASTER:  Sure.
 7                MR. CLARK:  And I just want to establish --
 8   I just want to establish dates and -- and that sort of
 9   thing.  So...
10                MS. BRASTER:  Sure.  And I mean -- and
11   going forward if there's any that you want to just
12   simply authenticate or me stipulating as such, just let
13   me know.
14                MR. CLARK:  Okay.  Cool.
15                Anna, let me let know when you have
16   Exhibit 4.
17                THE WITNESS:  I have Tab 4 in front of me.
18                MR. CLARK:  Okay.  And that's been marked
19   as Exhibit 4?
20                THE WITNESS:  Correct.
21        Q.  (BY MR. CLARK)  Okay.  Is -- does this document
22   contain Experian's policies and procedures for handling
23   ACDV's?
24        A.  Yes.
25        Q.  Okay.  And what's the -- what's the date of
```

Anna Simmons
May 3, 2017

1    this document?

2         A.   December 23, 2013.

3         Q.   Was this a copy of Experian's policies and

4    procedures which was in force in March through May 2016?

5         A.   I believe so.

6         Q.   Okay.  Do you know whether this document had

7    been updated at any point in 2017?

8         A.   I do not.

9         Q.   Okay.  Does Experian have a schedule for when

10   it updates its policies and procedures?  Does it do so,

11   you know, for example, every March, every January?  Is

12   there a routine update process?

13                 MS. BRASTER:  Objection to vague and

14   compound.

15                 THE WITNESS:  I do not know.

16        Q.  (BY MR. CLARK)  Okay.  And --

17                 MR. CLARK:  And -- and Jen, could we

18   stipulate to the authenticity of Exhibit 4?

19                 MS. BRASTER:  Yes.

20                 MR. CLARK:  Thank you, Anna.  You -- you

21   can set this one aside.

22                 After you set that aside, Madam Court

23   Reporter, if we could introduce Tab 5 as Exhibit 5.

24                 (Exhibit No. 5 was marked)

25                 MR. CLARK:  And, Jen, this is Experian 450

Anna Simmons
May 3, 2017

1   to 519.

2                  THE WITNESS:  I have this in front of me.

3                  MR. CLARK:  Okay.

4        Q.  (BY MR. CLARK)  Anna, is this Experian's

5   policies and procedures for handling trade disputes?

6        A.  Yes.

7        Q.  Okay.  And what's the date that this document

8   was -- was -- was, for lack of a better word, published?

9        A.  May 20, 2015.

10       Q.  Okay.  Was this the copy of Experian's policy

11   and procedures for handling trade disputes which was in

12   force between March 2016 and the end of May 2016?

13       A.  I believe so.

14       Q.  And do you know if this document had been

15   updated in 2017 at any point?

16       A.  I do not.

17                  MR. CLARK:  Okay.  Jen, could we stipulate

18   to authenticity of Exhibit 5?

19                  MS. BRASTER:  Yes.

20                  MR. CLARK:  Thank you.  All right.  Thank

21   you.  You can set this one aside.

22                  And, Madam Court Reporter, if we could have

23   Tab 6 as Exhibit 6.

24                  (Exhibit No. 6 was marked)

25                  THE WITNESS:  Thank you.  I have it in

Anna Simmons
May 3, 2017

```
 1   front of me.
 2               MR. CLARK:  Okay.
 3               MS. BRASTER:  And so I'm not leaning over,
 4   which one is this one?
 5               MR. CLARK:  Oh, sorry.  Sorry.  I keep
 6   forgetting this.  596 to 668.
 7               MS. BRASTER:  Thank you.
 8       Q.  (BY MR. CLARK)  Anna, is this Experian's
 9   policies and procedures for handling additional
10   information submitted in connection with a consumer
11   dispute?
12       A.  Yes.
13       Q.  Okay.  What's the date at the top of this?
14       A.  April 7, 2016.
15       Q.  Okay.  Was this document in force between April
16   and May 2016?
17       A.  I believe so.
18       Q.  And has this document been updated at any point
19   during 2017?
20       A.  I do not know.
21       Q.  Okay.
22               MR. CLARK:  Jen, can we stipulate to the
23   authenticity of Exhibit 6?
24               MS. BRASTER:  Yes.
25               MR. CLARK:  Thank you.
```

97

Anna Simmons
May 3, 2017

1                    Okay.  Anna, you can set that one aside.

2                    Now, as -- Tab 7 as Exhibit 7, please.

3                    And, Jen, this is 724 to 777.

4                    (Exhibit No. 7 was marked)

5                    THE WITNESS:  Thank you.  I have this in

6        front of me.

7            Q.  (BY MR. CLARK)  Is this document Experian's

8        policies and procedures for identification arising in

9        connection with a consumer dispute?

10           A.  Yes.

11           Q.  And what's the date on this document?

12           A.  March 7, 2016.

13           Q.  Okay.  Was this a copy of the policies and

14       procedures for identification and statements in force

15       between March 2016 and May 2016?

16           A.  I believe so.

17           Q.  Was this document updated in 2017, to your

18       knowledge?

19           A.  I do not know.

20           Q.  Okay.

21                    MR. CLARK:  Jen, can we stipulate to the

22       authenticity of Exhibit 7?

23                    MS. BRASTER:  Yes.

24                    MR. CLARK:  Thank you.

25                    Could we have Tab 8 as Exhibit 8, please?

Anna Simmons
May 3, 2017

```
 1              (Exhibit No. 8 was marked)
 2              MR. CLARK:  And, Jen, this is 931 to 962.
 3              THE WITNESS:  I have this in front of me.
 4      Q.  (BY MR. CLARK)  Is this Experian's policies and
 5  procedures for handling public records?
 6      A.  Yes.
 7      Q.  And what's the date of this document?
 8      A.  March 29, 2016.
 9      Q.  Was this a -- was this a copy of the --
10  Experian's policies and procedures for handling public
11  records that was in -- in effect between March 29, 2015,
12  and the end of May 2015?
13      A.  I believe so.
14      Q.  And has this document been updated at any point
15  in 2017?
16      A.  I do not know.
17              MR. CLARK:  Okay.  Jen, can we stipulate to
18  the authenticity of Exhibit 8?
19              MS. BRASTER:  Yes.
20              MR. CLARK:  Thank you.
21              Now if we could have Tab 9 as Exhibit 9,
22  please.
23              (Exhibit No. 9 was marked)
24              MR. CLARK:  Jen, this 1021 to 1029.
25              MS. BRASTER:  Thank you.
```

Anna Simmons
May 3, 2017

1          THE WITNESS:  I have the document in front

2    of me.

3               MR. CLARK:  Okay.

4         Q.  (BY MR. CLARK)  And so what is this document?

5         A.  It basically describes e-OSCAR.

6         Q.  Okay.  What is e-OSCAR?

7         A.  It is the automated system that is used to

8    communicate disputes in between a data furnisher and

9    Experian or credit reporting agency.

10        Q.  Okay.  And is e-OSCAR the only means by which

11   Experian communicates consumer disputes to a data

12   furnisher?

13        A.  I think that the disputes can also be mailed

14   through a CDV instead of a ACDV.

15        Q.  Okay.  Is -- is it more common for Experian to

16   use e-OSCAR to communicate consumer disputes than it is

17   for Experian to mail those disputes?

18        A.  Yes.

19        Q.  Okay.  And do you know -- do you know who

20   operates the e-OSCAR system?

21               MS. BRASTER:  Objection to vague.  And

22   foundation.

23               THE WITNESS:  No.

24        Q.  (BY MR. CLARK)  Do you know who was in charge

25   of maintaining the e-OSCAR system?

Anna Simmons
May 3, 2017

```
 1              MS. BRASTER:  Same objection.
 2              THE WITNESS:  No.
 3      Q.  (BY MR. CLARK)  Okay.  Do you know if Experian
 4  participated in the -- in the construction of the
 5  e-OSCAR system?
 6              MS. BRASTER:  Same objection.
 7              THE WITNESS:  No.
 8      Q.  (BY MR. CLARK)  And you can -- and you've
 9  been -- you've been an Experian employee since May of
10  2004; is that fair to say?
11      A.  Yes.
12      Q.  During the entire length of your employment
13  with Experian, has Experian used the e-OSCAR system?
14      A.  I'm not a hundred percent sure, but I believe
15  so.
16      Q.  When you began your employment at Experian in
17  May of 2004, was Experian using the e-OSCAR system at
18  that time?
19      A.  I don't know for sure.  We -- as a customer
20  service agent, I was not informed right away about what
21  system was used.
22      Q.  Okay.  And as a customer service agent, did you
23  process consumer disputes?
24      A.  Yes.
25      Q.  And how did you process consumer disputes in
```

Anna Simmons
May 3, 2017

1    that role?

2        A.  I can't answer that.  Could you please be more

3    specific when you ask how?

4        Q.  Sure.  Do you understand what I mean when I say

5    "process consumer disputes"?

6        A.  Yes.

7        Q.  Okay.  And what -- what is your understanding

8    of processing consumer disputes?

9        A.  One of the things processing a consumer dispute

10   can mean is assisting a consumer with their dispute on

11   their credit file.

12       Q.  Could it also mean communicating with the data

13   furnisher about the information the consumer is

14   disputing?

15       A.  Yes, it can also mean that.

16       Q.  Is -- did -- in your role as a -- as -- sorry,

17   I forgot.  You said you were a consumer dispute agent.

18   I -- I -- I -- forget the exact terminology you used,

19   but...

20            What was the exact -- your exact job title?

21       A.  I stated customer service agent, but I -- I

22   also stated I wasn't sure if that was the title those

23   many years ago.

24       Q.  Okay.  So if I refer to customer service agent,

25   we both know what you're talking about.  It's that

Anna Simmons
May 3, 2017

1    employment you had with Experian starting in May 2004?

2         A.   Yes.

3         Q.   Okay.  So as a customer discuss -- a customer

4    agent, did you ever, in the course of processing a

5    consumer dispute, send an ACDV to a data furnisher?

6         A.   Yes.

7         Q.   Okay.  And what -- when you sent an ACDV to a

8    data furnisher, did -- did you send it through the

9    e-OSCAR system?

10        A.   More than likely, yes.  I just handled the

11   dispute where I would choose the dispute reason and then

12   I did not handle the ACDVs.  And I did not send them out

13   myself.

14        Q.   Okay.  And who -- who sent those ACDVs from the

15   disputes that you -- you handled?

16                  MS. BRASTER:  Objection to foundation.

17                  THE WITNESS:  I would assume they're almost

18   all systematically sent.

19        Q.   (BY MR. CLARK)  When you say systematically

20   sent, what do you mean?

21        A.   Sent by the system.

22        Q.   When you say "the system," what do you mean?

23        A.   Not sent by an agent.

24        Q.   Okay.  So the system in your mind means anyone

25   who is not an agent?

Anna Simmons
May 3, 2017

1       A.   In this case, correct.

2       Q.   Would the system then mean that -- does the

3   system in your mind include any human being?

4                   MS. BRASTER:  Objection to vague.

5                   THE WITNESS:  If I say system, I would

6   imagine it's not a human being, correct.

7       Q.   (BY MR. CLARK)  And why -- why do you believe

8   that?

9       A.   That is my understanding of human being and

10  system.

11      Q.   Okay.  So let me -- let me see if I understand

12  what you mean by system.

13                  Are you saying that you input information

14  based on a consumer dispute and then the system

15  transmits that information to the data furnisher?  Is

16  that -- is that sort of what you're -- you're getting at

17  or am I missing something?

18                  MS. BRASTER:  Objection to the extent it

19  misstates her testimony.

20                  THE WITNESS:  Yes, that makes sense.

21      Q.   (BY MR. CLARK)  Okay.  So let's see -- so

22  you're not sure what -- what the system is in terms of

23  whether it's -- all you know is that it's not a human --

24  it doesn't involve the intervention of a human being; is

25  that fair to say?

Anna Simmons
May 3, 2017

```
 1              MS. BRASTER:  Same objection.
 2              THE WITNESS:  Correct.  I'm -- I'm not sure
 3    of all the details of Experian's system.
 4         Q.  (BY MR. CLARK)  Okay.  Does the system ever --
 5    does the system ever refuse to send an ACDV as you've --
 6    as -- as it's been directed by your action?
 7         A.  I do not know.
 8         Q.  In your experience as a consumer dispute agent
 9    or customer dispute agent, did the system ever reject an
10    ACDV that you -- that you sent?
11              MS. BRASTER:  Objection to vague.
12    Foundation.
13              THE WITNESS:  I do not know.
14         Q.  (BY MR. CLARK)  Let me ask you a general
15    question, Anna, you -- do you use a computer at work?
16         A.  Yes.
17         Q.  When you're -- and -- and do you type on
18    that -- do you type on that computer at any point in
19    time?
20         A.  Yes.
21         Q.  Have you ever typed a letter E?
22         A.  The letter E, is that what you stated?
23         Q.  Yes.
24         A.  Yes.
25         Q.  Okay.  And how does -- how does the letter E --
```

Anna Simmons
May 3, 2017

```
 1    when you type the letter E on the keyboard, do you
 2    expect it to show up on -- on a screen that's in front
 3    of you?
 4         A.  Yes.
 5         Q.  Okay.  But even though you're typing the letter
 6    E, it's not actually the letter E that is -- that is
 7    going through the screen, it would be whatever the
 8    computer system is that -- that calculates what you've
 9    typed as the letter E and then displays it on the
10    screen, is that -- is that your understanding or do you
11    have a different understanding?
12              MS. BRASTER:  Objection to vague and
13    foundation.
14              THE WITNESS:  I am so sorry, I don't have
15    understanding of how the E gets transmitted through the
16    computer.
17         Q.  (BY MR. CLARK)  Okay.  If -- let me ask you
18    this question:  Have you -- have you wrote e-mails -- or
19    do you write e-mails in the course of -- in the course
20    of your job?
21         A.  Yes.
22         Q.  Okay.  And when you -- when you write e-mails,
23    do you type these e-mails out on a keyboard ever?
24         A.  Yes.
25         Q.  Okay.  And when you send those e-mails to -- to
```

Anna Simmons
May 3, 2017

```
 1    other people, is it -- is it you sending those e-mails
 2    or is it the system sending those e-mails?
 3                   MS. BRASTER:  Objection to foundation and
 4    vague.
 5                   THE WITNESS:  I -- I'm really not quite
 6    sure.  I guess it would be the system, after I request
 7    the e-mail be sent.  I don't know how to answer that
 8    that well.  I'm so sorry.
 9       Q.  (BY MR. CLARK)  Okay.  That -- that's -- that's
10    okay.
11                   Basically what I'm trying to do here is I'm
12    trying to find an analogy to what you testified to.  And
13    maybe this is because -- maybe it's not.
14                   So -- but let me ask one more question
15    about -- about those e-mails and then I'll tie it back
16    in.  If someone got back to you based on the e-mail that
17    you sent, would they be -- would they be asking about an
18    e-mail that you sent or would they be asking about an
19    e-mail that the system sent?
20                   MS. BRASTER:  Same objection.
21                   THE WITNESS:  I would imagine that they
22    would be asking about an e-mail that I sent through the
23    system.
24       Q.  (BY MR. CLARK)  Okay.  Now, in the context of
25    tying this back in to the consumer dispute process as
```

Anna Simmons
May 3, 2017

```
 1    you -- as you indicate your -- your role as a customer

 2    service agent was, is -- is it -- well, let me ask you

 3    this.

 4              Why is -- what is the process of sending a

 5    consumer dispute through the system any different than

 6    sending an e-mail through an e-mail server to -- to

 7    another individual in the ordinary course of your work?

 8              MS. BRASTER:  Objection to vague and

 9    foundation.

10              THE WITNESS:  I do not know.

11        Q.  (BY MR. CLARK)  Okay.  Do you think that those

12    processes, based on your experience, are -- are the

13    same?

14              MS. BRASTER:  Same objection.

15              THE WITNESS:  I am so sorry.  I don't

16    understand the question.  Did you ask if an e-mail and

17    an ACDV were sent the same?

18        Q.  (BY MR. CLARK)  Well, is -- is -- let me ask

19    you this.

20              If -- if there was something -- if there

21    was something that -- that -- that had been entered by a

22    dispute agent in the course of a dispute that was

23    submitted through e-OSCAR in an ACDV, would -- would

24    the -- would the blame for that error lie with the

25    system or would it lie with the agent who inputted the
```

Anna Simmons
May 3, 2017

```
 1   information that was transmitted through the system?
 2             MS. BRASTER:  Objection to vague.
 3   Speculation, foundation.
 4             THE WITNESS:  I will have to ask for the
 5   question to be repeated.
 6             MR. CLARK:  Sure.  Madam Court Reporter.
 7             THE REPORTER:  (Read back.)
 8             MS. BRASTER:  Same objection.
 9             THE WITNESS:  I don't know which error you
10   are referring to.
11        Q.  (BY MR. CLARK) Okay.  Let me -- let me try
12   asking it again.  Let's suppose that a -- a -- an
13   Experian agent inputted information that was sent to a
14   data furnisher through an ACDV.  Are you with me so far?
15        A.  Yes.
16        Q.  And let's say that some of the information that
17   the agent entered that wound up on that ACDV sent to the
18   a furnisher was inaccurate or incorrectly entered.  Are
19   you with me so far?
20             MS. BRASTER:  Objection to speculation.
21             THE WITNESS:  Yes.  I didn't understand it
22   that way earlier.
23        Q.  (BY MR. CLARK) Okay.  And let's say -- let's
24   that Experian found out about that and was trying to
25   figure out who was responsible for -- for that -- for
```

Anna Simmons
May 3, 2017

1    that mistake.  Are you with me so far?

2                 MS. BRASTER:  Same objection.

3                 THE WITNESS:  Kind of.  I don't know when

4    you state Experian found out about it, but I'm doing my

5    best to -- to follow you as best I can.

6         Q.  (BY MR. CLARK)  Okay.  When I say found out, I

7    mean received notification that the information inputted

8    by the -- by the Experian employee who sent the dispute

9    to -- ACDV was inaccurate.

10                MS. BRASTER:  Objection to vague,

11   speculation.

12        Q.  (BY MR. CLARK)  Are you with me so far?

13        A.  Yes.

14        Q.  Okay.  When Experian was trying to figure out

15   who was responsible for inputting that information,

16   would it -- would it look to see if the system was

17   operating properly or would it ask the dispute agent

18   what went wrong?

19                MS. BRASTER:  Same objections.

20   Speculation, foundation and vague.

21                THE WITNESS:  If I remember correctly, you

22   stated that agent entered the wrong information.  So --

23                MR. CLARK:  Yes.

24                THE WITNESS:  -- Experian would speak to

25   the agent.

Anna Simmons
May 3, 2017

1    Q.  (BY MR. CLARK)  Okay.  Thank you.  And last

2  question.  Is -- you referred to it as "the system"

3  before, right?

4    A.  Yes.

5    Q.  Is the system an Experian system?

6              MS. BRASTER:  Objection to foundation.

7              THE WITNESS:  Experian uses many systems.

8  I don't know if they have created all of them.  But yes,

9  some are Experian systems.

10    Q.  (BY MR. CLARK)  So when you refer to "the

11  system" in the singular, would you like to amend your

12  testimony to say "the systems"?

13    A.  I don't think so.  I think only one system was

14  used for the ACDV to be spent, but Experian --

15    Q.  Okay.

16    A.  -- has several systems regarding different

17  sections.

18    Q.  So I will repeat my question.  When we -- we

19  were talking about "the system" before in the singular,

20  do you recall that?

21    A.  Yes.

22    Q.  Now, the system that we're talking about, is

23  that an Experian system?

24              MS. BRASTER:  Objection to foundation.

25              THE WITNESS:  The e-OSCAR system, I don't

Anna Simmons
May 3, 2017

```
 1   think is an Experian system, but there are other systems
 2   that are.
 3       Q.  (BY MR. CLARK)  And so let me -- let me --
 4   maybe we could have answered this a lot easier before.
 5   When you refer to the system, were you referring to
 6   e-OSCAR system?
 7                 MS. BRASTER:  Objection to vague and to the
 8   extent it misstates her testimony.
 9                 THE WITNESS:  Yes, when the ACDV is sent
10   I'm referring to the e-OSCAR system.
11       Q.  (BY MR. CLARK)  Okay.  Okay.  So as you sit
12   here today, you're -- you're not sure whether that is or
13   is not an Experian system?
14       A.  That is correct.  I do not know if Experian
15   assisted in creating e-OSCAR.
16       Q.  Okay.  Or if Experian maintains e-OSCAR; is
17   that -- is that fair to say?
18                 MS. BRASTER:  Objection; asked and
19   answered.
20                 THE WITNESS:  Yes, that is fair to say.
21       Q.  (BY MR. CLARK)  Okay.  But -- so it is possible
22   that -- that Experian did, in fact, either create and/or
23   maintains e-OSCAR; is that -- is that fair to say?
24                 MS. BRASTER:  Objection; asked and
25   answered.
```

Anna Simmons
May 3, 2017

 1              THE WITNESS:  I do not know.

 2       Q.  (BY MR. CLARK)  Okay.  You can't rule out the

 3   possibility though, can you?

 4              MS. BRASTER:  Same objections.

 5              THE WITNESS:  I do not know.

 6       Q.  (BY MR. CLARK)  Okay.  Let's be clear.  You're

 7   not -- you're not sure whether Experian either created

 8   or -- and/or maintains the e-OSCAR system?

 9              MS. BRASTER:  Same objection.

10              THE WITNESS:  I do not know if Experian

11   created or maintains e-OSCAR.

12              MR. CLARK:  Okay.  Thank you.

13              All right.  So, Jen, could we stipulate to

14   the authenticity of Exhibit 9?

15              MS. BRASTER:  Yeah.  Let me just -- sorry,

16   we went off on a little bit of a tangent there.

17   Exhibit 9 is --

18              MR. CLARK:  Yeah.  Yeah.  This is --

19              MS. BRASTER:  -- 1021 to 1029.

20              MR. CLARK:  Yes.

21              MS. BRASTER:  Okay.  Thank you.

22

Anna Simmons
May 3, 2017

1    ████  ████  ████   ██████

2              MR. CLARK:  Jen, we're -- we're -- I've

3    got -- I've got three more of these.  I know it's a

4    little bit after 1:00.  So I think -- I think -- I don't

5    have -- I don't think we'll go on any tangents, so it's

6    up to you whether you just want to get through this so

7    we're at a good stopping point.  But I'm happy to stop

8    now because we had -- we're already past 1:00.  It's up

9    to you.

10             MS. BRASTER:  Yeah.  If this is just the

11   basic questions like most of other ones were -- and I

12   didn't mean tangent in an offensive way.

13             MR. CLARK:  Oh, no, no.  I -- I agree it

14   did.

15             MS. BRASTER:  Yeah.

16             MR. CLARK:  It was definitely different

17   than the other ways.  So I just want to make sure that

18   that -- as I -- as I sit here right now, I don't think

19   that's going to happen.  So it's up to you whether you

20   want to break now.

21             MS. BRASTER:  Yeah.  Why don't we just go

22   through these last couple if you just want to -- if you

23   have a couple of questions on each of these.  But if you

24   think it's going to go lengthy, let us know and we'll

25   take a stop for lunch.

Anna Simmons
May 3, 2017

1          MR. CLARK:  Okay.  Will do.

2          All right.  So, Madam Court Reporter, if we

3  could have Tab 10 as Exhibit 10, please.

4          (Exhibit No. 10 was marked)

5          THE WITNESS:  I have this in front of me.

6     Q.  (BY MR. CLARK)  Okay.  Anna, what is this

7  document?

8



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



19          MR. CLARK:  Great.  Well, with that, thanks
20  for -- thanks for sticking with me for a few minutes
21  after -- after 1:00.  But let's -- let's go on break and
22  you just let me know -- for lunch, let me know how long
23  do you think you need?
24          MS. BRASTER:  Okay.  Well, let's go off the
25  record.

Anna Simmons
May 3, 2017

```
 1              MR. CLARK:  Sure.
 2              (Break taken)
 3              MR. CLARK: Let's go back on the record.
 4              MS. BRASTER:  We are on.  All right.
 5              Anna, so we're -- I had -- for the
 6    remainder of the deposition we're going to be talking
 7    largely about Exhibit 2 and Exhibit 3.  So -- just so
 8    you know that in advance and so you have those --
 9    those -- those documents at that -- at the ready.
10              MR. CLARK:  And, Jen, again for -- for your
11    benefit those were -- those were Experian 1 to 106, as
12    broken up in Exhibit 2.  The first being Experian 1
13    through 93 and Exhibit 3 being 94 to 106.
14              MS. BRASTER:  Thank you.
15         Q.  (BY MR. CLARK)  All right.  So, Anna, looking
16    at Exhibit 2.  We had discussed --
17              MS. CHIUSANO:  Lucille Chiusano.  I'm here
18              MR. CLARK:  Thank you, Lu.
19         Q.  (BY MR. CLARK)  So, Anna, looking at Exhibit 2
20    we had discussed in the morning a consumer dispute
21    submitted by Mr. Ashcraft.  Do you recall that?
22         A.  Yes.
23         Q.  And was -- was Mr. Ashcraft's dispute -- or was
24    there a letter that Mr. Ashcraft sent to Experian
25    included in the document that you had review?
```

Anna Simmons
May 3, 2017

1           MS. BRASTER:  Objection to foundation.

2           THE WITNESS:  Yes.

3      Q.  (BY MR. CLARK)  Okay.  And on what pages of

4  Exhibit 2 was that letter contained in?

5      A.  Page one.

6      Q.  Okay.  How about page two?

7      A.  Yes.  It -- it only starts on page one.  Is --

8  I should have clarified.

9      Q.  Okay.  Yeah.  Then page two is blank and

10  then -- but it continues on page three; is that fair to

11  say?

12      A.  Yes.

13      Q.  Okay.  So looking at -- so what's -- what's the

14  date of Mr. Ashcraft's letter to Experian on page one?

15      A.  The date on this letter is April 25, 2016.

16      Q.  Okay.  And do you see that Mr. Ashcraft is --

17  is referencing a credit report number, a little bit

18  further down page?

19      A.  Yes.

20      Q.  Okay.  And is that credit report number the

21  same credit report number that we see on page five?

22      A.  (Looked at document.)  Yes.

23      Q.  Okay.  Looking at page three, do you see where

24  it says:  Incorrect furnisher of account information?

25      A.  Yes.

Anna Simmons
May 3, 2017

1        Q.   Okay.  Is there a furnisher account that

2   Mr. Ashcraft is disputing?

3        A.   Yes.

4        Q.   And what is the name of this furnisher account?

5        A.   Welk Resort Group.

6        Q.   Okay.  And what -- what information is

7   Mr. Ashcraft disputing?

8        A.   Late payments after filing a bankruptcy.

9        Q.   And what late payments specifically?

10       A.   May and June of 2011.

11       Q.   Okay.  And what information does Mr. Ashcraft

12   dispute on those dates?

13       A.   May of 2011, it appears he's disputing 30 days

14   late.  From June of 2011, it appears that he was

15   disputing the 60 days late.

16       Q.   And based on the remainder of the information

17   contained on page three, what does Mr. Ashcraft want

18   Experian to do with respect to this inaccurate

19   information?

20            MS. BRASTER:  Objection to the extent it

21   calls for speculation.

22            THE WITNESS:  To change the late notices to

23   reflect that he was current.

24       Q.   (BY MR. CLARK)  Okay.  All right.  And

25   Mr. Ashcraft references a bankruptcy on this page; is

Anna Simmons
May 3, 2017

1   that fair to say?

2        A.   Yes.

3        Q.   Okay.  Let's see.  So looking at -- looking at

4   Ashcraft 9, do you see a notation for a public record?

5        A.   (Looked at document.)  Yes.

6        Q.   Okay.  And what is that public record?

7        A.   (Looked at document.)  A Chapter 7 discharge

8   bankruptcy.

9        Q.   Okay.  And what -- is there -- is there a

10   notation as to when the Chapter 7 bankruptcy was filed?

11        A.   Yes.

12        Q.   Okay.  And is that -- what is that notation?

13        A.   April 2011.

14        Q.   Is there a date on which this bankruptcy was

15   discharged?

16        A.   Yes.

17        Q.   And what is that date?

18        A.   August 2011.

19        Q.   And is there a -- is that August 2011 entry,

20   does it appear underneath a line that says "date

21   resolved"?

22        A.   Yes.

23        Q.   Okay.  So by date resolved, that means the date

24   that it was discharged, the bankruptcy?

25        A.   Yes.

Anna Simmons
May 3, 2017

1       Q.   Okay.   And looking on Ashcraft 13 do you see a

2   trade line for Welk Resort Group?

3       A.   (Looked at document.)   Yes.

4       Q.   Okay.   And is this the Welk Resort Group

5   account that Mr. Ashcraft was disputing in his April 25,

6   2016, letter to Experian?

7       A.   Yes.

8       Q.   And do you see in -- do you see -- do you see

9   a -- a line near the bottom of this trade line that says

10   payment history?

11       A.   Yes.

12       Q.   Okay.   And do you see -- do you see those May

13   and June late notations that Mr. Ashcraft was disputing

14   on that payment history section?

15       A.   Yes.   Although they're whited out on this copy

16   so I don't actually right now see the late payments

17   there.   It's just two white spots.

18       Q.   Okay.   And let's see if we can -- if we can

19   clarify this.

20       A.   I -- I can also add that I did review the

21   documents and I -- I did see that there were late

22   payments there if that will help.

23       Q.   That would.   Thank you.   And in addition,

24   I'll -- I'll note we -- we had talked earlier about the

25   fact that there was another copy of this March 15, 2016,

Anna Simmons
May 3, 2017

1    disclosure contained in Ashcraft -- in Ashcraft 47 to

2    64; did we not?

3        A.  (Looked at document.)  Yes.

4        Q.  Okay.  And I mean if it's easier for you to

5    read, is -- is that -- on Ashcraft 51 do you see a -- do

6    you see that Welk Resort Group disputed trade line also

7    appearing there?

8        A.  Yes.

9        Q.  And maybe it's little clearer, do you see the

10   May and June late payment that Mr. Ashcraft was

11   disputing on Ashcraft 51 in the payment history of the

12   Welk Resort Group trade line?

13       A.  Yes.

14       Q.  Okay.  Okay.  So -- and does the -- Welk Resort

15   Group account indicate that it was included in

16   Mr. Ashcraft's bankruptcy?

17       A.  No.

18       Q.  Okay.  Let's see.  All right.  So did -- did

19   Mr. Ashcraft's April 25, 2016, letter dispute a Capital

20   One account with Experian?

21       A.  (Looked at document.)  I don't believe so.

22       Q.  Okay.  So after -- after Mr. Ashcraft submitted

23   his consumer dispute on April 25, 2016; what did

24   Experian --

25              Let me ask you this:  Did Experian contact

Anna Simmons
May 3, 2017

1    Welk Resort Group regarding Mr. Ashcraft's dispute?

2         A.   Yes.

3         Q.   And how did it do so?

4         A.   Experian sent an ACDV to the data furnisher,

5    along with attaching Mr. Ashcraft's complete mail

6    correspondence.

7         Q.   Okay.  And when you say "complete mail

8    correspondence," you're talking about his letter and all

9    the documents that he attached to his letter, as

10   contained on Ashcraft 1 to 46?

11        A.   Yes.

12        Q.   Okay.  And how do know that Experian sent an

13   ACDV to -- to Welk after it received this dispute from

14   Mr. Ashcraft?

15        A.   I believe we looked at a copy of the ACDV

16   response.  In addition to the fact that the dispute is

17   displaying in the D/R Log.

18        Q.   Okay.  And so that would be ACDV on Ashcraft --

19   I'm sorry.

20               Was that the ACDV we looked at in

21   Ashcraft -- on Ashcraft 65?

22        A.   Yes.

23        Q.   Okay.  And is that -- is sending the ACDV to

24   Mr. Ashcraft's data furnisher, Welk, in response to

25   Mr. Ashcraft's dispute, that's -- would -- would you say

Anna Simmons
May 3, 2017

```
 1    that's a -- a -- a normal thing that Experian does when
 2    it receives a dispute from the consumer?
 3                    MS. BRASTER:  Objection to vague.
 4                    THE WITNESS:  Yes, this can be considered a
 5    normal thing, as you stated.
 6        Q.  (BY MR. CLARK)  Okay.  Roughly speaking, how
 7    many consumer disputes does Experian receive per year?
 8                    MS. BRASTER:  Objection to the extent it's
 9    outside the scope.  Foundation.
10                    THE WITNESS:  I do not know.
11        Q.  (BY MR. CLARK)  Is it more than a thousand?
12                    MS. BRASTER:  Same objections.
13                    THE WITNESS:  I would assume so.
14        Q.  (BY MR. CLARK)  Is it more than a million?
15                    MS. BRASTER:  Same objections.
16                    THE WITNESS:  I do not know.
17        Q.  (BY MR. CLARK)  Okay.  Do you know how many
18    disputes it received by mail?
19                    MS. BRASTER:  Same objections and vague.
20                    THE WITNESS:  No.
21        Q.  (BY MR. CLARK)  How about by electronic mail?
22                    MS. BRASTER:  Same objections.
23                    THE WITNESS:  No.
24        Q.  (BY MR. CLARK)  Do you know how many disputes
25    Experian receives per year which dispute the accuracy of
```

Anna Simmons
May 3, 2017

```
 1   information in trade lines which were included in a
 2   Chapter 13 bankruptcy?
 3                 MS. BRASTER:  Same objections.
 4                 THE WITNESS:  No.
 5        Q.  (BY MR. CLARK)  Do you think the number is more
 6   than a thousand?
 7                 MS. BRASTER:  Same objections.
 8                 THE WITNESS:  I do not know.
 9        Q.  (BY MR. CLARK)  Does -- would Experian have a
10   record of -- of such disputes?
11                 MS. BRASTER:  Same objections.
12                 THE WITNESS:  I do not know.
13        Q.  (BY MR. CLARK)  Do you think Experian's
14   internal records could -- could show us how many
15   disputes were received?
16                 MS. BRASTER:  Same objections.
17                 THE WITNESS:  I do not know.
18        Q.  (BY MR. CLARK)  Same question.  How many
19   disputes does Experian receive per year which dispute
20   the accuracy of information contained in trade line
21   which were included in a Chapter 7 bankruptcy?
22                 MS. BRASTER:  Same objections.
23                 THE WITNESS:  I do not know.
24        Q.  (BY MR. CLARK)  Do you think the number is more
25   than a thousand?
```

Anna Simmons
May 3, 2017

1           MS. BRASTER:  Same objections.

2           THE WITNESS:  I do not know.

3      Q.  (BY MR. CLARK)  Do you know think the number is

4  more than 40?

5           MS. BRASTER:  Same objections.

6           THE WITNESS:  I would assume so.

7      Q.  (BY MR. CLARK)  And do you think there's --

8  there would be more than 40 disputes that Experian

9  receives per year which dispute the accuracy of

10  information contained in trade lines which were included

11  in a Chapter 13 bankruptcy?

12           MS. BRASTER:  Same objections.

13           THE WITNESS:  I would assume so.

14      Q.  (BY MR. CLARK)  Okay.  Do you think the number

15  is more than a hundred?

16           MS. BRASTER:  Same objections.

17           THE WITNESS:  I do not know.

18      Q.  (BY MR. CLARK)  And we were -- we were talking

19  about Mr. Ashcraft's dispute as -- as related, at least

20  in part, to claimed inaccuracies in the payment history

21  section of his Welk trade line.  Do you recall that?

22      A.  Yes.

23      Q.  Okay.  What is the payment history section

24  of -- of a trade line?

25      A.  It shows the history of how the payments were

Anna Simmons
May 3, 2017

1    made to that account and most specifically the

2    timeliness of the payments.

3         Q.   Okay.  If the account history section of

4    Mr. Ashcraft's Welk trade line had included a statement

5    which said:  That included the Chapter 7 bankruptcy on

6    April 29, 2011, would there be any reporting of payment

7    history after April of 2011?

8              MS. BRASTER:  Objection; calls for

9    speculation and assumes facts.

10             THE WITNESS:  No.

11        Q.   (BY MR. CLARK)  Okay.  And why not?

12        A.   Because the payment history after that filing

13   date would have been suppressed.

14        Q.   Okay.  And is that Experian's policy to

15   suppress payment history after the bankruptcy filing

16   date?

17             MS. BRASTER:  Objection to vague.

18             THE WITNESS:  Yes.

19        Q.   (BY MR. CLARK)  Okay.  Okay.  And so let's see.

20             Do you know how many disputes Experian

21   receives per year which dispute the accuracy of

22   information contained in a payment history section of a

23   trade line which was included in a consumer's

24   bankruptcy?

25             MS. BRASTER:  Objection; foundation.

Anna Simmons
May 3, 2017

1    Speculation.

2                    THE WITNESS:  I do not.

3                    MS. BRASTER:  I was going to say -- I'm --

4    objection; foundation.  Outside the scope.

5                    THE WITNESS:  I do not know.

6        Q.  (BY MR. CLARK)  Do you think the number is more

7    than 40?

8                    MS. BRASTER:  Same objections.

9                    THE WITNESS:  I would assume so.

10       Q.  (BY MR. CLARK)  Do you think the number is more

11   than a thousand?

12                   MS. BRASTER:  Same objections.

13                   THE WITNESS:  I do not know.

14       Q.  (BY MR. CLARK)  Looking at -- perhaps, Anna,

15   just because it's easier, since we've -- we've agreed

16   that Ashcraft 51 is -- is the same reporting on the Welk

17   trade line as Ashcraft -- what was it?  Ashcraft 13.

18   I'll just refer to that one because it's a little bit --

19   it's a little bit clearer.

20                   The -- do you see where the Welk Resort

21   Group indicates that the account was -- the status is

22   paid and closed on Ashcraft 51?

23       A.  Yes.

24       Q.  Do you see where the -- what's the last date

25   that's included in the payment history on the Welk

Anna Simmons
May 3, 2017

1    Resort Group trade line?

2         A.   October 2011.

3         Q.   And that's after April 2011, right?

4         A.   Yes.

5         Q.   Okay.  Let's see.  So turn back to the status

6    section.  What is -- what -- what is the status section

7    of a -- of a -- of a consumer trade line?

8         A.   It states the status of the account.

9         Q.   If -- if -- if an account was discharged in a

10   bankruptcy, would a notation to that effect be included

11   in the status section?

12                    MS. BRASTER:  Objection; speculation.

13                    THE WITNESS:  If a data furnisher reported

14   that this account was discharged in a bankruptcy, that

15   would be reflected under the status section.

16        Q.   (BY MR. CLARK)  Can Experian obtain information

17   about a -- the fact of a bankruptcy discharge from

18   anywhere other than from the data furnisher?

19                    MS. BRASTER:  Objection to vague.

20                    THE WITNESS:  Experian can obtain

21   information regarding bankruptcy public record through

22   LexisNexis.

23        Q.   (BY MR. CLARK)  Okay.  And is LexisNexis, are

24   they -- are they -- is it fair to say they're a

25   third-party vendor of information?

Anna Simmons
May 3, 2017

1      A.   Yes.

2      Q.   Okay.   Is that where Experian gets its

3   bankruptcy-related public record information?

4      A.   Yes.

5      Q.   Are you -- are you familiar with the -- with

6   the --

7           Let me ask you this:   Have you ever seen a

8   bankruptcy petition?

9      A.   I believe so.

10      Q.   Okay.   Have you ever seen schedules attached to

11   a bankruptcy petition?

12      A.   Yes.

13      Q.   And -- and are those -- and a bankruptcy

14   petition, to your knowledge, is that a -- a document

15   submitted into the public record in a bankruptcy?

16      A.   I believe it is submitted, as you state, into

17   the public record.

18      Q.   Okay.   So a bankruptcy schedule is -- would be

19   a document submitted into the public record, to the best

20   of your knowledge; is that fair to say?

21           MS. BRASTER:   Objection to foundation.

22           THE WITNESS:   I believe so.

23      Q.   (BY MR. CLARK)  Okay.  Let's see.  And let's

24   see.

25           And how many consumer disputes does

Anna Simmons
May 3, 2017

```
 1    Experian receive per year which dispute the accuracy of
 2    information contained in the status section of a trade
 3    line which was included in a consumer's bankruptcy?
 4                    MS. BRASTER:  Objection; outside the scope.
 5    Speculation.
 6                    THE WITNESS:  I do not know.
 7         Q.  (BY MR. CLARK)  Is it more than 40?
 8                    MS. BRASTER:  Objection; outside scope.
 9    Foundation.
10                    THE WITNESS:  I would assume so.
11         Q.  (BY MR. CLARK)  Do you know if it's more than a
12    thousand?
13                    MS. BRASTER:  Same objections.
14                    THE WITNESS:  I do not know.
15         Q.  (BY MR. CLARK)  Okay.  And looking -- looking
16    down at Ashcraft 52, we had talked before about a -- a
17    Capital One account which was included in a -- in a
18    carbon copy reinvestigation from Equifax.  Do you recall
19    that?
20         A.  Yes, I recall the -- speaking about a carbon
21    copy for a Capital One account.
22         Q.  Okay.  I want you to look at Ashcraft 52.  Do
23    you see a Capital One account listed there?
24         A.  Yes.
25         Q.  Okay.  Do you see that a section below the
```

Anna Simmons
May 3, 2017

```
 1   payment history that says "account history"?
 2        A.  Yes.
 3        Q.  Do you know -- what is an account history
 4   section in a trade line?
 5        A.  The history of the account.
 6        Q.  Okay.  And when you say history of the account,
 7   what do you -- what do you mean in particular with that?
 8        A.  It could be such things as balance information.
 9        Q.  Okay.  Anything else?
10        A.  It could be something like the date that a
11   payment was received.
12        Q.  Okay.  Could it include a scheduled payment
13   amount?
14        A.  Yes.
15        Q.  Could it include an actual amount paid?
16        A.  Yes.
17        Q.  Okay.  Do you know how many disputes Experian
18   receives per year which dispute the accuracy of
19   information contained in the account history section of
20   a trade line included in a consumer's bankruptcy?
21             MS. BRASTER:  Objection; foundation.
22   Outside scope.
23             THE WITNESS:  I do not know.
24        Q.  (BY MR. CLARK)  Do you think the number is more
25   than 40?
```

Anna Simmons
May 3, 2017

1      A.  I would assume so.

2              MS. BRASTER:  Same objections.

3      Q.  (BY MR. CLARK)  And do you think the number is

4  more than a thousand?

5              MS. BRASTER:  Same objections.

6              THE WITNESS:  I do not know.

7      Q.  (BY MR. CLARK)  Okay.  So let's go back to --

8  let's go back to the ACDV that that we're talking about

9  on Ashcraft 65.

10     A.  (Witness complies.)

11     Q.  Let me know when you're there.

12     A.  I'm there.

13     Q.  Okay.  And so -- and I apologize, I -- I know

14  that we've done -- we've gone through this a few times

15  in other depositions, but I just have to -- I have to

16  understand some of the things that are -- that are

17  present on this form.

18              So do you see there are three boxes in the

19  middle of the page that state:  Subscriber response on

20  profile and consumer claims?

21     A.  Yes.

22     Q.  What -- what information goes in the consumer

23  claims box?

24     A.  Information that the consumer claimed was

25  accurate.

Anna Simmons
May 3, 2017

```
 1        Q.   Okay.  And do you see any -- any notation -- do

 2    you see any notations in the consumer claims box on

 3    Ashcraft 65?

 4        A.   Yes.

 5        Q.   Okay.  And so what -- what notations do you

 6    see?

 7        A.   That it was current.  Paid current.

 8        Q.   Okay.  And is that -- is information in the

 9    consumer claims box information that Experian would --

10    would -- would put in before it sends the ACDV to -- to

11    Welk?

12        A.   Yes, it can be.

13        Q.   Okay.  Can Welk put that information in the

14    consumer claims box after it receives the ACDV from

15    Experian?

16        A.   No.

17        Q.   Okay.  Do you see anything in the consumer

18    claims box that -- that indicates that Mr. Ashcraft

19    wanted a statement of dispute added to his trade line?

20        A.   No.

21                 MS. BRASTER:  Objection to assume facts.

22                 MR. CLARK:  Sorry, go ahead.

23                 MS. BRASTER:  Sorry.  I didn't -- I just

24    don't want to interrupt her answer because we're -- with

25    the phone.  Just objection assumes facts.
```

Anna Simmons
May 3, 2017

1      Q.  (BY MR. CLARK)  Do -- do you see anywhere on

2  the consumer claims box where Mr. Ashcraft indicated

3  that his Welk trade line was included in his Chapter 7

4  bankruptcy?

5                   MS. BRASTER:  Same objection.

6                   THE WITNESS:  No, both of those statements

7  you stated were provided to the data furnisher in the

8  attached correspondence.

9      Q.  (BY MR. CLARK)  Okay.  But they don't -- they

10  don't appear in the consumer claims box, correct?

11     A.  That is correct.  They were sent over with the

12  correspondence.

13     Q.  But the consumer claims box does have an

14  indication towards zero under the balance; is that -- is

15  that accurate?

16     A.  That is correct.  There was also a zero balance

17  on the account.

18     Q.  Okay.  So Experian did place portions of

19  Mr. Ashcraft's dispute in the consumer claims box, but

20  not everything?

21                   MS. BRASTER:  Objection; assumes fact.

22                   THE WITNESS:  That's correct.  There is not

23  a spot to add the dispute statement in the consumer

24  claims.  That's why we provided it in that

25  correspondence, so the data furnisher can view it.

Anna Simmons
May 3, 2017

```
 1        Q.  (BY MR. CLARK)  Is the ACDV form used here the
 2   form used by all consumer reporting agencies?
 3                   MS. BRASTER:  Objection to foundation.
 4                   THE WITNESS:  I do not know.
 5        Q.  (BY MR. CLARK)  Is -- do you know if this is a
 6   form that Experian devised?
 7                   MS. BRASTER:  Same objection.
 8                   THE WITNESS:  I do not know.
 9        Q.  (BY MR. CLARK)  Okay.  The -- is there anywhere
10   on the consumer claims box where Experian indicates that
11   Mr. Ashcraft is disputing the -- the late payments in
12   May and June of 2011?
13        A.  Yes.  That is where it states "paid current".
14        Q.  Okay.  And where are you looking?  And to be
15   clear, I was looking at the consumer claims box.  I
16   wasn't -- oh, I see what you're saying.  Paid current.
17                   Okay.  And so by "paid current" Experian
18   meant to convey to -- to Welk that -- that there was --
19   that there was no -- that there was no prior late
20   payments on the account?
21        A.  Experian conveyed that there were no late
22   payments on the account.
23        Q.  Okay.  So -- and that's what paid current
24   means?
25        A.  Yes.  The status already was paid.  And the
```

Anna Simmons
May 3, 2017

```
 1    current after it conveys that there were no late
 2    payments on the account.
 3         Q.  Okay.  So -- so it would never be the case that
 4    an account would say paid current if there were late
 5    payments that had been entered previously, but the
 6    account had been -- been brought current at a later
 7    time?
 8                   MS. BRASTER:  Objection to vague,
 9    speculation.
10                   THE WITNESS:  If it states "paid current,"
11    that means it was paid and never late.
12         Q.  (BY MR. CLARK)  Okay.  So -- so the word "paid"
13    means never late?
14         A.  No.
15         Q.  Does the word "current" mean never late?
16         A.  In this scenario on the ACDV under consumer
17    claims it does mean that.
18         Q.  Okay.  And the -- and is there -- is there an
19    internal -- is -- is the word "current," is that like --
20    because to me the word "current" doesn't mean never
21    late.  So I'm assuming that that's some kind of internal
22    Experian code for -- for never late?
23         A.  The phrase "paid and current" would mean never
24    late.
25         Q.  Okay.  Well, the phrase here is "paid current"
```

Anna Simmons
May 3, 2017

```
 1   it's not paid and current; is that fair to say?
 2        A.  My apologizes.  I didn't mean to put "and" in
 3   the middle of those two words.
 4        Q.  No worries.  I just want to make sure.  Because
 5   we're talking about a very granulated statement.  I'm
 6   not trying to put words in your mouth.  I just want to
 7   make it absolutely clear.
 8             Okay.  So -- so is -- is paid current an
 9   Experian code for -- for reporting the information the
10   consumer's claim is never late?
11        A.  I -- I guess it could be called a code.  I'm
12   not exactly sure what the name for it is.
13        Q.  Okay.  Am I -- I mean code or terminology, is
14   that sort of the same -- is terminology maybe a better
15   word?
16        A.  Okay.
17        Q.  Well, I'm asking you.  I just want to make sure
18   that you understand what I'm trying to get at.
19        A.  Yes.
20        Q.  Okay.  And so where in the policies and
21   procedures would we find evidence of terminology which
22   indicated that "paid current" as reflected on this
23   consumer claims box means paid and never late?
24        A.  I do not know.  I would have to look through
25   the participant guide to see where that is listed.
```

Anna Simmons
May 3, 2017

1      Q.   Okay.  So it would be -- it would be included

2   in the participants guide, you believe?

3      A.   I would have to look through there to see.

4      Q.   Would it be included on any other document

5   we've looked at which is not a participants guide?

6      A.   I'm not sure.  I would have to look through the

7   documents and see if it's listed there.

8      Q.   Okay.  How -- how -- so Experian put this

9   consumer claims "paid current."  How would Experian know

10  that Welk would know that paid current means paid and

11  never late?

12     A.   I do not know.

13     Q.   Okay.  Is there -- is there a uniform system of

14  reporting disputed information that -- that Experian and

15  data furnishers use to resolve consumer disputes?

16              MS. BRASTER:  Objection to foundation.

17              THE WITNESS:  There is Metro 2 Reporting

18  that data furnishers use when conveying information with

19  Experian.

20     Q.   (BY MR. CLARK)  Okay.  Is the notation "paid

21  current" included along the terms listed in Metro 2?

22              MS. BRASTER:  Same objection.

23              THE WITNESS:  I do not know.  I would have

24  to review the documents that we looked at earlier in

25  detail to find out the answer for you.

Anna Simmons
May 3, 2017

1      Q.  (BY MR. CLARK)  Okay.  Would -- aside from
2  Metro 2, would there be any other -- any other means by
3  which Experian would know that Welk would know what it
4  meant?  And by "it" I mean Experian -- when Experian
5  said paid current?
6                  MS. BRASTER:  Objection to foundation.
7  Calls for speculation.
8                  THE WITNESS:  There could have been
9  training with Experian and Welk.  I am not sure.  I am
10  not privy to that information.
11      Q.  (BY MR. CLARK)  I understand.  Aside from
12  training and Metro 2, can you think of any other way
13  that Welk would know?
14                  MS. BRASTER:  Same objections.
15                  THE WITNESS:  I do not know.
16      Q.  (BY MR. CLARK)  Okay.  Now let's talk about the
17  training a little bit.  When you say when training --
18  and I understand you may not know the particulars of the
19  training that Welk provided -- or Welk was provided by
20  Experian.  But do you know enough about it to be able to
21  say that that might be something that happened.
22                  In -- so -- so let me ask you a general.
23                  In general what kind of -- what kind of
24  training does Experian provide to data furnishers about
25  codes that it would -- that it would have provided on

Anna Simmons
May 3, 2017

```
 1    ACDVs for the purpose of review?
 2                MS. BRASTER:  Objection, outside the scope.
 3    Speculation.  Foundation.
 4                THE WITNESS:  I do not know.
 5         Q.  (BY MR. CLARK)  Okay.  Do you recall any such
 6    training that -- that -- that you know have occurred in
 7    the past?
 8                MS. BRASTER:  Same objections.
 9                THE WITNESS:  I do not know.
10         Q.  (BY MR. CLARK)  So may I ask what -- what is
11    your basis for -- for thinking that there may have been
12    a training provided from -- by Experian to Welk
13    regarding information contained on the ACDV that
14    Experian sent to Welk?
15                MS. BRASTER:  Objection to the extent that
16    it misstates her testimony.
17                THE WITNESS:  I have previously heard that
18    there are trainings between the credit reporting agency
19    and the data furnishers.
20         Q.  (BY MR. CLARK)  And How did you hear that?
21         A.  I do not remember.
22         Q.  Do you know when you heard it?
23         A.  I do not know.
24         Q.  Do you remember in general when you heard it?
25         A.  I do not know.
```

Anna Simmons
May 3, 2017

1   Q. Do you remember who told you?

2   A. I do not know.

3   Q. Do you -- do you remember any details of the

4 trainings that were provided?

5   A. No.

6   Q. That you heard about?

7      MS. BRASTER:  You might want to repeat it.

8 I don't know if he heard you.

9      THE WITNESS:  No.

10   Q. (BY MR. CLARK)  Okay.  Would Experian have a

11 record of trainings that it provided to data furnishers

12 about information that it contains on ACDVs that it sent

13 to the data furnishers?

14      MS. BRASTER:  Objection; speculation.

15 Foundation.  Outside the scope.

16      THE WITNESS:  I do not know.

17   Q. (BY MR. CLARK)  Do you know if Experian charges

18 for those -- for those trainings?

19      MS. BRASTER:  Same objections.

20      THE WITNESS:  I do not know.

21   Q. (BY MR. CLARK)  Okay.  Do you know when in the

22 course of Experian's business relationship with a data

23 furnisher it would provide those trainings to the data

24 furnisher?

25      MS. BRASTER:  Same objections.

Anna Simmons
May 3, 2017

```
 1              THE WITNESS:  I do not know.
 2      Q.  (BY MR. CLARK)  Okay.  All right.  Have you
 3  ever conducted any -- any trainings along the lines that
 4  we just discussed?
 5      A.  No.
 6      Q.  Do you know anybody who has?
 7      A.  I do not know.
 8      Q.  Okay.  So in the course of your work with
 9  Experian since 2004 you're -- you're not aware of
10  anybody who has conducted any trainings for any
11  furnisher regarding the information that Experian
12  provides on its ACDVs that it sends to furnishers after
13  Experian receives a consumer dispute?
14              MS. BRASTER:  Objection, outside the scope.
15  Foundation.  Speculation.  Asked and answered.
16              THE WITNESS:  I do not know the names of
17  the people that have conducted trainings with the data
18  furnishers.
19      Q.  (BY MR. CLARK)  Okay.  Do you remember their
20  job titles?
21              MS. BRASTER:  Same objection.
22              THE WITNESS:  I do not know their job
23  titles.
24      Q.  (BY MR. CLARK)  Okay.  All right.  Moving from
25  the consumer claims box.  Let's look at the on profile
```

Anna Simmons
May 3, 2017

1  box, which is the second one.  Do you see that?

2       A.  Yes.

3       Q.  And what's the -- what's the on profile box?

4       A.  This is basically the information as to how the

5  account was appearing on the credit file at the time of

6  the dispute.

7       Q.  Okay.  And that says the -- under the trade

8  information -- under the account condition it says paid

9  "del 60."  Do you see that?

10      A.  Yes.

11      Q.  And so what does that mean?

12      A.  That it was paid in full and at the time it was

13  paid in full it was being reported by Welk as 60 days

14  delinquent.

15      Q.  Do you see under -- let me ask you this.  Under

16  the -- well, actually, strike that.

17           Let's see.  And do you see a date last paid

18  that's -- that is being reported on the on profile?

19      A.  Yes.

20      Q.  And when -- when -- when is that date?

21      A.  April 20, 2011.

22      Q.  What does date last paid mean?

23      A.  It is the date Welk is stating they received a

24  payment on the account the last time.

25      Q.  Okay.  And let's see.  And looking at the

Anna Simmons
May 3, 2017

```
 1   subscriber response box to the -- that far right box of

 2   those three.  What is the subscriber response --

 3   response box?

 4        A.  Basically that is the information that the data

 5   furnisher responded back to in response to the ACDV that

 6   was sent to them for the dispute.

 7        Q.  Okay.  Do you see that there's a -- there's a

 8   box that says "account status/rating"?

 9        A.  Yes.

10        Q.  And there's a number that says 89 in there.  Do

11   you see that in the subscriber response?

12        A.  Yes.

13        Q.  What does 89 mean?

14        A.  I believe that is a code that stands for

15   creditor received deed.

16        Q.  Okay.  And below that you see a box that says

17   "payment rating," right?

18        A.  Yes.

19        Q.  And what -- and there's a number in -- in the

20   subscriber's response.  Do you see that?

21        A.  Yes.

22        Q.  And what is that -- what does that describe?

23   What is that payment rating -- what is -- and that --

24   that says the number -- sorry.  Strike all that.  I got

25   ahead of myself.
```

Anna Simmons
May 3, 2017

1            And -- and that's the number four, right?

2        A.  Yes.

3        Q.  And what does the number four represent in

4    payment rating box?

5        A.  As I sit here today, I don't know.  I do not

6    have all of the codes memorized.  And this is one

7    that --

8        Q.  Okay.

9        A.  -- I don't have memorized off the top of my

10   head.

11       Q.  That -- that's -- that's completely fine.

12   Would any of the documents that we looked at before we

13   took our lunch break help you to figure out what payment

14   rating -- what that number four means?

15       A.  Yes, they might.  I would have to look through

16   them and see.

17



Anna Simmons
May 3, 2017

1 ██  ███  ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████

██  ██████████  ██████████████████████

██  █████████████████████████████████

█████████████████████████████████

██  ███  ████

9            MS. BRASTER:  Miles, just give us a second.
10  We're going to go through them and pull the ones you
11  just referenced.
12            MR. CLARK:  Sorry, Jen?
13            MS. BRASTER:  We're just going through
14  right now and pulling the exhibits.  They're just
15  stacked catty-corner so I'm just going through right now
16  and finding them.
17            MR. CLARK:  Got it.  Okay.  Yeah.  Sorry
18  for this.  I just -- you know, I want to make sure that
19  she can look anywhere that she thinks it might be there.
20            MS. BRASTER:  No.  Understood.  Okay.  So
21  here is four.
22            THE WITNESS:  Thank you, ma'am.  (Looked at
23  document.)
24            MS. BRASTER:  I'll just put these here,
25  Anna.  There's eleven and there's ten.

Anna Simmons
May 3, 2017

1          THE WITNESS:  Thank you.  (Looked at

2    documents.)



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017

1

7      Q.   -- as we've seen -- we've seen it in a few

8   different contexts.  But if -- if -- if for some reason

9   you have a -- a different thought on that later, just

10  let us know.

11     A.   Yes.

12     Q.   Okay.  So -- okay.  So -- so to the best of

13  your knowledge, a four in that payment rating box would

14  mean a -- a closed and inactive account?

15     A.   That is correct.

16     Q.   Okay.  So let me -- let me ask you this.

17  The -- I -- I see that on the account condition status

18  and the account status rating, those are different boxes

19  on the subscriber response box.  Do you see that?

20     A.   You said which two boxes are different, I'm

21  sorry?

22     Q.   Sure.  Let me ask you this.  So on the

23  subscriber response box there are separate lines

24  separating the account status rating that we talked

25  about with an 89 and the payment rating where we talked

Anna Simmons
May 3, 2017

1  about the number four.  Do you see that?

2       A.  Yes.

3       Q.  Okay.  With the account status rating can -- is

4  there any account status for -- included in Chapter 7

5  bankruptcy?

6       A.  That would be listed a couple of boxes down

7  where it says CII.

8       Q.  Okay.  And so account status rating, that --

9  there's no way for -- there's no number that --

10 that's -- that anyone could -- could put in that would

11 designate the fact that an account was included in a

12 bankruptcy; is that -- is that what you're saying?

13      A.  I am not sure.  I would have to look through

14 all the account status codes to see.  But I do know that

15 the bankruptcy information on an ACDV is provided in the

16 CII box.

17      Q.  Okay.  Let's see.  So let's see.  If we look

18 back through Tab 11 at -- so we found -- we found 89 on

19 Ashcraft 1037 on Exhibit 11, right?

20      A.  We found 89 -- where did you state?

21           MS. BRASTER:  Sorry, Miles.  Anna was just

22 asking.  You said 89 was on 1037.  She was just

23 inquiring, is that what --

24           Miles?

25           Let's go off the record for a second.

Anna Simmons
May 3, 2017

1              (Pause in proceedings)

2         MS. BRASTER:  Back on the record.

3         MR. CLARK:  Thank you.



Anna Simmons
May 3, 2017

1    ███  ████████████████████████

██  ███████████████

3        A.   Discharge through Chapter 7 bankruptcy.

4        Q.   Okay.  And is this also a -- could the code E

5    have been included in the -- in the payment rating box?

6    Or sorry, in the -- in the -- in the account status

7    rating box where the number 89 already occurs in the

8    subscriber response box on that ACDV that we're talking

9    about on Ashcraft 65?

10       A.   I believe so.

11       Q.   So what -- so let me -- let me ask you this:

12   On the on profile history grid, does it look like the

13   account status rating and payment rating boxes are

14   combined?

15       A.   It looks like there's not a line.  I don't know

16   why that is.

17       Q.   Could -- can Experian actually tell the data

18   furnisher -- so I guess the question is:  How would

19   Experian communicate with the data furnisher the account

20   status rating and the payment rating in the ACDV that it

21   sends to the data furnisher?

22       A.   In this scenario it sent that as the condition

23   paid delinquent 60 because that encompassed everything.

24       Q.   Does paid delinquent 60, does that -- does that

25   indicate that the -- that the creditor received a deed

Anna Simmons
May 3, 2017

```
 1    in lieu?
 2         A.   No, that is not what Welk was reporting.   It
 3    means --
 4         Q.   Okay.
 5         A.   -- that it was paid and at the time of payment
 6    it was 60 days late.
 7         Q.   Okay.  Is -- is -- is -- is paid del 60, does
 8    that indicate that the account was -- was closed?
 9         A.   It does.  Because it states paid in full.  That
10    also means closed for this type of account.
11         Q.   Sorry, you -- you say it says "paid in full."
12    Where do you see it says paid in full?
13         A.   I'm sorry, I -- I just have the understanding
14    that it's paid in full because it says "paid."
15         Q.   Okay.  So in -- when -- when Experian paid,
16    what it means is paid in full?
17         A.   That is correct.
18         Q.   Okay.  So the on -- so the on-line profile
19    history grid it's being reported to Welk that the
20    account was paid in full, but it was also delinquent
21    60 days?
22         A.   That is what Welk was reporting.
23         Q.   Okay.  And is that the information that
24    Experian communicated to Welk when it sent the ACDV to
25    Welk?
```

Anna Simmons
May 3, 2017

1       A.   That is the information Experian stated we had
2   on the file at that time.
3       Q.   Okay.  Going back to the consumer claims box.
4   So is there anywhere on the consumer claims box that --
5   that indicates that Mr. Ashcraft believed the account
6   was included in his Chapter 7 bankruptcy?
7       A.   No.  That information was conveyed in the
8   document attached to the ACDV.
9       Q.   Okay.  If it -- and -- and looks like there's
10  no line between the account status rating and the
11  payment rating on the consumer claims box like there is
12  in the subscriber response box; is that fair to say?
13      A.   Yes.
14      Q.   So there would have been no way for Experian to
15  put in an account status rating the code -- the code of
16  E for bankruptcy -- discharged through Chapter 7
17  bankruptcy?
18      A.   I do not know why there's not a line there.
19      Q.   Does it say -- let me ask this:  In -- in -- in
20  the course of your work for Experian have you had
21  occasion to look at other that ACDVs and ACDV responses
22  that Experian had sent to a data furnisher and received
23  a response for?
24      A.   Yes.
25      Q.   In your experience does -- is there -- is there

Anna Simmons
May 3, 2017

```
 1   ever a line between the account status rating and
 2   payment rating codes on the consumer claims box?
 3        A.  I can't think of that off the top of my head.
 4        Q.  Okay.  How about on the on profile box?
 5        A.  I do not know right now.
 6        Q.  Okay.  So -- okay.  Okay.  Thanks.  So let's
 7   see.  In -- in -- in the subscriber response box do you
 8   see that there's -- there's a listing for original
 9   delinquency date?
10        A.  (Looked at document.)  Yes.
11        Q.  And what is that date?
12        A.  That is the date that Welk is stating they have
13   in their system for the original delinquency date.
14        Q.  Okay.  And I had represented to you earlier
15   that Mr. Ashcraft filed his bankruptcy on April 29,
16   2011.  Do you recall that?
17        A.  Yes.
18        Q.  Okay.  And -- and April 20th is different than
19   April 29th, right?
20        A.  Yes.
21        Q.  And then below on subscriber response box do
22   you see a -- do you see a date that says "closed date"?
23        A.  Yes.
24        Q.  And what is closed date on the subscriber
25   response?
```

Anna Simmons
May 3, 2017

1        A.   That is the date Welk is stating the account
2   was closed.
3        Q.   Do you recall that I represented to you that
4   the -- that Mr. Ashcraft received his bankruptcy
5   discharge in August of the 2011?
6        A.   Yes.
7        Q.   And do you recall that -- that the public
8   records section of Mr. Ashcraft's March 15, 2016,
9   disclosure it indicated a bankruptcy -- Chapter 7
10  bankruptcy discharge date of August 2011?
11       A.   Yes.
12       Q.   Let me ask you in -- in general.  If -- if
13  Experian provides -- well, actually no.
14            If -- if the subscriber response box on an
15  ACDV response is blank when Experian is reporting
16  different information, does -- does Experian re-report
17  the information that it has on its on profile?
18       A.   Can you repeat the question?
19       Q.   Sorry.  That didn't come out quite the right
20  way.
21            Let's -- let's -- let's take a concrete
22  example.  On the on profile history grid it says:  Paid
23  delinquent 60, correct?
24       A.   Yes.
25       Q.   And on the subscriber response box that -- that

Anna Simmons
May 3, 2017

1    field is blank.  Do you see that?

2        A.  Yes.

3        Q.  Would Experian -- if -- if -- if the subscriber

4    response box is blank, does Experian just re-report that

5    information?

6        A.  I believe so.

7        Q.  Okay.  And is that true for any information

8    that -- that the subscriber leaves blank, if there's

9    already information on Experian on profile grid?

10                MS. BRASTER:  I'm sorry.  Can you repeat --

11   Madam Court Reporter, can you read that?

12                THE REPORTER:  (Read back.)

13                MS. BRASTER:  I'm just going to object to

14   vague.

15                THE WITNESS:  That is my understanding.

16       Q.  (BY MR. CLARK)  Okay.  Let's look below the --

17   the -- those three boxes in the on file history grid.

18   Do you see that?

19       A.  Yes.

20       Q.  Okay.  And what is the on file history grid?

21       A.  It is the monthly payment history of the

22   account that was displaying at the time of the dispute.

23       Q.  Okay.  And on -- the -- do you see to the right

24   side of that there's a response history grid?

25       A.  Yes.

Anna Simmons
May 3, 2017

1        Q.   What's the response history grid?

2        A.   That is the monthly payment history of the

3   account provided by the data furnisher at the time of

4   the ACDV response.

5        Q.   And on this response history grid that --

6   that -- that -- there's nothing in that response history

7   grid.  Do you see that?

8        A.   Yes.

9        Q.   Okay.  So Experian would have re-reported

10  everything from the on file history grid after it --

11  after -- sorry.  Strike that.

12            So Experian would just simply re-report

13  everything from the on file history grid because it did

14  not receive -- because there's no other entry in the

15  response history grid?

16       A.   Yes.

17       Q.   Okay.  So let's look at that on file history

18  grid.  So do you see there's a one on -- for May 2,

19  2011?

20       A.   Yes.

21       Q.   Does that mean -- does that one mean 30 days

22  late?

23       A.   Yes.

24       Q.   And what about the two in June 2011?

25       A.   That is 60 days late.

Anna Simmons
May 3, 2017

```
 1        Q.   Okay.  What about the D from -- from July -- on
 2   July, August, September of 2011?
 3        A.   That is no data provided.
 4        Q.   And rest of those --- everything after
 5   October 2011 is blank?
 6        A.   Yes.
 7        Q.   Okay.  So let's look -- let's look now at -- at
 8   Ashcraft -- let's see.  68 through 71.
 9        A.   I'm there.
10        Q.   Is this that May 15, 2016, report of
11   reinvestigation that Experian sent Mr. Ashcraft that we
12   were talking about earlier this morning?
13        A.   Yes.
14        Q.   Okay.  And so do you see on Ashcraft 68
15   there's -- there's a -- there's a -- there's a box --
16   there's a line that says "dispute results" on the
17   left-hand side?
18        A.   Yes.
19        Q.   And do you see underneath that this summary
20   shows the revision made to your credit file as a result
21   of our processing of your dispute?
22        A.   Yes.
23        Q.   Okay.  And under the -- on -- on the third
24   column do you see there's a box that's -- there's a line
25   that says results?
```

Anna Simmons
May 3, 2017

1      A.  Yes.

2      Q.  And below that there's a -- there's a -- a -- a

3  line that says credit items?

4      A.  Yes.

5      Q.  Do you see that Welk Resort Group account

6  listed under the credit items?

7      A.  Yes.

8      Q.  And what's the outcome of -- of -- of the

9  reinvestigation as Experian characterized it?

10     A.  Updated.

11     Q.  Okay.  And so let's -- let's go to the -- let's

12 go to Ashcraft 59.

13     A.  (Witness complies.)  Yes.

14     Q.  Okay.  Do you see that Welk Resort Group

15 account that Mr. Ashcraft disputed?

16     A.  Yes.

17     Q.  Okay.  And so do you see those -- there --

18 there's still those -- 30, 60s on May and June of 2011

19 reported on the payment history?

20     A.  (Looked at document.)  Yes.

21     Q.  Do you see under the status it says the

22 creditor received deed?

23     A.  Yes.

24     Q.  What does creditor received deed mean?

25     A.  It means it was a deed in lieu of foreclosure.

Anna Simmons
May 3, 2017

```
 1        Q.  Okay.  So the suggestion here is that -- is
 2   that instead of foreclosing on the -- on -- on
 3   Mr. Ashcraft's property the -- Welk accepted a deed -- a
 4   deed?
 5              MS. BRASTER:  Objection to foundation.
 6   Speculation.
 7              THE WITNESS:  Yes.
 8        Q.  (BY MR. CLARK)  Okay.  Because -- and so the --
 9   the status when it says:  Creditor received deed, that's
10   how a -- a -- that's how a status of 89 gets reported on
11   an Experian trade line?
12              MS. BRASTER:  Same objections.
13              THE WITNESS:  Yes.
14        Q.  (BY MR. CLARK)  Okay.  And then what is the --
15   what is the date on -- is -- is there a notation in the
16   payment history that indicates when the creditor
17   received the deed?
18        A.  Yes.
19        Q.  And what is that -- when -- when did that
20   occur?
21        A.  Payment history shows May of 2016.
22        Q.  Okay.  And -- and that's -- is that the entry
23   that says CRD?
24        A.  Yes.
25        Q.  Okay.  Do you see anywhere in here that
```

Anna Simmons
May 3, 2017

1    indicates that this account was included in

2    Mr. Ashcraft's Chapter 7 bankruptcy?

3        A.   No.

4        Q.   And going back to -- going back to Experian 65.

5    I want to ask you about the -- I wanted to ask you about

6    the -- the deed that's -- that occurred on the on file

7    history grid.  Because I think we had talked about the

8    fact that the last deed was in September of 2011.  Did

9    we not?

10       A.   Yes.

11       Q.   So -- but it looks like from the payment

12   history on Experian 69 that there's no data reported

13   from -- from -- let's see.  From July 2011 all the way

14   through April of 2016.  Do you see that?

15       A.   Yes.

16       Q.   So why would Experian fill in the rest of this

17   information with no data even though the on file history

18   grid had -- had the last deed from September of 2011?

19            MS. BRASTER:  Objection, assumes facts.

20            THE WITNESS:  Because in Welk's ACDV

21   response they did not provide any data for those months.

22   But they did respond with a creditor's deed.  And

23   Experian's logic is built to where we add no data for

24   each month, as we were not provided any data.

25       Q.   (BY MR. CLARK)  Okay.  So looking at the

Anna Simmons
May 3, 2017

1    subscriber response box is -- how would -- how would
2    Experian figure out when to -- when to determine that
3    creditor received the deed?
4        A.  Experian would figure it out by looking at the
5    balance date that the data furnisher is required to
6    respond back with.  In this case they did not provide
7    the required balance date, so Experian adds the ACDV
8    response date.
9        Q.  I see.  So Experian -- so Experian basically
10   said that we don't have the balance date, we can't
11   figure it out, but based on the ACDV response date we're
12   going to put that information in -- in as -- as the --
13   as the -- the date of -- of the -- that the creditor
14   received the deed; is that fair to say?
15              MS. BRASTER:  Objection to the extent it
16   misstates her testimony.
17              THE WITNESS:  The data furnisher is
18   required to respond back with a balance date when they
19   provide the account status and they did not and Experian
20   used the ACDV response date.
21       Q.  (BY MR. CLARK)  Would that be Experian's policy
22   to use the ACDV response date in a circumstance where
23   the data furnisher did not provide a balance date in
24   their ACDV response?
25       A.  I know that's what Experian does.  I'm not sure

Anna Simmons
May 3, 2017

1  if it's only Experian's policy, but I know that that's

2  the case.

3       Q.  Okay.  Yeah.  And I'm not asking about anybody

4  else but Experian.  I'm just wondering if that what's

5  Experian does as a matter of course when it gets an ACDV

6  that looks like that.

7       A.  Experian does that.

8       Q.  Okay.  And on the subscriber response box in

9  the -- on Ashcraft 65 I actually do see a balance date

10 reported there of 5/16/2016.  Do you see that?

11      A.  Yes.

12      Q.  So did Experian put that information in the

13 subscriber response box?

14      A.  Yes.  Because the balance date was not provided

15 as is required when they provide that account status.

16      Q.  Okay.  So -- so the subscriber response box

17 actually doesn't comprise information that the data

18 furnisher actually sent to you; is that fair to say?

19      A.  Not in this case for the balance date.

20      Q.  Okay.

21           MS. BRASTER:  Object to the extent it

22 misstates her testimony.

23      Q.  (BY MR. CLARK)  Is there --

24           MR. CLARK:  Sorry, Jen.  Do you have an

25 objection?

Anna Simmons
May 3, 2017

1          MS. BRASTER:  I have just to the extent it
2    misstated her testimony.  Again, I just didn't want to
3    interrupt in the middle of her answer.
4          MR. CLARK:  Sure.  Thank you.
5      Q.  (BY MR. CLARK)  So how do you -- how do you
6    know that Welk did not provide a -- a balance date?  Is
7    there another document that you're looking at to make
8    that determination?
9      A.  No.
10   ████  ████  ████████████████████████  ████
     ████████████████████████████████████████████
     ████████████████████████████████████████
     ████  ████████████████████
     ████  ████
     ████  ████████████████████████
     ████████████████████████
     ████  ████  ██████████████████████
     ████████████████████████████████████████████
     ████  ████████████████████████████████████
     ████████████████████████████████████████████
     ████████████████████████████
22     Q.  Okay.  I -- I'm just trying to figure out --
23   because when I look at the subscriber response -- I
24   think we talked about the fact that -- that that's
25   information that Experian gets back from the data

Anna Simmons
May 3, 2017

1  furnisher.  So I'm trying to figure out, you know,

2  how -- how we would know that -- that information isn't,

3  in fact, provided by the -- by the subscriber, that it's

4  actually provided by Experian.  And so I guess my

5  question then is:  Would we be able to look at each

6  piece of information on the subscriber response box and

7  match that up to something on the D/R Log to be able to

8  determine that -- that the -- the -- the -- that

9  particular item in the subscriber response box was

10  actually added by Experian, but not added by -- by Welk?

11      A.  I do not know.  I know that the balance date is

12  the one item that Experian has to put in when the data

13  furnisher does not provide the required balance date in

14  their ACDV response.

15      Q.  Okay.  And so if -- so if -- if the subscriber

16  response is just blank, then Experian would -- would

17  then insert the balance date, which would be the date of

18  ACDV response; is that fair to say is?

19          MS. BRASTER:  Objection to extent it

20  misstates her testimony.

21          THE WITNESS:  If the subscriber responds

22  with a different status than we previously had, then

23  they are required to provide a balance date for that

24  status.  And in this case they did not, so Experian used

25  the ACDV response date.

Anna Simmons
May 3, 2017

1     Q.  (BY MR. CLARK)  I see.  So -- so let me -- let
2     me see if I understand that.  So if -- in the event that
3     the -- that the data furnisher provides a different
4     status, would -- which -- which box would we be looking
5     at the -- in the subscriber response box that indicates
6     a different status?
7          A.  The box that says "account status/rating."
8          Q.  Okay.  And so in this case it looks like
9     Farmers (sic) did provide an account status/rating that
10    was different than what was on the on profile?
11              MS. BRASTER:  Miles, Welks?
12              MR. CLARK:  Oh, yes.  Sorry.
13              THE WITNESS:  Yes.
14         Q.  (BY MR. CLARK)  Okay.  And so because Welk
15    provided a different -- a -- a different status but did
16    not include the balance date, Experian used the date of
17    the ACDV response as the new balance date?
18         A.  Yes.
19         Q.  Okay.  Turning back to the on profile -- the on
20    file history grid.  You had said that Experian's logic
21    was such that -- that it would just continue to report
22    the no data up until the time that -- of the new balance
23    date.  Did I -- did I hear you correctly?
24         A.  Yes.
25         Q.  Okay.  So if -- if, for example, the account

Anna Simmons
May 3, 2017

1    was reporting as -- in this case the account reporting

2    as no data on September of 2011, correct?

3        A.  Yes.

4        Q.  Okay.  And if the account had been reporting

5    two as of June -- as it did in June 2011, if -- if -- if

6    there was -- if we had a circumstances like the one that

7    we're confronted with here where Experian updated the

8    account with the new status as of the balance date of

9    ACDV response, Experian may continue the report two all

10   the way from June 2011 through May of 2016; is that fair

11   to say?

12               MS. BRASTER:  Objection to vague.

13   Speculation.

14               THE WITNESS:  No.  Experian would --

15               MR. CLARK:  Okay.

16               THE WITNESS:  -- report no data for those

17   months because it hasn't been provided with data for

18   those months.

19       Q.  (BY MR. CLARK)  Okay.  So -- so -- so the -- so

20   Experian would, regardless of what the account condition

21   was in the last month that there was any reporting on

22   the on file history grid, Experian would report no data

23   for the months in which it had nothing on the on file

24   history grid?

25               MS. BRASTER:  Same objections.

Anna Simmons
May 3, 2017

1              THE WITNESS:  If it was not provided with

2      the 60-day late information for the following months,

3      Experian would report no data, as it was provided with

4      no data for those months.

5          Q.  (BY MR. CLARK)  Okay.  My question is slightly

6      different.  Maybe -- maybe we're talking about the same

7      thing, but I just want to make sure.  Let's assume that

8      the deeds on September, August and July of 2011 did not

9      exist.  Okay?

10         A.  Okay.

11         Q.  And -- and so the last -- the last entry on the

12     on file history grid would have been June of 2011, okay?

13         A.  Yes.

14         Q.  And -- and in June of 2011 the account was

15     reporting as 60 days late, correct?

16         A.  Yes.

17         Q.  So if -- if Welk had provided the account

18     status rating of 89, but did not provide a balance date

19     in its ACDV response and the balance date was -- as it

20     is here -- 5/16/2016, what would Experian have entered

21     in the months from July of 2011 to May 2016 when it was

22     using its logic to fill in the dates in between the date

23     of last reported and the date of, then, the new balance

24     date.

25              MS. BRASTER:  Objection; speculation.

Anna Simmons
May 3, 2017

1    Vague.

2                    THE WITNESS:  Experian would report no data

3    for each month, as we were not provided a data for any

4    of -- any data for any of those months.

5         Q.  (BY MR. CLARK)  Okay.  And would -- would that

6    be true if the last entry on the on file history grid

7    was charge off?

8                    MS. BRASTER:  Same objections.

9                    THE WITNESS:  I -- I believe so.

10        Q.  (BY MR. CLARK)  Okay.  And that would be for --

11   for any -- any account condition, it would be -- it

12   would be no data, wouldn't matter what the condition

13   was?

14                   MS. BRASTER:  Same objections.

15                   THE WITNESS:  I believe so.  If no data is

16   provided for those months leading up to the balance date

17   that you stated we didn't receive, so we had to -- to

18   input the ACDV response date, no data would be added to

19   the box for each month leading to that balance date.

20        Q.  (BY MR. CLARK)  Okay.  So did Welk report in

21   its subscriber response -- we were talking about the

22   close date of 8/29/2011, right?

23        A.  I see that.

24        Q.  Is that a date that Welk reported?

25        A.  Yes.

Anna Simmons
May 3, 2017

```
 1        Q.   Okay.  And how do you know that?
 2        A.   Because it's in their ACDV response.  It is not
 3   the balance date the creditors were required to write
 4   back and provide.
 5        Q.   Okay.  So -- so the balance date isn't
 6   something that Experian would have -- would have updated
 7   itself, right?
 8             MS. BRASTER:  Sorry.  Can you repeat that
 9   question?
10             MR. CLARK:  Yeah.  Sure.
11        Q.   (BY MR. CLARK)  So the balance date -- yeah.
12   That came out the wrong way.  I got that one mixed up.
13             So unlike the balance date, the close date
14   is not a -- is not a field in the subscriber response
15   that Experian would update itself.  It would -- it would
16   depend entirely on the furnisher; is that fair to say?
17             MS. BRASTER:  Objection to the extent it
18   calls for speculation.
19             THE WITNESS:  Yes.
20        Q.   (BY MR. CLARK)  And it looks like in this case
21   Welk listed the close date as 8/29/2011, right?
22        A.   Yes.
23        Q.   So let's see.  5/16/2016 is almost four years
24   after the date that -- that Welk reported the account as
25   closed, right?
```

Anna Simmons
May 3, 2017

1      A.   It is almost four years you said after?

2      Q.   Almost five.  Almost five years after the date

3  that Welk reported the account as closed?

4      A.   Yes.

5      Q.   Okay.  So why would -- if the data furnisher

6  was telling you that the account was closed in August of

7  2011, why would Experian think that there was a balance

8  due for almost five years after that point?

9             MS. BRASTER:   Objection; foundation and

10  speculation.

11             THE WITNESS:   Experian did not state that

12  there was a balance due.  The balance shows zero.

13      Q.   (BY MR. CLARK)  Okay.  That wasn't my question.

14  My question was the -- the status on the -- on the

15  account, the account says closed in 2011, but the

16  balance date is 2016, right?

17      A.   Correct.

18      Q.   Okay.  And that's almost five years after

19  the -- the date of the -- of the -- the date the account

20  was closed as Welk had put it?

21      A.   Yes.

22      Q.   And April 2016 is the month that Experian

23  reported that Welk received the deed in lieu?

24             MS. BRASTER:   I'm sorry, what month did you

25  say, Miles?

Anna Simmons
May 3, 2017

1          MR. CLARK:  I'm sorry.  May of 2016.

2          THE WITNESS:  The balance date was filled

3    in with May 16th of 2016 since Welk responded back with

4    an account status that was different than before and

5    they were required to provide a balance date.  Because

6    they did not, Experian used the ACDV response date.

7       Q.  (BY MR. CLARK)  Did -- could Experian have

8    contacted Welk after it received Welk's response to ask

9    them what the balance date should be?

10          MS. BRASTER:  Objection; speculation.

11          THE WITNESS:  Yes.

12       Q.  (BY MR. CLARK)  And did it do so?

13          MS. BRASTER:  Same objection.

14          THE WITNESS:  No.  This was an automated

15    ACDV response and there was no phone call, according to

16    my records, looking at this ACDV response.

17       Q.  (BY MR. CLARK)  Okay.  And -- and to derive

18    that conclusion that this was an auto ACDV issue, are

19    you looking at the -- the D/R Log on -- at Exhibit 3 on

20    page 98?

21       A.  Yes.

22       Q.  Okay.  Let me ask you this:  Is the decision to

23    make an account subject to auto ACDV processing a

24    decision that is made before or after the ACDV is sent

25    to the data furnisher?

Anna Simmons
May 3, 2017

```
 1              MS. BRASTER:  Objection to foundation.
 2   Outside scope.
 3              THE WITNESS:  I'm not sure if it's before
 4   or after.  It could be either.  I cannot answer that.
 5       Q.  (BY MR. CLARK)  Okay.  When you were a
 6   customer -- and I'm going to butcher the term again.
 7   But the -- would -- and so correct me if I'm wrong.
 8              When you were a customer dispute agent --
 9   I'm talking about first job you had with Experian
10   starting in May of 2004.  You -- you -- you stated
11   that -- that you sent ACDVs to data furnishers, right?
12   Or you -- you directed the system to send it, I guess
13   would be a fairer statement.
14              MS. BRASTER:  Objection to the extent it
15   misstates her testimony.
16              THE WITNESS:  I would input the dispute as
17   a consumer provided.  And then if an ACDV was required,
18   if we had to contact the data furnisher, that would be
19   sent out.
20       Q.  (BY MR. CLARK)  Okay.  During the course of
21   your -- your -- your employment in that role, did you
22   ever designate a -- a dispute as subject to auto ACDV
23   processing?
24              MS. BRASTER:  Objection to foundation.
25              THE WITNESS:  No.
```

Anna Simmons
May 3, 2017

1      Q.   (BY MR. CLARK)  And was auto ACDV processing a

2   term you were familiar with when you were a customer --

3   an consumer dispute agent?

4      A.   I don't remember if I was familiar with that

5   term in May of 2004.

6      Q.   Okay.  When did you first became familiar with

7   the term, to the best of your recollection?  I mean here

8   I'm asking for like -- I'm not asking for like the day

9   or the -- you know, even the month, but just -- just a

10  year, if you know that?

11     A.   I don't remember.

12     Q.   Okay.  Do you think it was after 2004?

13     A.   Yes.

14     Q.   Okay.  In your role -- in your second role at

15  Experian, did you ever -- did you process consumer

16  disputes?

17             MS. BRASTER:  Objection to vague.

18             THE WITNESS:  Yes.

19     Q.   (BY MR. CLARK)  And when I say your role, I

20  mean the second job you had before you -- that you

21  testified to earlier -- before you became a -- a -- a

22  senior legal compliant specialist or that -- that

23  terminology of the role that you have now.  Do you

24  understand what I'm talking about?

25     A.   Yes.

Anna Simmons
May 3, 2017

1      Q.  So -- and -- and -- and you were in that second

2    role for -- between the end of 2004 and the summer of

3    2016; is that -- is that correct?

4      A.  Yes.

5      Q.  During that time did you process any consumer

6    disputes?

7      A.  Yes.

8      Q.  Okay.  And when you processed consumer

9    disputes, did you ever designate a -- a response for

10   auto ACDV processing?

11     A.  No.  When I send the disputes through, I don't

12   designate the ACDV processing.

13     Q.  Okay.  So -- so -- so the designation of auto

14   ACDV processing is not one that's made by the dispute

15   agent at the beginning, but before they send the dispute

16   to the data furnisher; is that -- as far as you know?

17                 MS. BRASTER:  Objection to foundation.

18                 THE WITNESS:  It is not made by the dispute

19   agent.

20     Q.  (BY MR. CLARK)  Do you know who at Experian

21   makes that decision?

22                 MS. BRASTER:  Same objection.

23                 THE WITNESS:  No.

24     Q.  (BY MR. CLARK)  Is the decision made by

25   Experian's internal computer systems --

Anna Simmons
May 3, 2017

1        MS. BRASTER:  Same --

2    Q.  (BY MR. CLARK) -- and their algorithms or?

3        MS. BRASTER:  Same objection.

4        THE WITNESS:  Yes, it could be.

5    Q.  (BY MR. CLARK)  Okay.  Is the decision made by

6  the algorithm after the -- Experian receives the results

7  of -- or the ACDV response from the data furnisher?

8        MS. BRASTER:  Objection; foundation.  Asked

9  and answered.

10        THE WITNESS:  I do not know.

11    Q.  (BY MR. CLARK)  Okay.  But -- and so auto ACDV

12  processing, I know we talked about this a -- a few times

13  in other -- other depositions, just to -- to be clear

14  for -- for this one.  What -- what is auto ACDV

15  processing?

16    A.  It is basically that the ACDV response, the

17  changes, if any, are made to the item systematically.

18    Q.  Okay.  And when you say systematically, what do

19  you mean?

20    A.  Through the system.

21    Q.  Okay.  Does any -- by the system, what do you

22  mean?  Do you mean the same system as we talked about

23  earlier with the E-Oscar system or a different system?

24    A.  I'm not sure if it's just one or if it's

25  Experian's other system also.  So I do not know.

Anna Simmons
May 3, 2017

1        Q.   Okay.   Is it -- is a system that -- that is --
2   is a computer program or -- or some kind of nonhuman
3   actor?
4               MS. BRASTER:   Objection to foundation,
5   vague.
6               THE WITNESS:   I'm assuming the system would
7   be as a result of a computer program, but I am not aware
8   of the details.
9

Anna Simmons
May 3, 2017

 1  ████████████████████████████████████████

    ████████████████████████████████████

    ████████████████████████████████████

    █████████████████████████████████████

    █████████████████████████████████████

    ██████████████████████████████

        ██    ██████████████████████████████

    ██████████████████████

 9       Q.  Okay.  And by systematically, do you mean

10  any -- any nonhuman actor?

11                 MS. BRASTER:  Objection to vague.

12                 THE WITNESS:  I don't understand you.  Can

13  you please repeat -- I don't know what nonhuman actor

14  mean.  If -- if that's what I heard.

15       Q.  (BY MR. CLARK)  Well, let me -- let me -- let

16  me ask you this way:  Is a dispute agent -- when -- when

17  we're talking about a dispute agent, are we talking

18  about a human being?

19       A.  Yes.  I was stating I don't know what actor

20  means, so...

21       Q.  Oh.

22       A.  I do know what nonhuman means.

23       Q.  Oh, I'm sorry.  Yes.  When -- when I say actor,

24  I mean employee or agent of Experian.

25       A.  So you're saying nonhuman agent or are you

Anna Simmons
May 3, 2017

1    saying system?

2        Q.   Yeah.   So I'm saying -- so it's a -- a -- a

3    nonhuman agent or employee of Experian.   Or a piece of

4    intellectual property that Experian maintains, such as a

5    computer system.

6                MS. BRASTER:   I'm just going to object to

7    vague again.

8                THE WITNESS:   And I don't remember how the

9    question started.

10       Q.   (BY MR. CLARK)   Okay.   Let's try this again.

11   Does auto ACDV processing refer to a human being?

12       A.   No.

13   ███ █████   ████████████████████████████████

     ██ ████████████████████████████████████████████

     ██ ███████████████████████████████████████

     ██ █████████████████████████████████████████

     ██ █████████████████████████████████████████

     ██ █████████████████████████████████████████

     ██ ████████████████████████████

     ██ ███ ██████████████████████████████████████

     ██ █████████████████████████

22       Q.   Okay.   Let me ask you this:   Do you recall -- I

23   asked you before about your testimony in the Lynn

24   Travers case.   Do you recall that?

25       A.   I recall your question about -- from this

Anna Simmons
May 3, 2017

1  morning, yes.

2      Q.  Okay.  Do you recall that during the deposition

3  in the Lynn Travers case we talked about auto ACDV

4  processing?

5      A.  I'm sorry, I don't recall.

6              MS. BRASTER:  I'm just going to object.

7  Foundation and improper question.

8              MR. CLARK:  Okay.  That's -- that's fine.

9  And I -- Jen, I don't intend to introduce anything here.

10  I'm trying to -- trying to figure out what her basis is.

11             MS. BRASTER:  No, I understand.

12             MR. CLARK:  Sorry?

13             MS. BRASTER:  No, I said -- no, I

14  understand.

15             MR. CLARK:  Okay.

16      Q.  (BY MR. CLARK)  Do you -- and -- and -- and,

17  Anna, you -- you recall that earlier in -- in the

18  morning we talked about your -- that you had testified

19  in a case called Selena Goodman on behalf of Experian?

20      A.  Yes.

21      Q.  Do you recall that during our -- during that

22  deposition you and I had a conversation about what

23  the -- the -- the term "auto ACDV processing"?

24             MS. BRASTER:  Same objections.

25             THE WITNESS:  I'm sorry, I don't remember

Anna Simmons
May 3, 2017

```
 1   what we spoke about in that deposition.
 2        Q.  (BY MR. CLARK)  Okay.  If you saw your
 3   deposition testimony, would it -- would it refresh your
 4   recollection as to whether or not that discussion took
 5   place?
 6               MS. BRASTER:  Same objections.  Calls for
 7   speculation.
 8               THE WITNESS:  Yes, if I would be given the
 9   opportunity to review my testimony from -- I don't know
10   which one of the three you're referencing, it would -- I
11   would be able to tell you what we spoke about.
12        Q.  (BY MR. CLARK)  Okay.  And would your answer be
13   the same if -- if -- if I were to introduce or show
14   you -- not introduce, but show you portions of your
15   deposition in the Lynn Travers case about auto ACDV
16   processing, would that refresh your recollection?
17               MS. BRASTER:  Same objections.
18               THE WITNESS:  If I was able to review my
19   testimony from -- again, I forget which one of the three
20   we're referencing, I would be able to tell you what we
21   spoke about, yes.
22        Q.  (BY MR. CLARK)  Sure.  And for purposes of
23   clarity, my -- my last line of questioning has related
24   to the Serena Goodman deposition and the Lynn Travers
25   deposition that we talked about earlier today.  Just --
```

Anna Simmons
May 3, 2017

1    just to be clear.

2           Okay.  Well -- and as it turns out I --

3    I -- I -- I won't be introducing that -- that -- that --

4    that testimony here.  I don't have it.

5           You say a little more -- it's been a

6    discussion that's ongoing between -- between the parties

7    as to whether or not that could be -- that could be

8    shown.  But that -- that -- that's fine.  Okay.

9           MS. BRASTER:  Miles, whenever you're at a

10   good stopping, we've been going over an hour and a half,

11   just so we can take a quick break.

12          MR. CLARK:  Yeah.  You know, I -- I was

13   thinking about that.  I was going to do a little bit

14   more with the D/R Log and if I could just finish with

15   that then.  Can take a break in maybe like ten minutes?

16          MS. BRASTER:  Is that okay?

17          THE WITNESS:  Yes.

18          MS. BRASTER:  That's fine.

19          MR. CLARK:  Okay.  Thanks.

20   ████  █████████     █████████████

     ██  ███████████████████████████████

     ██    ████  ██████

     ██    ████  ████  █████████████████

     ██  ██████████████████████████

     ██  ███████████████████████████

Anna Simmons
May 3, 2017



17      Q.  Okay.  And do you see when the ACDV was

18  received -- or when the ACDV response was received by

19  Experian?

20      A.  Yes.

21      Q.  And when -- when did Experian receive the ACDV

22  response?

23      A.  May 16th, 2016.

24      Q.  The -- so really -- and so below I see -- I see

25  a box that looks like -- it looks sort of like the on

Anna Simmons
May 3, 2017

1    file history grid, but it's -- it's -- it's cordoned off

2    with a bunch of dashes.  Do you see what I'm talking

3    about?

4        A.  Yes.

5        Q.  Okay.  And that -- that has -- and just to be

6    clear, that's -- that's a box -- it appears right below

7    a line that says LST pay DT and has a number of years

8    listed, the years being from 2009 to 2016.  So -- so

9    we're on the same page.  Do you see that?

10       A.  Yes.

11       Q.  And is this -- so what is the information in

12   this box?

13       A.  The payment history for each month.

14       Q.  Okay.  And the payment history for each month.

15   And who put the information in that box?  Was that

16   information that was provided by Welk or did Experian

17   put the information in?

18       A.  The information was provided by Welk.  Up

19   until, as we talked about earlier, the no data of

20   September 2011.  And the rest of the no data information

21   was provided by Experian because Welk responded back

22   with a different account status and they did not respond

23   with a required balance date and Experian provided no

24   data, because they did not give us any data up until May

25   of 2016.  There's actually nothing in May of 2016

Anna Simmons
May 3, 2017

 1   because that's the balance date.  So we put no data up

 2   until April of 2016.

 3        Q.  I see.  So if -- if Welk had reported a balance

 4   date in May of 2016, there would have been an entry in

 5   May of 2016 to reflect that?

 6        A.  I'm sorry, what was your question?

 7        Q.  If -- if Welk had reported a balance date in

 8   their ACDV response in May 2016 that would have been --

 9   that -- that balance date would have appeared in this

10   box that we're talking about on Ashcraft 98?

11        A.  No.  We only provide information up until the

12   month before the month of the balance date.

13        Q.  Okay.  So -- so in this box if -- if, for

14   example, Welk had reported the account as charged off or

15   paid and closed as of May 2016, it wouldn't -- that

16   information wouldn't appear in this box we're talking

17   about?

18             MS. BRASTER:  Objection; speculation.

19             THE WITNESS:  That is correct.  That

20   information would not appear in that month.  The only

21   information -- the information only goes to the month

22   before the month of the provided status.

23   ███ ███████████ ██████ █████████████

  ███████████████████████████████████████

  ███ ████████████████████████████████████

Anna Simmons
May 3, 2017



21        Q.   Okay.   I'm looking -- looking above at the

22   original data, do -- do you see -- it's -- there's a

23   dash about a few lines from -- from the top and below

24   that it says:   Agent ID.   And then below that there's --

25   there's -- there's a line to the original data.   Do you

Anna Simmons
May 3, 2017

```
 1   see where I'm looking at?
 2        A.  I see original data equals tag-5.  Is that what
 3   you're speaking about?
 4        Q.  Yes.  Yes.  So the -- so -- so in the original
 5   data, the two lines of text here, is -- is this original
 6   data the data that was on file at the time of the
 7   dispute?
 8        A.  Yes.
 9        Q.  Okay.  And do you see a balance date listed on
10   the original data?
11        A.  Yes.
12        Q.  And what is that balance date?
13        A.  October 31, 2011.
14        Q.  Okay.  And then below do you see a line that
15   says "bal hist"?
16        A.  (Looked at document.)  Yes.
17        Q.  And then what does bal hist mean?
18        A.  The balance history.
19        Q.  Okay.  And when it says all months ignored
20   CCCCFRDT-731, 2009.  Do you see that?
21        A.  Yes.
22        Q.  What does that mean?
23        A.  I believe that it's -- it stands for there's no
24   balance history showing on any month provided with this
25   account.
```

Anna Simmons
May 3, 2017

1    Q.   Okay.  And where would we see the balance
2  history on -- on an Experian disclosure to Mr. Ashcraft?
3    A.   I have to look and see.  (Looked at document.)
4  It would be under account history if one is provided
5  and -- by the data furnisher.
6    Q.   I see.  So -- and the indication there was no
7  balance history -- there was no balance history provided
8  and -- and that's why it says all months ignored.
9    A.   Correct.
10    Q.   Okay.  Now, below -- below that original data
11  line, do you see that line that says "update data"?
12    A.   Yes.
13    Q.   And update data, what does -- what does -- what
14  does -- what does that mean?
15    A.   That is the data that is sent to a data
16  furnisher requesting to be updated, as it appears here.
17    Q.   Okay.  And I see it says:  Status paid current.
18  Do you see that under update data?
19    A.   Yes.
20    Q.   Okay.  And so that's -- that's information that
21  Experian would have sent to the data furnisher in terms
22  of what -- what -- what it was asking the data furnisher
23  to submit?
24             MS. BRASTER:  Objection to vague.  Assumes
25  facts.

Anna Simmons
May 3, 2017

1          MR. CLARK:  Yeah.  That came out kind of
2    wrong.  I'll withdraw it.
3       Q.  (BY MR. CLARK)  The -- the update data field,
4    does that include all the information that a consumer
5    would have submitted in connection with their consumer
6    dispute that was sent to a data furnisher for its own
7    review?
8          MS. BRASTER:  I'm sorry, can you repeat
9    that?  I apologize.
10          MR. CLARK:  Yeah.
11          Madam Court Reporter, could you please read
12    back my last question?
13          THE REPORTER:  (Read back.)
14          MS. BRASTER:  Object to the extent it calls
15    for speculation.
16          THE WITNESS:  No, there was also that mail
17    correspondence sent to the data furnisher which provided
18    additional details as the consumer provided in their
19    correspondence.
20          MR. CLARK:  Okay.
21



Anna Simmons
May 3, 2017



15      Q.  (BY MR. CLARK)  Turning back to the update

16   data.  Do you see that underneath the update data

17   there's a most recent date 10/31/2011?

18      A.  Yes.

19      Q.  Okay.  What does that mean?

20      A.  That is the balance date -- date carried over

21   from the balance date a couple of lines above that we

22   discussed earlier.

23      Q.  Okay.  All right.

24           MR. CLARK:  Jen, this might be a good time

25   for a break.

Anna Simmons
May 3, 2017

```
 1              MS. BRASTER:  Perfect.
 2              MR. CLARK:  We can take a break now.  You
 3      want to take ten minutes or?
 4              MS. BRASTER:  I think five minutes should
 5      be fine.  Five minutes should be fine.
 6              (Break taken)
 7              MR. CLARK:  We're on the record.
 8          Q.  (BY MR. CLARK)  Okay.  So -- so, Anna, the --
 9      we were talking before about the D/R Log and the -- and
10      the ACDV response.  Did -- after -- after Experian
11      received the ACDV response from Welk, did it update
12      Mr. Ashcraft's account, as Welk had instructed, on the
13      ACDV response?
14          A.  Yes.  In addition to updating that balance
15      date.
16          Q.  Okay.  And then after it updated -- and it
17      updated that information based on auto ACDV processing,
18      right?
19          A.  Yes.
20          Q.  Okay.  And after the auto ACDV processing, it
21      sent back the May 16, 2016, reinvestigation to
22      Mr. Ashcraft?
23          A.  Yes.
24          Q.  And the May 16, 2016, reinvestigation sent to
25      Mr. Ashcraft, on the Welk side, it did not -- it did not
```

Anna Simmons
May 3, 2017

1  indicate that the Welk account had been included in
2  Mr. Ashcraft's Chapter 7 bankruptcy, did it?
3      A.  No.  Welk did not state it was included in the
4  bankruptcy.
5      Q.  Okay.  And if -- if Experian had known that the
6  account was included in the bankruptcy in April of 2011,
7  all of the post-petition payment history after April of
8  2011 would be suppressed; would it not?
9              MS. BRASTER:  Objection to vague.
10 Foundation.  Speculation.
11             THE WITNESS:  Correct.
12     Q.  (BY MR. CLARK)  All right.  Let's -- let's move
13 onto Ashcraft 72 through 87.
14     A.  Okay.
15     Q.  And I believe you testified earlier that this
16 is a disclosure prepared for John Ashcraft?
17             MS. BRASTER:  Objection to the extent it
18 misstates her testimony.
19             THE WITNESS:  Yes, the name on this
20 disclosure is John Ashcraft.
21     Q.  (BY MR. CLARK)  Okay.  And do you see the Welk
22 account reported on Ashcraft 76?
23     A.  (Looked at document.)  Yes.
24     Q.  And does that -- does the reporting on the Welk
25 account on Ashcraft 76 look the same as the reporting on

Anna Simmons
May 3, 2017

1    the Welk account on Ashcraft 51 that we've been talking

2    about -- or I'm sorry.  Not -- not Ashcraft 51.  My

3    apologies.  Ashcraft 69.

4         A.  (Looked at document.)  I believe so.  Okay.

5         Q.  And on Ashcraft 74, do you see there's a public

6    record listed?

7         A.  Yes.

8         Q.  And is that the same -- is -- is that a Chapter

9    7 bankruptcy that's listed under the public record

10   section?

11        A.  Yes.

12        Q.  And is that the same public record that we were

13   discussing earlier in connection with Mr. Ashcraft's

14   March 2016 disclosure?

15        A.  I believe so.

16        Q.  Okay.  Turning to Ashcraft 88 through 93 now.

17        A.  (Witness complies.)

18        Q.  And I'll direct your attention towards Ashcraft

19   88.

20        A.  One second.  I am at Ashcraft 88.

21        Q.  Thank you.  Do you see that a -- that there are

22   three lines -- three columns of -- of texts here.  I'm

23   going to direct your attention first to the column on

24   the -- on the far right-hand side.

25             Do you see where it says "the results"?

Anna Simmons
May 3, 2017

1       A.   Yes.   The far left side, I'm sorry.   I was
2  looking on the right.   I see dispute results.
3       Q.   Yes, to the left.   I'm sorry.   I meant the
4  left.   My -- my apologies.
5       A.   Yes.   I see it.
6       Q.   Okay.   And then below dispute results it says:
7  Our reinvestigation into the dispute you recently
8  submitted is now complete.
9            Do you see that?
10      A.   Yes.
11      Q.   Going back to Ashcraft -- going back to
12 Ashcraft -- going back to Ashcraft 68, we were talking
13 about dispute results before on that earlier today.   Do
14 you remember that?
15      A.   Yes.
16      Q.   And under dispute results it says:   This
17 summary shows the revisions made to your credit file as
18 a result of our processing of your dispute.
19            Do you see that?
20      A.   Yes.
21      Q.   So why would -- and that's different than the
22 first sentence of -- under dispute results contained in
23 Ashcraft 88, correct?
24      A.   The two sentences you stated are different,
25 correct.

Anna Simmons
May 3, 2017

```
 1        Q.  Okay.  The one on 88 says "reinvestigation;"
 2    does it not?
 3        A.  Yes.
 4        Q.  And the one on -- the one on 68 doesn't say
 5    reinvestigation, does it?
 6                 MS. BRASTER:  Objection to vague.
 7                 THE WITNESS:  I don't see the word
 8    "reinvestigation" in the first sentence.
 9        Q.  (BY MR. CLARK)  What is the -- do you have an
10    understanding of what the word "reinvestigation" means?
11                 MS. BRASTER:  Objection to the extent it
12    calls for a legal conclusion.
13                 THE WITNESS:  I have an understanding.
14        Q.  (BY MR. CLARK)  And what is your understanding?
15        A.  In this case it's an investigation into the
16    account information.
17        Q.  The investigation by whom?
18                 MS. BRASTER:  Same objection.
19                 THE WITNESS:  This investigation was
20    conducted by Experian.
21        Q.  (BY MR. CLARK)  Okay.  And did Experian conduct
22    an investigation or a reinvestigation?
23                 MS. BRASTER:  Same objection.
24                 THE WITNESS:  A reinvestigation.
25        Q.  (BY MR. CLARK)  Okay.  Would -- would a data
```

Anna Simmons
May 3, 2017

```
 1   furnisher conduct an investigation as opposed to a

 2   reinvestigation?

 3               MS. BRASTER:  Objection to the extent it

 4   calls for a legal conclusion.  Foundation.  Calls for

 5   speculation.

 6               THE WITNESS:  I do not know.

 7       Q.  (BY MR. CLARK)  Okay.  Are you aware that

 8   the -- that a data furnisher has some obligation to

 9   respond to consumer dispute once it's submitted through

10   the consumer reporting agency?

11               MS. BRASTER:  Objection --

12       Q.  (BY MR. CLARK)  If that dispute references

13   disputed information on a -- on that furnisher trade

14   line as being reported by Experian?

15               MS. BRASTER:  Objection; assumes facts.

16   Speculation.  Legal conclusion.

17               THE WITNESS:  Yes.

18       Q.  (BY MR. CLARK)  Okay.  And do you know if

19   that -- that -- if the process by which a -- a data

20   furnisher fulfills its obligation would be called an

21   investigation?

22               MS. BRASTER:  Same objections.

23               THE WITNESS:  No, I do not know what

24   they -- it would be called.

25       Q.  (BY MR. CLARK)  Okay.  But you're aware
```

Anna Simmons
May 3, 2017

```
 1    there -- there's some obligation of the data furnisher
 2    to -- to respond, right?
 3                 MS. BRASTER:  Same objections.
 4                 THE WITNESS:  They need -- if there's a
 5    dispute that was sent to them by the credit reporting
 6    agency, I am aware that they're obligated to respond.
 7       Q.  (BY MR. CLARK)  Okay.  And last piece of
 8    comparison on those two dispute results sentences on
 9    Ashcraft 68 and 88.  Do you see that -- that on 88 the
10    first sentence indicates:  The dispute you've recently
11    submitted is now complete?
12       A.  Yes.
13       Q.  And on 68 is there any indication that the
14    dispute results were -- were sent based on
15    Mr. Ashcraft's dispute that he recently submitted?
16                 MS. BRASTER:  Objection to vague.
17                 THE WITNESS:  Can you please repeat the
18    question?
19       Q.  (BY MR. CLARK)  Sure.  On -- in -- in the first
20    sentence of dispute results -- in the first sentence
21    under the -- the words "dispute results" on Ashcraft 68,
22    do you see the words -- do you see the word "recent"
23    anywhere?
24       A.  No.
25       Q.  Okay.  If Mr. Ashcraft contacted Experian
```

Anna Simmons
May 3, 2017

1  disputing an item of information on an Experian trade
2  line, would Experian have a record of that
3  communication?
4       A.  I believe that would be in the D/R Log.
5       Q.  Okay.
6       A.  Or any CDFs that were sent in response to that
7  would be in the disclosure log.
8
15       Q.  Okay.  Are you aware if Mr. Ashcraft contacted
16  Experian after he submitted his April 2016 dispute to
17  Experian to dispute information on his -- his trade line
18  as they appeared on his Experian credit report?
19            MS. BRASTER:  Objection to vague.
20            THE WITNESS:  I am aware that he did not.
21       Q.  (BY MR. CLARK)  And how do you know that?
22       A.  Because we do not have record of another
23  contact from him.
24

Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017

1    Q.  (BY MR. CLARK)  Okay.  Do you -- do you know
2  if, in particular, whether it could mean different
3  things as we sit here today?
4              MS. BRASTER:  Same objection.
5              THE WITNESS:  No, I'm very confused about
6  the questioning.  So I'm so sorry, you'll have to ask me
7  again.
8              MR. CLARK:  That -- that's okay.  As I said
9  at the beginning if I -- if I ask a question that you
10  can't -- you -- you don't -- you don't understand, I
11  would ask that you ask me to ask it again.  I want you
12  to understand my question.  So absolutely.
13    Q.  (BY MR. CLARK)  Sitting here today, do you --
14  are you aware of any distinction between the word
15  "processing" and the word "reinvestigation" --
16  "reinvestigating"?
17              MS. BRASTER:  Objection to the extent it
18  calls for a legal conclusion.
19              THE WITNESS:  I think they can mean
20  different things and also the same thing.  I don't know
21  how else to answer that question.
22    Q.  (BY MR. CLARK)  Okay.  In your -- in your
23  work -- sorry.
24              In your work at Experian, have you -- have
25  you used both words interchangeably?

Anna Simmons
May 3, 2017

1      A.   Yes.

2      Q.   Okay.  And so looking at Ashcraft 88.  It

3    says -- we talked about the fact that it says:  Our

4    reinvestigation into the dispute you recently

5    resubmitted is now complete.

6              The word "reinvestigation" of the dispute

7    you recently submitted, what -- what does that mean?

8              MS. BRASTER:  Objection to the extent it

9    calls for a legal conclusion.

10             THE WITNESS:  What does reinvestigation

11   mean?

12             MR. CLARK:  Yeah.

13             THE WITNESS:  An investigation or a

14   reinvestigation into an account information.



Anna Simmons
May 3, 2017



14   Foundation.

15            THE WITNESS:  This document was created as

16   a result of our post-litigation procedures.

17        Q.  (BY MR. CLARK)  Okay.  And it says that this

18   is -- that -- those post-litigation procedures include a

19   reinvestigation?

20            MS. BRASTER:  Objection to vague and to the

21   extent that it calls for a legal conclusion.

22            THE WITNESS:  That's part of our

23   post-litigation procedures.

24        Q.  (BY MR. CLARK)  Okay.  And so looking on the --

25   looking on the next page, Ashcraft 89.  Do you see under

Anna Simmons
May 3, 2017

```
 1   the results it says:  We have completed the processing
 2   of your dispute?
 3        A.  Yes.
 4        Q.  Okay.  And do you see two credit items listed
 5   there?
 6        A.  Yes.
 7        Q.  And one of them is that Welk Resort Group
 8   account we've been talking about?
 9        A.  Yes.
10        Q.  And the other one is an account from Capital
11   One Bank, USA, correct?
12        A.  Yes.
13        Q.  As we talked about before, Mr. Ashcraft has not
14   disputed his Capital One bank account in his --
15   April 2016 dispute.  Do you remember that?
16        A.  Yes.
17        Q.  So why does Experian include that account as --
18   as -- showing that account in the processing of
19   Mr. Ashcraft's dispute?
20             MS. BRASTER:  Objection to vague.  Assumes
21   facts.
22             THE WITNESS:  This was addressed as part of
23   our post-litigation procedures.
24        Q.  (BY MR. CLARK)  Okay.  And -- so hang on one
25   second.  Let me just make sure.  Give me one second.
```

Anna Simmons
May 3, 2017

1              So you're aware that Mr. Ashcraft filed a

2    complaint in -- in this case, right?

3        A.  Yes.

4        Q.  And I think I represented to you before that

5    the complaint was filed on December 22, 2016, correct?

6        A.  Yes.

7        Q.  Did you review that complaint in preparation

8    for your deposition today?

9        A.  Yes.

10       Q.  All right.  Did -- did you see any reference to

11   Capital One in the complaint when you reviewed it?

12       A.  No.

13       Q.  And I'll represent to you that there is none.

14   So --

15              But the -- you're saying that the account

16   that -- that Mr. Welk's (sic) Experian information was

17   updated based on Experian's post-litigation procedures,

18   correct?

19       A.  Yes.

20              MS. BRASTER:  Objection to vague and to the

21   extent it misstates her testimony.

22              MR. CLARK:  Sure.

23       Q.  (BY MR. CLARK)  On -- on February 8, 2017?

24              I'm sorry, Anna.  I -- I didn't know if you

25   responded.  If -- if you did, I missed it.

Anna Simmons
May 3, 2017

1      A.  I -- yes.  I responded yes.

2      Q.  Okay.  So -- so if the complaint didn't

3   reference the Capital One Bank trade line, why did

4   Experian include it in its post-litigation procedures?

5              MS. BRASTER:  Objection; asked and

6   answered.  To the extent it gets into what Experian's

7   post-litigation procedures are, I'm going to instruct

8   the witness not to answer as to work product.

9              THE WITNESS:  This was addressed as part of

10  our post-litigation procedures.

11     Q.  (BY MR. CLARK)  Okay.  So you don't -- you

12  don't know why it was addressed?

13             MS. BRASTER:  And same caution.  Asked and

14  answered.  To the extent it gets into what those

15  post-litigation procedures are, I would instruct the

16  witness not to answer as that is work product and

17  privileged.

18             THE WITNESS:  I do know that it was part of

19  our post-litigation procedures.

20     Q.  (BY MR. CLARK)  And we did talk earlier about

21  the fact that Equifax -- that a carbon copy

22  reinvestigation from Equifax was submitted for a Capital

23  One account.  Do you recall that?

24     A.  Yes.

25     Q.  And in the dispute results provided to

Anna Simmons
May 3, 2017

1   Mr. Ashcraft on -- in his reinvestigation on -- in May

2   of 2016, the results of that reinvestigation did not

3   include the Capital One account; is that -- is that

4   correct?  And you can refer back to Ashcraft 68 if

5   you -- if -- if you wish.

6        A.   Correct.

7        Q.   Okay.  Is there anything on Ashcraft 88 to 93

8   which indicates to -- to -- to Mr. Ashcraft or anyone

9   else that this document was generated based on

10  Experian's post-litigation procedures?

11       A.   No.

12       Q.   Looking at the -- looking at the -- the

13  pages -- let me ask this.  In -- when we were talking

14  about the -- some of the participants guides earlier

15  today, did you see that those pages had been marked

16  "confidential" in the participants guide?

17               MS. BRASTER:  Objection to vague.

18               THE WITNESS:  I did not see that as I was

19  looking at it today.

20       Q.   (BY MR. CLARK)  Okay.  Well, I -- I mean if --

21  if you wish to -- for reference, you could look at

22  Exhibit 4 and you should see a designation that says

23  "confidential" on it, on I -- I believe each -- each

24  page of that document?

25       A.   Yes, I see it.

Anna Simmons
May 3, 2017

1        Q.   Okay.   Okay.   So you -- you see those
2   designations as confidential -- that the document's been
3   marked confidential?
4        A.   Yes.
5        Q.   Do you see any -- any designation on Ashcraft
6   88 through 93 that those pages have been marked
7   confidential?
8        A.   No.
9        Q.   Do you know when Experian, if at all, provided
10  this February 8, 2017, reinvestigation to Mr. Ashcraft?
11              MS. BRASTER:   And objection to assumes
12  facts.   Foundation.
13              THE WITNESS:   I do not know when.
14        Q.   (BY MR. CLARK)  Okay.   Would you agree with me
15  that there's a reinvestigation?
16              MS. BRASTER:   Objection to the extent it
17  calls for a legal conclusion.
18              THE WITNESS:   Yes.   That was initiated as
19  part of our post-litigation procedures.
20        Q.   (BY MR. CLARK)  Okay.   So it was a
21  reinvestigation, correct?
22              MS. BRASTER:   Same objection.
23              THE WITNESS:   Yes.   That was initiated as
24  part of our post-litigation procedures.
25        Q.   (BY MR. CLARK)  And in the course of the

Anna Simmons
May 3, 2017

1    reinvestigation from Ashcraft 88 to 93, did Experian

2    send an ACDV to either Welk or Capital One?

3                   MS. BRASTER:  Objection to the extent it

4    calls for a legal conclusion.

5                   THE WITNESS:  I'm sorry, for what pages?

6         Q.  (BY MR. CLARK)  This is -- this is that

7    February 8th, 2017, reinvestigation on Ashcraft 88 to

8    90 -- 93.  And the question is:  Do you know if Experian

9    sent an ACDV to either Welk or -- or Capital One before

10   it generated the dispute results?

11        A.  Yes, I know.

12        Q.  Okay.  So Experian -- and so did Experian send

13   a -- an ACDV to either furnisher?

14        A.  No.

15        Q.  Okay.  And looking at the -- looking at the

16   Welk -- actually, if you look at Ashcraft 91 --

17   actually, let me back up.

18                   How do you know that Experian did not send

19   an ACDV to Welk?

20        A.  I know as part of my post-litigation research.

21   ███  █████  ████████████████████████████

     ██  █████████████████████████████████████

     ██  ███████████████████████████

     ██  ███  ██████

     ██  ███  █████████████████████████████

Anna Simmons
May 3, 2017



23      Q.  (BY MR. CLARK)  Okay.  And you've been a --

24  you've been a -- and forgive me.  Let -- let me make

25  sure I get the terminology right.

Anna Simmons
May 3, 2017

1              You -- you're currently a senior legal and
2    compliance specialist?  Or am I getting that definition
3    wrong?
4         A.   That is correct.
5         Q.   Okay.  And how many other senior legal
6    compliance specialists does Experian employ?
7                   MS. BRASTER:  Just objection to foundation.
8                   MR. CLARK:  All right.  Let me back up.
9         Q.   (BY MR. CLARK)  Does Experian employ more than
10   one senior legal compliance specialist?
11        A.   Yes.
12        Q.   How many more do they employ besides yourself?
13        A.   Three.
14        Q.   Okay.  And what are their names?
15        A.   Douglas Holland, Amanda Hoover, Carla Blair.
16        Q.   Is Mary Nessin (phonetic) a senior legal
17   compliance specialist?
18        A.   No.
19                   MS. BRASTER:  Objection to outside scope.
20        Q.   (BY MR. CLARK)  Have you ever heard the name
21   Mary Nessin before?
22        A.   Yes.
23        Q.   And who is Mary Nessin?
24                   MS. BRASTER:  Same objection.
25                   THE WITNESS:  She works for a different

Anna Simmons
May 3, 2017

```
 1   department.  I don't work with her so I do not know her
 2   title.
 3        Q.  (BY MR. CLARK)  Okay.  Do you know if
 4   Ms. Nessin has ever been a senior legal compliance
 5   specialist?
 6        A.  Yes.
 7             MS. BRASTER:  Same -- same objection.
 8        Q.  (BY MR. CLARK)  Sorry, I -- I -- Anna, forgive
 9   me, I missed your answer.
10        A.  I had stated yes.
11        Q.  Okay.  Do you know what her job title is now?
12             MS. BRASTER:  Same objection.
13             THE WITNESS:  No.
14        Q.  (BY MR. CLARK)  Okay.  Do you know was she ever
15   a senior legal compliance specialist during the time in
16   which you were also a senior legal compliance
17   specialist?
18             MS. BRASTER:  Same objection.  Foundation.
19             THE WITNESS:  No.
20        Q.  (BY MR. CLARK)  Okay.  Let's look at Ashcraft
21   91.  And this is part of that February 8, 2017,
22   reinvestigation we've been talking about.
23        A.  Okay.  I'm there.
24        Q.  Okay.  Do you see the payment history is a
25   little different than the payment history in the -- the
```

Anna Simmons
May 3, 2017

```
 1    May 2015 reinvestigation we were talking about earlier
 2    today?
 3         A.   Yes.
 4         Q.   And how is it different?
 5         A.   It states -- okay.  You stated payment history.
 6    It only shows payment history to April of 2011.
 7         Q.   Okay.  And under the account history is -- is
 8    that different than the May 2015 reinvestigation we're
 9    talking about before?
10         A.   Yes.
11         Q.   And -- and what does the account history say
12    on -- in -- on this February 8, 2017, reinvestigation?
13         A.   Debt included in Chapter 7 bankruptcy on
14    April 29, 2011.
15         Q.   Okay.  Under the status do you see that entry
16    that says "creditor received deed" anymore?
17         A.   No.
18         Q.   Does it -- does the status reference the
19    bankruptcy at all?
20         A.   Yes.
21         Q.   And what -- what -- what does it say about
22    that?
23         A.   Discharged through bankruptcy, Chapter 7.
24         Q.   Okay.  It also says, slash, never late, right?
25         A.   Yes.
```

Anna Simmons
May 3, 2017

```
 1        Q.   Okay.  And let me ask you this:  Why -- why did

 2   Experian change the -- the account history to now

 3   indicate debt included in Chapter 7 bankruptcy on April

 4   29th of 2011, on this February 8th, 2017,

 5   reinvestigation?

 6                 MS. BRASTER:  And I'm just going to caution

 7   the witness to the extent it goes into attorney work

 8   product, don't answer.

 9                 THE WITNESS:  This was updated as part of

10   our post-litigation procedures.

11        Q.   (BY MR. CLARK)  And you -- you indicated that

12   you did not reach out to the -- to Welk to obtain that

13   information?

14        A.   Correct.

15        Q.   And did you reach out to anyone else to obtain

16   that information?

17                 MS. BRASTER:  Objection to asked and

18   answered.

19                 THE WITNESS:  I do not believe so.

20        Q.   (BY MR. CLARK)  How did Experian determine that

21   the account was included in the Chapter 7 bankruptcy?

22                 MS. BRASTER:  And I'm just going to object

23   and caution the witness to the extent it calls for

24   privileged communications or work product.

25                 THE WITNESS:  This was updated as part of
```

Anna Simmons
May 3, 2017

1    our post-litigation procedures.

2        Q.  (BY MR. CLARK)  You testified earlier that

3    LexisNexis provides Experian's -- Experian's public

4    record information, correct?

5        A.  Yes.

6        Q.  Did LexisNexis -- on February 8, 2017, did

7    LexisNexis continue to provide public information --

8    public record information to Experian?

9        A.  I -- I could assume so.

10       Q.  Do you have any reason to doubt that that is --

11   that this is no longer the case?

12       A.  No.

13       Q.  When -- when you were reviewing the complaint

14   in -- that Mr. Ashcraft had submitted disputing his Welk

15   information with Experian, did you see whether there

16   were any attachments to the complaint?

17              MS. BRASTER:  Objection to vague and

18   assumes facts.

19              THE WITNESS:  Are you talking about his

20   dispute when you say complaint?

21       Q.  (BY MR. CLARK)  Yeah.  Well, I'm talk --

22   talking about the -- the filing made in the District of

23   Nevada on December 22nd, 2016.

24       A.  Oh, okay.  I believe there were.

25       Q.  Okay.  You -- you -- you recall seeing

Anna Simmons
May 3, 2017

1   attachments to that complaint?
2              MS. BRASTER:  Same objections.
3              THE WITNESS:  Yes.
4      Q.  (BY MR. CLARK)  Okay.  And what were those
5   attachments, if you can recall?
6      A.  If I recall correctly, it was his mail
7   correspondence that he previously sent to Experian.
8      Q.  Give me one second, please.  Okay.  I'll
9   represent to you -- Anna, I'm not trying to play gotcha
10  here at all.  But I'll -- I'll represent to you I'm
11  looking at a copy of the docket in the Ashcraft case.
12  And I'll represent to you that the -- the -- in my
13  review of the docket, I see that the complaint was filed
14  in -- in DCS docket one.  There were three attachments.
15              One was a civil cover sheet.  Another was
16  the summons to Experian.  And a third was the summons to
17  Welk.
18              But I do not see any other attachments with
19  it in the complaint.  So -- and I know that -- I haven't
20  introduced the complaint here so I -- I -- I understand
21  that you looked through a lot of documents.
22              So with -- with those representations
23  though -- and I'm not trying to play gotcha.  I, you
24  know, that is -- that's not the point of this.
25              But based on the representations that I

Anna Simmons
May 3, 2017

```
 1    made, are you sure that you looked at -- along with the
 2    complaint -- attachments to that complaint which were
 3    Mr. Ashcraft's mail correspondence?
 4        A.  I would have to look at the complaint now.  I'm
 5    not an attorney so I don't always know what the titles
 6    are for the different documents filed within the courts.
 7        Q.  Okay.  And -- and -- and I -- I understand
 8    that.  And, like I said, I'm not trying to play gotcha
 9    here.  I just -- I just -- I -- I just wanted to make
10    sure that I understood.
11              But I will represent to you that in my
12    review of the docket I did not see Mr. Ashcraft's mail
13    correspondence, as we had described it, as an attachment
14    to DCS docket one.
15              But I -- I -- I certainly appreciate the
16    idea of looking at a lot of documents and -- and maybe
17    getting mixed up.  So I'm not -- just -- just trying to
18    clear that up right now.  But that's fine.  We can -- we
19    can move on.
20              So let me ask you this:  We were talking
21    about ACDVs earlier today.  Do you have any idea how
22    many ACDVs Experian sends to data furnishers in a year?
23        A.  No.
24              MS. BRASTER:  Objection to scope.
25    Foundation.
```

Anna Simmons
May 3, 2017

1          Q.   (BY MR. CLARK)  Do you think it's over a

2     thousand?

3                    MS. BRASTER:  Same objections.

4                    THE WITNESS:  I would assume so.

5          Q.   (BY MR. CLARK)  Do you know how often Experian

6     uses auto ACDV processing with respond -- in -- in

7     connection with an ACDV response that it receives from a

8     data furnisher?

9                    MS. BRASTER:  Same objections.  And vague.

10                   THE WITNESS:  No.

11         Q.   (BY MR. CLARK)  Do you think it's more than

12    50 percent of the time?

13                   MS. BRASTER:  Same objections.

14                   THE WITNESS:  I do not know.

15         Q.   (BY MR. CLARK)  Do you recall that we had a

16    conversation about the frequency by which Experian uses

17    auto ACDV processing in the Lynn Travers case?

18         A.   No.

19         Q.   Okay.  Would it -- would it help to refresh

20    your recollection if -- if you reviewed that prior

21    testimony?

22                   MS. BRASTER:  Objection to outside the

23    scope.  Improper.  And assumes facts.

24                   THE WITNESS:  Yes, if I reviewed the

25    Travers deposition testimony, I would be able to tell

Anna Simmons
May 3, 2017

```
 1   you exactly what I stated.
 2       Q.  (BY MR. CLARK)  Okay.  And would that also be
 3   true for the Goodman deposition we were talking about
 4   earlier?
 5               MS. BRASTER:  Same objections.
 6               THE WITNESS:  Yes.
 7               MR. CLARK:  Okay.  Okay.
 8               Jen, this a probably a good time to take a
 9   break if you want to take one or I can just keep
10   powering through.
11               MS. BRASTER:  I'm okay.  I'm looking at
12   Anna and the court reporter, if you guys need a break.
13               (Pause in proceedings)
14               (Break taken)
15       Q.  (BY MR. CLARK)  Anna, I know we've previously
16   discussed some of Experian's terminology.  And I'm
17   afraid I'm going to have to go through a little bit of
18   that -- a little bit of that again here.  So I just want
19   to -- let me -- let me -- because you testified today
20   that certain documents were disclosures.  So I just want
21   to see if I understand that.
22               Is -- does Experian have a common word it
23   uses to represent a document sent to consumers?
24               MS. BRASTER:  Objection to vague.
25               THE WITNESS:  Yes.  It could be a CDI.
```

Anna Simmons
May 3, 2017

1    Another document is a CDF.

2         Q.  (BY MR. CLARK)  Are those -- are those

3    disclosures as you understand them?

4              MS. BRASTER:  Same objections.  And legal

5    conclusion.

6              THE WITNESS:  Yes.

7         Q.  (BY MR. CLARK)  Okay.  So what is CID?

8         A.  Consumer Disclosure Initial.

9         Q.  And what -- what -- what -- what is -- what is

10   a -- what does a CDI represent?

11             MS. BRASTER:  I'm sorry.  Can you repeat

12   that again?

13        Q.  (BY MR. CLARK)  What does a Consumer Disclosure

14   Initial or CDI represent?

15        A.  It can contain credit information that Experian

16   is reporting regarding a specific consumer.  It could

17   contain identification information, address information,

18   inquiries.

19        Q.  Does it contain all the information in the

20   consumer's file that Experian has on that consumer?

21             MS. BRASTER:  Objection to the extent it

22   calls for speculation.

23             THE WITNESS:  I do not believe so.

24        Q.  (BY MR. CLARK)  What information is not -- is

25   not included?

Anna Simmons
May 3, 2017

1              MS. BRASTER:  Same objection.

2              THE WITNESS:  I don't know everything

3    that's not included.  But the main thing would be items

4    that are over seven years old and they're no longer

5    appearing on the CDI.

6         Q.  (BY MR. CLARK)  Okay.  But they are contained

7    in Experian's records, right, somewhere else?

8              MS. BRASTER:  Same objections.  Assumes

9    facts.

10             THE WITNESS:  I do not know if all the

11   information is always contained in Experian's records.

12        Q.  (BY MR. CLARK)  Okay.  Would a CDI -- would

13   Experian continue to maintain a record of any

14   information that it would suppress on a payment history

15   grid as a result of an account being included in Chapter

16   7 bankruptcy or Chapter 13 bankruptcy on a specific

17   date?

18             MS. BRASTER:  Objection; speculation.

19   Foundation.

20             THE WITNESS:  I don't remember how the

21   question began.

22        Q.  (BY MR. CLARK)  Okay.  Well, let's look at

23   Ashcraft 90.  And this was that Welk trade line we were

24   talking about.  Or sorry, Welk 91, which is that Welk

25   trade line that we were talking about.

Anna Simmons
May 3, 2017

1       A.   Okay.

2       Q.   And so would you agree with me that there is --

3   there's less payment history on -- being reported on

4   Experian's -- on -- on the Welk trade line on

5   February 8, 2017, then there was on the March 2016 CDI

6   that Experian sent to Mr. Ashcraft?

7       A.   Yes.

8       Q.   Okay.  And I think we talked about the fact

9   that the payment history after the -- Mr. Ashcraft's

10  Chapter 7 petition date had been suppressed on the

11  February 8th, 2017, Welk trade line?

12      A.   Yes.

13      Q.   Would Experian continue to maintain a record of

14  that suppressed post-petition information after it

15  was -- after -- in its file after the information was

16  suppressed?

17      A.   I'm not sure.  I know Experian can, but I'm not

18  sure if we are maintaining a record for this person.

19      Q.   Okay.  And so if -- if -- if Experian doesn't

20  maintain the information based on its suppression, then

21  the information is deleted from Experian's files and

22  Experian doesn't have any other record of it?

23           MS. BRASTER:  Objection to the extent it

24  calls for speculation.  Assumes facts.

25           THE WITNESS:  I don't know.

Anna Simmons
May 3, 2017

```
 1        Q.  (BY MR. CLARK)  What's a -- what is a Consumer
 2   Disclosure Final or CDF?
 3        A.  It is the results of a reinvestigation.
 4        Q.  Okay.  And we've discussed -- we discussed two
 5   CDFs today, right?  One in -- one in May of 2016 and one
 6   in February of 2017; have we not?
 7        A.  Yes.
 8        Q.  And is -- does ACDV always contain all the
 9   information that a CDI contains or can that -- can it
10   contain less information?
11                  MS. BRASTER:  Objection to vague.  And to
12   the extent it calls for speculation.
13                  THE WITNESS:  It can contain less.
14        Q.  (BY MR. CLARK)  Okay.  And under what
15   circumstances -- would Experian -- sorry.  Let me ask
16   the question this way.
17                  Does Experian have a different name other
18   than ACDV for -- for a -- for a -- for the results of
19   the investigation that contain less information than a
20   CDI?
21                  MS. BRASTER:  Objection to vague.
22                  THE WITNESS:  I believe it's still called
23   CDF.
24        Q.  (BY MR. CLARK)  Okay.  Does the name "consumer
25   disclosure abbreviated" mean anything to you?
```

Anna Simmons
May 3, 2017

1      A.  I've never heard that.  It's still a consumer
2  disclosure final or CDF and then it would be
3  abbreviated.
4      Q.  Okay.  So let me ask it this way.
5              Is -- have you heard of the term CDF full?
6      A.  Yes.
7      Q.  Okay.  And what does that mean?
8      A.  It is a full CDF and it is not abbreviated.
9      Q.  Okay.  Does a -- does a CDF full contain all
10  the information that would be contained on a CDI?
11              MS. BRASTER:  Objection to vague.
12              THE WITNESS:  I'm not sure.
13      Q.  (BY MR. CLARK)  Okay.  Does a CD -- how -- so
14  what is a CDF abbreviated?
15      A.  It is an abbreviated version of CDF and it is
16  not a full version.
17      Q.  Okay.  Are you familiar with the term "consumer
18  file disclosure"?
19              MS. BRASTER:  I'm sorry, what was that,
20  Miles?
21              MR. CLARK:  Consumer file disclosure.
22              MS. BRASTER:  Objection to vague.  And to
23  the extent it calls for a legal conclusion.
24              THE WITNESS:  Those words get interchanged
25  a lot, but I'm familiar with the word "disclosure."

Anna Simmons
May 3, 2017

1    But I understand what consumer file means.

2        Q.   (BY MR. CLARK)  Okay.  So you've never heard

3    the phrase -- have you ever heard the phrase "consumer

4    file disclosure" before?

5                    MS. BRASTER:  Same objections.

6                    THE WITNESS:  I might have, but I'm not

7    sure if I've heard it in that terminology.  But I could

8    have.

9        Q.   (BY MR. CLARK)  Okay.  So sitting here today as

10   Experian 30(b)(6) witness, you don't know what the term

11   "consumer file disclosure" means?

12                   MS. BRASTER:  Same objections and asked and

13   answered.

14                   THE WITNESS:  A consumer file disclosure

15   could -- no, I'm not exactly sure because it could be --

16   people use it different ways and I know we've been

17   tripped up on the terminology before.  So I know

18   disclosure is something that's provided to the consumer

19   as a consumer disclosure initial.  And a consumer file

20   disclosure some people would think that it could be

21   provided for a third party, but I'm not sure what the

22   terminology is.

23       Q.   (BY MR. CLARK)  Okay.  That's fine.  And I -- I

24   don't want you to guess.  So that's fair.

25                   Have you ever heard the term "consumer file

Anna Simmons
May 3, 2017

```
 1   disclosure" used in your work at Experian?
 2        A.  I don't think that we use that, no.  Most of my
 3   peers, I've never heard of that -- I -- I don't know if
 4   I have.  I can't remember.  So I'll -- I'll keep saying
 5   that.
 6        Q.  Okay.  That's fine.  That's fine.  Is it fair
 7   to say that it's not a term you commonly use in your
 8   work at Experian?
 9        A.  Yes.
10        Q.  Okay.  What about the term -- are you familiar
11   with the term "credit report"?
12        A.  Yes.
13        Q.  And what does credit report mean?
14             MS. BRASTER:  Objection to the extent it
15   calls for a legal conclusion.
16             THE WITNESS:  It generally means a report
17   that is provided to a third party regarding a consumer.
18        Q.  (BY MR. CLARK)  Okay.  And are you familiar
19   with the term "credit file disclosure"?
20             MS. BRASTER:  Objection, vague.  And to the
21   extent it calls for a legal conclusion.
22             THE WITNESS:  My answer would be the same.
23   I -- I might have heard it before, but I don't think so.
24        Q.  (BY MR. CLARK)  Okay.  And when you say your
25   answer would be the same, are you saying your answer
```

Anna Simmons
May 3, 2017

```
 1    would be the same for credit file disclosure as it was
 2    for consumer file disclosure?
 3         A.  Oh, yes.  I'm sorry, I didn't even realize the
 4    two different words.
 5         Q.  Oh, oh.  Oh, golly.  So let me -- let me just
 6    make sure that we're on the same page.  And I apologize.
 7    I'll just back up just to make sure.  So I apologize for
 8    asking the question again.
 9              Are you familiar with term "credit file
10    disclosure"?
11              MS. BRASTER:  Same objections.
12              THE WITNESS:  I think I've heard that term
13    and it's been used in many different ways by many
14    different people.  Usually it would be a report provided
15    to a third party regarding a consumer.
16         Q.  (BY MR. CLARK)  Okay.  And when you say it's
17    been used in many different ways, what do you mean by
18    that?
19         A.  That's all I mean.
20         Q.  Okay.  Do you mean used by -- in many different
21    ways by people at Experian?
22              MS. BRASTER:  Objection to asked and
23    answered.
24              THE WITNESS:  It could be people at
25    Experian, people outside Experian.  And they have --
```

Anna Simmons
May 3, 2017

```
 1   people might think it means something provided to a
 2   consumer.  And some might think it means something
 3   provided to a creditor.  So it gets very confusing.
 4        Q.  (BY MR. CLARK)  Okay.  Have you ever used the
 5   term "credit file disclosure" before?
 6        A.  I might have.  I'm not quite sure.
 7        Q.  Okay.  Is it a term you commonly encounter in
 8   your work at Experian?
 9        A.  No.
10        Q.  Okay.  And are you familiar with the term
11   "personal credit report"?
12             MS. BRASTER:  Objection to the extent it
13   calls for a legal conclusion.
14             THE WITNESS:  Yes.
15        Q.  (BY MR. CLARK)  And what is a personal credit
16   report?
17             MS. BRASTER:  Same objection.
18             THE WITNESS:  It's usually used
19   interchangeably like a disclosure.
20        Q.  (BY MR. CLARK)  It's used interchangeably
21   with -- with the disclosure you said?
22        A.  Yes.
23        Q.  Okay.  And by disclosure -- just -- just --
24   just so I'm clear -- what do you mean by disclosure?
25        A.  CDI.
```

Anna Simmons
May 3, 2017

1      Q.  Okay.  But not a CDF or a -- but not a CDF?

2      A.  It means CDI.

3      Q.  Okay.  So it means CDI.

4              Are you familiar with the personal --

5      sorry.  That -- strike that.

6              Are you familiar with the term "consumer

7      report"?

8      A.  I've heard that before and that usually means a

9      report provided to a third party regarding a consumer.

10     Q.  Okay.  Does -- is a CDF a consumer report?

11             MS. BRASTER:  Object to the extent it calls

12     for a legal conclusion.

13             THE WITNESS:  No, I don't think so.  A CDF

14     does not go to third parties usually.

15     Q.  (BY MR. CLARK)  Okay.  Are you familiar with

16     the term "credit profile report"?

17     A.  Yes.

18     Q.  And what is a credit profile report?

19             MS. BRASTER:  Objection to the extent it

20     calls for a legal conclusion.

21             THE WITNESS:  It's a report that would go

22     to a third party regarding a specific consumer.

23     Q.  (BY MR. CLARK)  Other than the terms that we

24     just discussed, are there any others that you're aware

25     that Experian uses to describe the -- a document sent to

Anna Simmons
May 3, 2017

1    a consumer which includes all the information in that
2    consumer's credit file?
3              MS. BRASTER:  Objection to vague.  Assumes
4    facts.  And foundation.
5              THE WITNESS:  I cannot think of any right
6    now.
7        Q.  (BY MR. CLARK)  Okay.  And other than the terms
8    we have discussed, are there any others Experian uses to
9    describe the documents that consumers -- which
10   constitute the results of its reinvestigation into a
11   consumer dispute?
12             MS. BRASTER:  Objection to vague.  Assumes
13   facts.
14             THE WITNESS:  I cannot think of any right
15   now.
16       Q.  (BY MR. CLARK)  And other than the terms that
17   we've discussed, are there any others that Experian uses
18   to describe a document sent to third parties regarding
19   information that may be contained in the consumer's
20   credit file?
21             MS. BRASTER:  Same objections.
22             THE WITNESS:  I cannot think of any right
23   now.
24       Q.  (BY MR. CLARK)  Okay.  Thank you.
25             MR. CLARK:  All right.  I think --

Anna Simmons
May 3, 2017

1              Madam Court Reporter, do you -- could you
2    tell me how much time remains in the deposition?
3              THE REPORTER:  One hour.
4              MR. CLARK:  Okay.  So we've been going
5    about six hours, correct?
6              THE REPORTER:  We've been going six hours
7    and three minutes.
8              MR. CLARK:  Okay.  Great.  Great.  I think
9    I have -- okay.  Let me -- let me just follow up on that
10   terminology for a second here, Anna.
11        Q.  (BY MR. CLARK)  The March 15, 2016, document we
12   were discussing which appears on Ashcraft 5 through --
13   through 35.  What kind of document is that?
14        A.  A -- a CDI.
15        Q.  Okay.  And it's not any other kind of document?
16             MS. BRASTER:  Objection to vague.
17             THE WITNESS:  That's -- that's what I call
18   it is a CDI or a disclosure.
19        Q.  (BY MR. CLARK)  Okay.  And -- and the reason I
20   ask is that you mentioned that they were disclosures
21   before so I'm just trying to figure out what kind of
22   disclosures they are.
23        A.  Okay.
24        Q.  Just -- just so I'm clear.
25             And how about the May 16th, 2016,

Anna Simmons
May 3, 2017

1    reinvestigation we talked about from Ashcraft 68 to 71,

2    what would you call that document?

3         A.   A CDF.

4         Q.   Would you call it anything else?

5         A.   I don't think so.

6         Q.   Okay.  How about the January 25, 2017, personal

7    credit report we were talking about from Ashcraft 72

8    through -- through 87, what would you call that?

9         A.   A CDI.

10        Q.   Would you call it anything else?

11        A.   A disclosure.

12        Q.   Okay.  And finally, the February 8th, 2017,

13   reinvestigation that we were talking about from Ashcraft

14   89 -- I'm sorry.  88 through 93, what would you call

15   that?

16        A.   A CDF.

17        Q.   Would you call it anything else?

18        A.   I don't think so.

19        Q.   Okay.  All right.  I think we're almost done.

20   I've just got a -- a few more -- a few more questions

21   for you.

22   ████████████████████████████████  ████████████████

███  ██████████████████████████████████████████████████

███  ██████████████████████████████████████████████

███        ███  ████████

240

Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017

1    ████████████    ████████████████

2    ██████████████    ████████████████

3    ████████████    ████████

4         Q.   (BY MR. CLARK)  All right.  So let's see --

5    let's go back to Exhibit 2 briefly.  And we are -- we

6    are almost finished.  And I want to direct your

7    attention to Ashcraft 82 through 84.

8         A.   (Witness complies.)  Okay.

9         Q.   So I want to direct your attention to the top

10   of -- the top left portion of Ashcraft 82 where it says

11   "record of requests of your credit history."  Do you see

12   that?

13        A.   Yes.

14        Q.   And below that do you see a line that says

15   "inquiries shared with others"?

16        A.   Yes.

17        Q.   Okay.  And below that do you see three entries

18   down on -- there's -- there's a listing for Discover

19   Financial Serv -- and I'm not sure what the end of it

20   says, but do you see where I'm looking at?

21        A.   Yes.

22        Q.   And there's a date of that inquiry for

23   February 13, 2016?

24        A.   Yes.

25        Q.   And is -- is -- and -- and below the reason --

Anna Simmons
May 3, 2017



1   below the date does it -- does it -- on that Discover

2   credit pull is -- is there anything listed?

3       A.   Unspecified.

4

246

Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



19

20       Q.  (BY MR. CLARK)  All right.  Looking at the

21  January 25th CDI and I want to direct your attention

22  to -- bear with me.  I'm going to direct your attention

23  to Ashcraft 83.  And on -- on the first -- on -- on the

24  left side column about halfway down do you see an entry

25  for Capital One?

Anna Simmons
May 3, 2017

1        A.   Yes.

2        Q.   And what's the date of that -- is there a date

3   by which -- on which Capital One inquired as to

4   Mr. Ashcraft's consumer information?

5        A.   Yes.

6        Q.   And what is the date?

7        A.   October 17, 2016.

8        Q.   Do you see any other dates of inquiries in

9   to -- for Mr. Ashcraft's consumer report other -- by

10  Capital One other than October 17, 2016?

11              MS. BRASTER:   Objection to foundation.

12              THE WITNESS:   No.

13



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017



Anna Simmons
May 3, 2017

████  ▂▂▂  ████████  ██████████████

████  ████████████████████████

████  ▂▂▂  ████████████

4        Q.   Okay.

5             MR. CLARK:   Jen, if I can just have --

6    agree to go off for like -- for just a minute or two.

7             MS. BRASTER:   Sure.

8             MR. CLARK:   I may have a few clean-up

9    questions, but that's -- that's -- that's the end of

10   my -- that's the end of my direct right now.

11             Not -- not the official end of my direct,

12   but I just want to go off and make sure I didn't miss

13   anything.

14             MS. BRASTER:   That's -- that's fine.  We'll

15   just stay on the line if that works for you, unless you

16   need more time.

17             (Pause in proceedings)

18             MS. BRASTER:   Anna, I want to thank you

19   again for -- for sitting down and discussing some of the

20   issues involved in this case with me today.  As always.

21   I appreciate your time.  Glad we were able to get out of

22   here at least with my direct a little bit sooner than we

23   have before.

24             But at this point I have -- I have nothing

25   further.  And I would pass the witness.

Anna Simmons
May 3, 2017

1              MS. BRASTER:  Thank you, Miles.  I don't

2  have any questions.  And this time I'll remember to put

3  it -- say it now that we want to review and sign,

4  please.

5              MR. CLARK:  Okay.

6              (Proceedings concluded at 5:18 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Anna Simmons
May 3, 2017

1                    CHANGES AND SIGNATURE

2   WITNESS:  ANNA SIMMONS        DATE:  MAY 3, 2017

3   PAGE      LINE    CHANGE           REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

Anna Simmons
May 3, 2017

1    I, ANNA SIMMONS, have read the foregoing deposition

2  and hereby affix my signature that same is true and

3  correct, except as noted above.

4

5

6                      _____

                        ANNA SIMMONS

7

8

9  THE STATE OF _____)

10 COUNTY OF _____)

11

12    Before me, _____, on this day

13 personally appeared ANNA SIMMONS, known to me (or proved

14 to me under oath or through_____) (description

15 of identity card or other document) to be the person

16 whose name is subscribed to the foregoing instrument and

17 acknowledged to me that they executed the same for the

18 purposes and consideration therein expressed.

19    Given under my hand and seal of office this _____

20 day of _____, 2017.

21

22

23                      _____

                        NOTARY PUBLIC IN AND FOR

24                      THE STATE OF TEXAS

25

258

Anna Simmons
May 3, 2017

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
 2
        JOHN E. ASHCRAFT      ) Case No. 2:16-cv-02978-JAD-NJK
 3                            )
                              )
 4      VS.                   )
                              )
 5      WELK RESORT GROUP,    )
        CORP., and EXPERIAN   )
 6      INFORMATION SOLUTIONS,)
        INC.                  )
 7

 8

 9                  REPORTER'S CERTIFICATION

10                DEPOSITION OF ANNA SIMMONS

11                      MAY 3, 2017

12

13        I, Sherry Folchert, Certified Shorthand Reporter in

14      and for the State of Texas, hereby certify to the

15      following:

16        That the witness, ANNA SIMMONS, was duly sworn by the

17      officer and that the transcript of the oral deposition

18      is a true record of the testimony given by the witness;

19        That the deposition transcript was submitted on the

20      _____ day of May, 2017, to the witness or to the

21      attorney for the witness for examination, signature and

22      return to me by _____ day of June, 2017;

23        That the amount of time used by each party at the

24      deposition is as follows:

25        Miles N. Clark - 6 hours, 29 minutes
```

Anna Simmons
May 3, 2017

1        Jennifer L. Braster - 0 minutes

2        That pursuant to information given to the

3   deposition officer at the time said testimony was taken,

4   the following includes counsel for all parties of

5   record:

6        Miles N. Clark, Attorney for Plaintiff;

7        Jennifer L. Braster, Attorney for Defendant;

8        I further certify that I am neither counsel for,

9   related to, nor employed by any of the parties or

10  attorneys in the action in which this proceeding was

11  taken, and further that I am not financially or

12  otherwise interested in the outcome of the action.

13            Certified to by me this 16th day of May, 2017.

14

15            _____

16            SHERRY FOLCHERT, CSR NO. 6259
              Expiration Date:  12/31/17
17            Compass Reporting Group
              P.O. Box 79487
18            Houston, Texas  77279
              504-207-5736

19

20

21

22

23

24

25

Anna Simmons
May 3, 2017

```
1              UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
2

   JOHN E. ASHCRAFT        ) Case No. 2:16-cv-02978-JAD-NJK
3                          )
                           )
4  VS.                     )
                           )
5  WELK RESORT GROUP,      )
   CORP., and EXPERIAN     )
6  INFORMATION SOLUTIONS,  )
   INC.                    )
7

8

9              REPORTER'S CERTIFICATION

10           DEPOSITION OF ANNA SIMMONS

11                  MAY 3, 2017

12

13      I, Sherry Folchert, Certified Shorthand Reporter in

14  and for the State of Texas, hereby certify to the

15  following:

16      That the witness, ANNA SIMMONS, was duly sworn by the

17  officer and that the transcript of the oral deposition

18  is a true record of the testimony given by the witness;

19      That the deposition transcript was submitted on the

20  _21_ day of May, 2017, to the witness or to the

21  attorney for the witness for examination, signature and

22  return to me by _16_ day of June, 2017;

23      That the amount of time used by each party at the

24  deposition is as follows:

25      Miles N. Clark - 6 hours, 29 minutes
```

Compass Reporting Group
(844) 817-1080

Anna Simmons
May 3, 2017

1        Jennifer L. Braster - 0 minutes
2        That pursuant to information given to the
3   deposition officer at the time said testimony was taken,
4   the following includes counsel for all parties of
5   record:
6        Miles N. Clark, Attorney for Plaintiff;
7        Jennifer L. Braster, Attorney for Defendant;
8        I further certify that I am neither counsel for,
9   related to, nor employed by any of the parties or
10  attorneys in the action in which this proceeding was
11  taken, and further that I am not financially or
12  otherwise interested in the outcome of the action.
13        Certified to by me this 16th day of May, 2017.
14
15        _Sherry Folchert_____
16        SHERRY FOLCHERT, CSR NO. 6259
          Expiration Date:  12/31/17
17        Compass Reporting Group
          P.O. Box 79487
18        Houston, Texas   77279
          504-207-5736
19
20
21
22
23
24
25